UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. *19cr10078* |
| v. | Violations: |
| WILLIAM RICK SINGER, | Count One: Racketeering Conspiracy (18 U.S.C. § 1962(d)) |
| Defendant. | Count Two: Money Laundering Conspiracy (18 U.S.C. § 1956(h)) |
| | Count Three: Conspiracy to Defraud the United States (18 U.S.C. § 371) |
| | Count Four: Obstruction of Justice (18 U.S.C. § 1512(c)(2)) |
| | RICO Forfeiture Allegations: (18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 1963(a) |
| | Money Laundering Forfeiture Allegations (18 U.S.C. § 982(a)(1)) |

INFORMATION

At all times relevant to this Information:

General Allegations

1.     The defendant, WILLIAM RICK SINGER, was a resident, variously, of Sacramento and Newport Beach, California. SINGER owned the Edge College & Career Network, LLC and served as Chief Executive Officer of the Key Worldwide Foundation.

The Enterprise

2.     The Edge College & Career Network, LLC, also known as "The Key," was a for-profit college counseling and preparation business that SINGER founded in or about 2007 and incorporated in the State of California in or about 2012.

3.      The Key Worldwide Foundation ("KWF") was a non-profit corporation in Newport Beach, California that SINGER established as a purported charity in or about 2012. In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal Revenue Code, meaning that KWF was exempt from paying federal income tax. KWF maintained several bank accounts (collectively, the "KWF charitable accounts").

4.      Together, The Key and KWF constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4) (the "Key Enterprise"), that is, an association in fact of entities engaged in, and the activities of which affected, interstate and foreign commerce ("the enterprise"). The Key Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

<u>Other Relevant Entities</u>

5.      ACT, Inc. is a non-profit organization headquartered in Iowa City, Iowa that administers the ACT exam, a standardized test that is widely used as part of the college admissions process in the United States.

6.      The College Board is a non-profit organization headquartered in New York, New York. Together with Educational Testing Service ("ETS"), a nonprofit organization headquartered in Lawrence Township, New Jersey, the College Board develops and administers the SAT, a standardized test that, like the ACT exam, is widely used as part of the college admissions process in the United States. The College Board and ETS also develop and administer SAT subject tests, which are also used as part of the college admissions process.

2

7.      Georgetown University ("Georgetown") is a highly selective private university located in Washington, D.C.

8.      Stanford University ("Stanford") is a highly selective private university located in Palo Alto, California.

9.      The University of California at Los Angeles ("UCLA") is a highly selective public university located in Los Angeles, California.

10.     The University of San Diego ("USD") is a selective private university located in San Diego, California.

11.     The University of Southern California ("USC") is a highly selective private university located in Los Angeles, California.

12.     The University of Texas at Austin ("U-Texas") is a highly selective public university located in Austin, Texas.

13.     Wake Forest University ("Wake Forest") is a highly selective private university located in Winston-Salem, North Carolina.

14.     Yale University ("Yale") is a highly selective private university located in New Haven, Connecticut.

15.     The athletic teams of Georgetown, Stanford, UCLA, USD, USC, U-Texas, Wake Forest and Yale (collectively, "the Universities") compete in most sports at the Division I level, the highest level of intercollegiate athletics sanctioned by the National Collegiate Athletic Association ("NCAA").

16.     Each of the Universities annually receives more than $10,000 in federal grants.

3

Background on Standardized Testing and the College Admissions Process

17.     Most selective colleges in the United States require students to take a standardized test, such as the ACT or the SAT, as part of the admissions process.

18.     The ACT includes sections on English, mathematics, reading and science.

19.     The SAT includes sections on writing, critical reading and mathematics.

20.     The ACT and the SAT are typically administered to large groups of students on specified dates and under strict time limits. In some instances, however, students with certain learning or other disabilities may qualify for extended time and, in such circumstances, may take the test alone, under the supervision of a test administrator retained by ACT, Inc. or the College Board.

21.     Prior to administering the ACT, test administrators must typically certify that they will administer the exam in accordance with the ACT Administration Manual, and will ensure that the "test materials are kept secure and confidential, used for this examinee only, and returned to ACT immediately after testing."

22.     Similarly, prior to administering the SAT exam, test administrators must typically certify that they will administer the test in accordance with the SAT coordinator's manual, that the SAT test is the property of the College Board, and that no one other than the student can "open the test book and see the test content."

23.     The ACT tests are sent to and from the testing sites via Federal Express, a private, interstate commercial carrier.

24.     The SAT tests are sent to and from the testing sites via United Parcel Service ("UPS"), a private, interstate commercial carrier.

4

25.     Most of the Universities require prospective students to submit standardized test scores as part of their application packages. When submitted, standardized test scores are a material part of the admissions process at each of the Universities. All of the Universities recruit student athletes, and may apply different criteria when evaluating applications from students with demonstrated athletic abilities. Recruited student athletes at USC, for example, are typically considered by a designated admissions sub-committee, which gives significant consideration to their athletic abilities and which frequently admits applicants whose grades and standardized test scores are below those of other USC students, including non-recruited athletes. The admissions offices at the Universities typically allot a set number of slots to each head coach of a varsity sport for that coach's recruited athletes. At each of the Universities, the admissions prospects of recruited athletes are higher—and in some cases significantly higher—than those of non-recruited athletes with similar grades and standardized test scores.

<u>The Racketeering Conspiracy</u>

<u>Purposes of the Racketeering Conspiracy</u>

26.     The principal purposes of the racketeering conspiracy included the following:

a.      to facilitate cheating on college entrance exams;

b.      to facilitate the admission of students to elite universities as recruited athletes, regardless of their athletic abilities; and,

c.      to enrich SINGER and his co-conspirators personally.

Manner and Means of the Racketeering Conspiracy

27.     Among the manner and means by which SINGER and others known and unknown to the United States Attorney carried out the racketeering conspiracy were the following:

a.     facilitating cheating on the SAT and ACT exams in exchange for bribes by arranging for or allowing a third party to secretly take the exams in place of the actual students, or to replace the students' exam responses with his own;

b.     designating applicants as purported recruits for competitive college athletic teams, without regard for the applicants' athletic abilities, in exchange for bribes; and

c.     concealing the nature and source of the bribe payments by funneling payments through the KWF charitable accounts.

Acts in Furtherance of the Racketeering Conspiracy

28.     On various dates between 2011 and September 2018, SINGER and others known and unknown to the United States Attorney committed and caused to be committed the following acts, among others, in furtherance of the racketeering conspiracy:

A.     Cheating on Standardized Tests

29.     SINGER agreed with clients whose children were scheduled to take the SAT or ACT exams as part of the college admissions process to have another individual either take the tests in their children's place or correct the children's answers after they had completed the tests.

30.     Parents generally paid SINGER between $15,000 and $75,000 per test, typically structuring the payments as purported donations to KWF that they wired or deposited into one of the KWF charitable accounts.

31.     To facilitate the cheating, SINGER counseled parents to seek extended time on the exams, including by having their children purport to have learning disabilities in order to obtain

medical documentation that ACT, Inc. and the College Board typically required before granting students extended time.

32.     SINGER used the purported charitable donations from parents, at least in part, to bribe two SAT and ACT test administrators:   Test Administrator 1, who administered the exams at a private school in Los Angeles, California, and Test Administrator 2, who administered the exams at a public high school in Houston, Texas.

33.     SINGER typically caused Test Administrator 1 to be paid $10,000 from one of the KWF charitable accounts for each student who took the exam at his school. SINGER initially paid Test Administrator 2 through a third party, but in July 2018 SINGER sent Test Administrator 2 a $5,000 check for administering the test to a student.

34.     In exchange for the bribe payments, Test Administrators 1 and 2 allowed another individual, Test Taker 1, to secretly take the ACT and SAT tests in place of the children of SINGER's clients, or to replace the children's exam responses with his own, in violation of the duty of honest services they owed to ACT, Inc. and the College Board.

35.     SINGER typically caused Test Taker 1 to be paid $10,000 per test, usually from one of the KWF charitable accounts.

36.     Test Administrators 1 and 2 then caused the falsified exams to be returned to ACT, Inc. and the College Board via Federal Express and UPS, respectively, so that they could be scored.

B.     The Student-Athlete Recruitment Scam

37.     SINGER also was paid approximately $25 million by clients to bribe coaches and university administrators to designate the clients' children as recruited athletes, in violation of the duty of honest services the coaches and administrators owed to their employers, thereby facilitating

the children's admission to the Universities.

       i.    <u>Yale</u>

38.     As one example of the recruitment scam, SINGER agreed in or about November 2017 to facilitate the admission of an applicant to Yale ("Yale Applicant 1"), in exchange for a payment of $1.2 million.

39.     SINGER subsequently sent the head coach of the Yale women's soccer team an athletic "profile," created at SINGER's direction, which falsely described Yale Applicant 1 as the co-captain of a prominent club soccer team in southern California.

40.     The soccer coach thereafter designated Yale Applicant 1 as a recruit for the Yale women's soccer team despite the fact that, as the coach knew at the time, Yale Applicant 1 did not play competitive soccer.

41.     On or about January 1, 2018, after Yale Applicant 1 was admitted to Yale, SINGER mailed the soccer coach a check for $400,000, drawn on one of the KWF charitable accounts.

42.     In or about the spring and summer of 2018, the client paid SINGER approximately $1.2 million in multiple installments, including approximately $900,000 that was paid into one of the KWF charitable accounts.

43.     SINGER similarly bribed coaches and administrators at each of the Universities to designate students as recruited athletes.

       ii.    <u>USC</u>

44.     For example, SINGER directed payments totaling approximately $350,000 to a private soccer club controlled by two USC soccer coaches.

45.     In exchange for these payments, the coaches designated four children of SINGER's clients as recruits for the soccer team, thereby facilitating their admission to USC, despite the fact that none of the children played competitive soccer.

46.     Likewise, SINGER made payments to a bank account at USC that funded the water polo team.

47.     In exchange for the bribes, the water polo coach designated two students as recruits for the water polo team, thereby facilitating the students' admission to USC.

48.     SINGER also made private school tuition payments for the children of the water polo coach—under the guise of a fabricated scholarship—via checks drawn on one of the KWF charitable accounts and sent to the school via U.S. Mail, in exchange for the water polo coach's commitment to designate one of SINGER's clients as a recruit for the USC water polo team in the future.

49.     In addition, on multiple occasions, SINGER's clients made payments of between $50,000 and $100,000 to a university account controlled by a senior official of USC's athletic department (the "USC Administrator"), typically an account for the USC Women's Athletic Board.

50.     SINGER also entered into a sham consulting agreement with the USC Administrator, pursuant to which, beginning in July 2018, he directed payments of $20,000 per month to the USC Administrator personally via checks drawn on one of the KWF charitable accounts and sent to the USC Administrator via U.S. Mail.

51.     In exchange for the bribes, the USC Administrator helped facilitate the admission of several dozen students to USC as recruited athletes, even though many of those students had

fabricated athletic credentials and some did not even play the sports they were purportedly being recruited to play.

       iii.   <u>Georgetown</u>

52.     Between 2012 and 2018, SINGER paid a Georgetown tennis coach bribes, falsely labeled as "consulting" fees, totaling more than $2.7 million. SINGER typically made the payments from one of the KWF charitable accounts and sent them to the coach via U.S. Mail, including in several instances to the coach's residence in Falmouth, Massachusetts.

53.     In exchange for the bribes, the Georgetown coach designated approximately 12 applicants as recruits for the Georgetown tennis team, including some who did not play tennis competitively, thereby facilitating their admission to the university.

       iv.   <u>UCLA</u>

54.     As another example, in or about 2016, SINGER directed $100,000 from one of the KWF charitable accounts to a sports marketing company controlled by the UCLA men's soccer coach.

55.     In exchange for that bribe, the coach arranged for the daughter of one of SINGER's clients to be designated as a recruit for the UCLA women's soccer team, thereby facilitating her admission to UCLA.

       v.   <u>Wake Forest</u>

56.     As yet another example, in or about 2017, SINGER directed $100,000 from one of the KWF charitable accounts to accounts controlled by the women's volleyball coach at Wake Forest, including $10,000 to the Wake Forest Deacon Club, $40,000 to Wake Forest Women's Volleyball, and $50,000 to a private volleyball camp the Wake Forest coach controlled.

57.     In exchange for this money, the Wake Forest coach agreed to designate the daughter of one of SINGER's clients—who had previously applied to Wake Forest and been placed on the wait list—as a recruit for the women's volleyball team, thereby facilitating her admission to the university.

        vi.    <u>Stanford</u>

58.     In or about the fall of 2017, the Stanford sailing coach agreed to designate the child of one of SINGER's clients ("Stanford Applicant 1") as a recruit for the Stanford sailing team, in exchange for a payment to Stanford sailing.

59.     In support of the student's application, SINGER, together with others, created a student-athlete "profile" that was submitted to Stanford, and that falsely suggested that Stanford Applicant 1 was a competitive sailor.

60.     In May 2018, after Stanford Applicant 1 deferred his application to Stanford for one year, SINGER directed a payment of $110,000 from one of the KWF charitable accounts to the Stanford sailing program in exchange for the sailing coach's agreement to designate Stanford Applicant 1 as a sailing recruit in the following year's recruitment cycle.

61.     In or about the summer of 2018, after Stanford Applicant 1 decided to attend a different university, the Stanford sailing coach agreed with SINGER to use that same recruiting spot for the child of another one of SINGER's clients, in exchange for a $500,000 payment to the Stanford sailing program.

62.     In support of the student's application, SINGER, together with others, created documents falsely indicating that the student was a competitive sailor, although the student in fact had minimal sailing experience.

63.     Although that student ultimately did not apply to Stanford, SINGER directed a payment of $160,000 from one of the KWF charitable accounts to the Stanford sailing program.

64.     The Stanford sailing coach agreed with SINGER that the payment would serve as a "deposit" for a future student's purported recruitment.

### vii.     U-Texas

65.      In or about 2015, SINGER paid a tennis coach at U-Texas approximately $100,000.

66.     In exchange for this bribe, the U-Texas coach designated the son of one of SINGER's clients, who did not play tennis competitively, as a recruit for the university's tennis team, thereby facilitating his admission to U-Texas.

### viii.    USD

67.     In or about 2016, in exchange for a bribe paid to a third-party, a varsity coach at USD designated the son of one of SINGER's clients, who did not play that sport, as a recruit for the university's team, thereby facilitating his admission to USD.

68.     In or about 2017, in exchange for an additional bribe, the same coach designated another student as a recruit to manage the same USD team, thereby facilitating her admission to USD.

### The Tax Fraud Conspiracy

### Background on Federal Tax Law

69.     The IRS is an agency of the United States Department of Treasury responsible for administering and enforcing federal tax laws.

70.     Section 501(c)(3) of the Internal Revenue Code permits organizations operated

exclusively for charitable purposes to be exempt from taxation ("501(c)(3) entities"). Among other

things, 501(c)(3) entities must not be organized or operated for the benefit of private interests, and

none of the earnings of a 501(c)(3) entity may inure to the benefit of any private shareholder or

individual.

71.     To encourage public support of charitable organizations, federal law permits

individuals to deduct contributions to 501(c)(3) entities from their taxable income. Such

deductions, which are subject to certain limitations, are typically reported to the IRS on a donor's

income tax returns, thereby reducing the donor's income tax obligation.

72.     Title 26, United States Code, Section 170 provides, among other things, that no

deduction for a charitable contribution of $250 or more shall be allowed unless it is substantiated

by a written acknowledgment from the recipient organization indicating whether any goods or

services were provided in consideration for the contribution, and, if so, providing a description and

good faith estimate of the value of the goods or services provided. Any deduction must be reduced

by the value of goods or services provided in exchange.

<u>The Conspiracy</u>

73.     Beginning in or about 2013, SINGER agreed with certain clients of The Key to

disguise bribe payments, at least in part, as charitable contributions to KWF. At SINGER's

direction, employees of KWF sent these clients acknowledgment letters falsely attesting that no

goods or services were exchanged for the purported donations.

### Purposes and Objects of the Tax Fraud Conspiracy

74.     A principal purpose and object of the tax fraud conspiracy was to allow clients of The Key to improperly deduct the cost of the bribes from their federal income taxes, and thereby to defraud the United States by underpaying federal income taxes.

### Manner and Means of the Tax Fraud Conspiracy

75.     Among the manner and means by which SINGER and others known and unknown to the United States Attorney carried out the tax fraud conspiracy were the following:

a.     registering KWF under Section 501(c)(3) of the Internal Revenue Code;

b.     directing purported charitable donations to KWF, even though those funds were intended to be used, at least in part, to bribe test administrators, athletic coaches and university administrators;

c.     sending acknowledgment letters falsely attesting that no goods or services were exchanged for the purported donations to KWF; and

d.     using the false acknowledgment letters as a basis to support fraudulent deductions from their federal income taxes.

### Overt Acts in Furtherance of the Tax Fraud Conspiracy

76.     On various dates between 2012 and September 2018, SINGER and others known and unknown to the United States Attorney committed or caused to be committed the following overt acts, among others, in furtherance of the tax fraud conspiracy:

77.     In or about 2016, SINGER agreed with a Hillsborough, California couple who wanted their daughter to attend UCLA (the "Hillsborough Parents") to use bribes to facilitate their daughter's admission to the university as a purported soccer recruit.

14

78.     On or about May 24, 2016, the Hillsborough Parents emailed SINGER their daughter's high school transcript and standardized test scores.

79.     SINGER forwarded the transcript and test scores to the UCLA men's soccer coach, who forwarded them to the UCLA women's soccer coach.

80.     On or about June 28, 2016, the UCLA Student-Athlete Admissions Committee approved the Hillsborough Parents' daughter ("UCLA Applicant 1") for "provisional student-athlete admission," pursuant to which she would be admitted to the university on the condition that she met certain requirements, including that she successfully completed her senior year of high school and participated on the UCLA team as a student-athlete for a minimum of one full academic year.

81.     On or about July 6, 2016, the UCLA men's soccer coach emailed SINGER that the Hillsborough Parents' daughter had been provisionally admitted to the university as a student-athlete.

82.     On or about July 7, 2016, SINGER directed a payment of $100,000 from one of the KWF charitable accounts to a sports marketing company controlled by the UCLA men's soccer coach.

83.     On or about July 8, 2016, an employee of KWF emailed a $250,000 invoice to the mother of UCLA Applicant 1. The invoice stated:   "Private Contribution – Letter of receipt will be provided upon payment."

84.     On or about July 11, 2016, the father of UCLA Applicant 1 emailed SINGER asking him to confirm in writing that the $250,000 would be returned to them in the event his daughter did not receive final admission to UCLA.

85.     SINGER replied that he would return the money in the event UCLA Applicant 1 did not receive final admission to UCLA.

86.     On or about July 15, 2016, the Hillsborough Parents donated 2,150 shares of Facebook, Inc. stock to KWF as a purported charitable contribution. The stock transfer settled that same day.

87.     On or about July 21, 2016, a KWF employee sent the Hillsborough Parents a letter acknowledging a charitable contribution of $251,159. The letter stated: "Your generosity will allow us to move forward with our plans to provide educational and self-enrichment programs to disadvantaged youth."   The letter falsely stated that "no goods or services were exchanged" for the donation.

88.     In or about November 2017, the Hillsborough Parents filed personal tax returns that falsely reported total gifts to charity in 2016 of $1,061,890—a sum that included the purported contribution to KWF.

COUNT ONE
Racketeering Conspiracy
(18 U.S.C. § 1962(d))

The United States Attorney charges:

89.    The United States Attorney re-alleges and incorporates by reference paragraphs 1-68 of this Information.

90.    From in or about 2011, and continuing through September 2018, in the District of Massachusetts and elsewhere, the defendant,

WILLIAM RICK SINGER,

being a person associated with or employed by The Key Enterprise, an enterprise engaged in, and the activities of which affected interstate and foreign commerce, conspired with others known and unknown to the United States Attorney to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and (5); consisting of multiple acts indictable under:

a.    Title 18, United States Code, Section 1341 (relating to mail fraud);

b.    Title 18, United States Code, Sections 1341 and 1346 (relating to honest services mail fraud);

c.    Title 18, United States Code, Section 1343 (relating to wire fraud);

d.    Title 18, United States Code, Sections 1343 and 1346 (relating to honest services wire fraud); and

e.    Title 18, United States Code, Section 1956(a)(1)(B)(i) (relating to the laundering of monetary instruments).

91.    It was part of the conspiracy that SINGER agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO
Money Laundering Conspiracy
(18 U.S.C. § 1956(h))

The United States Attorney further charges:

92.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-88 of this Information.

93.     From in or about 2013 and continuing through September 2018, in the District of Massachusetts and elsewhere, the defendant,

## WILLIAM RICK SINGER,

conspired with others known and unknown to the United States Attorney to conduct and attempt to conduct financial transactions, to wit, payments to athletic coaches, university administrators, and standardized test administrators, knowing that the property involved in such transactions represented the proceeds of some form of unlawful activity, and which in fact involved the proceeds of specified unlawful activity, that is, bribery, in violation of Title 18, United States Code, Section 666(a)(2), mail fraud and honest services mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346, and wire fraud and honest services wire fraud, in violation of Title 18, United States Code, Section 1343 and 1346, knowing that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT THREE
Conspiracy to Defraud the United States
(18 U.S.C. § 371)

The United States Attorney further charges:

94.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-88 of this Information.

95.     From in or about 2013 through in or about September 2018, in the District of Massachusetts and elsewhere, the defendant,

### WILLIAM RICK SINGER,

did unlawfully, voluntarily, intentionally and knowingly conspire, combine, confederate, and agree with others known and unknown to the United States Attorney to defraud the United States for the purpose of impeding, impairing, obstructing and defeating the lawful government function of the IRS in the ascertainment, computation, assessment and collection of the revenue, to wit: federal income taxes.

All in violation of Title 18, United States Code, Section 371.

COUNT FOUR

Obstruction of Justice

(18 U.S.C. § 1512(c)(2))

The United States Attorney further charges:

96.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-88 of this Information.

97.     In or about October 2018, in the District of Massachusetts and elsewhere, the defendant,

WILLIAM RICK SINGER,

did corruptly obstruct, influence and impede, and attempt to obstruct, influence and impede, an official proceeding, to wit, a federal grand jury investigation being conducted in the District of Massachusetts, by informing several co-conspirators of the existence of the investigation and encouraging them to take steps to thwart its progress.

All in violation of Title 18, United States Code, Section 1512(c)(2).

## RACKETEERING FORFEITURE ALLEGATION
### (18 U.S.C. § 1963)

The United States Attorney further alleges that:

98.    Upon conviction of the offense in violation of Title 18, United States Code, Section

1962(d), set forth in Count One of this Information, the defendant,

### WILLIAM RICK SINGER,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963:

  a.  any interest acquired or maintained in violation of Title 18, United States
      Code, Section 1962;

  b.  any interest in, security of, claim against, or property or contractual right of
      any kind affording a source of influence over, any enterprise established,
      operated, controlled, conducted, or participated in the conduct of, in violation
      of Title 18, United States Code, Section 1962; and

  c.  any property constituting, or derived from, any proceeds obtained, directly or
      indirectly, from racketeering activity or unlawful debt collection in violation
      of Title 18, United States Code, Section 1962.

The property to be forfeited includes, but is not limited to, the following assets:

  a.  All funds on deposit in Bank of America checking account in the name of the
      Key Worldwide Foundation ending in x0486;

  b.  All funds on deposit in Wells Fargo checking account in the name of the Key
      Worldwide Foundation ending in x2391;

  c.  All assets owned or controlled by the Key Worldwide Foundation, including,
      but not limited to:
        i.  KWF's investment in Jamtown;
       ii.  KWF's investment in Bluestone Partnership;
      iii.  KWF's investment in Hauser Private Equity;
       iv.  KWF's investment in WhamTech, Inc.;
        v.  KWF's investment in Sharky's Restaurant Chain – 10% control
            purchase and related investment;
       vi.  KWF's investment in Swansea Football Club; and,
      vii.  KWF's investment in Virtual PhD; and,

    d.   $3,429,970.87, to be entered in the form of a forfeiture money judgment.

99.    If any of the property described in Paragraph 98, above, as being forfeitable pursuant to Title 18, United States Code, Section 1963(m), as a result of any act or omission of the defendant --

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 1963(m) to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 98 above.

    All pursuant to Title 18, United States Code, Section 1963.

## MONEY LAUNDERING FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(1))

The United States Attorney further alleges that:

100. Upon conviction of the offense in violation of Title 18, United States Code, Section 1956(h), set forth in Count Two of this Information, the defendant,

### WILLIAM RICK SINGER

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, and any property traceable to such property. The property to be forfeited includes, but is not limited to, the following:

   a. All funds on deposit in Bank of America checking account in the name of the Key Worldwide Foundation ending in x0486;

   b. All funds on deposit in Wells Fargo checking account in the name of the Key Worldwide Foundation ending in x2391;

   c. All assets owned or controlled by the Key Worldwide Foundation, including, but not limited to:
      i. KWF's investment in Jamtown;
      ii. KWF's investment in Bluestone Partnership;
      iii. KWF's investment in Hauser Private Equity;
      iv. KWF's investment in WhamTech, Inc.;
      v. KWF's investment in Sharky's Restaurant Chain – 10% control purchase and related investment;
      vi. KWF's investment in Swansea Football Club; and,
      vii. KWF's investment in Virtual PhD;

   d. $3,429,970.87, to be entered in the form of a forfeiture money judgment.

101. If any of the property described in Paragraph 100, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of the defendant --

   a. cannot be located upon the exercise of due diligence;

24

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 102 above.

All pursuant to Title 18, United States Code, Section 982(a)(1).


ANDREW E. LELLING
UNITED STATES ATTORNEY

By: _____
ERIC S. ROSEN
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
JUSTIN D. O'CONNELL
Assistant U.S. Attorneys

Date: March 5, 2019