1                   UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
2

3

4                                     )
   UNITED STATES OF AMERICA,       )
5                                     )
          Plaintiff,         )
6                                   )  Criminal Action
   v.                          )  No. 1:19-cr-10078-RWZ
7                                   )
   WILLIAM RICK SINGER,         )
8                                     )
          Defendant.        )
9                                     )

10

11             BEFORE THE HONORABLE RYA W. ZOBEL
               UNITED STATES DISTRICT JUDGE
12

13

14                    RULE 11 HEARING

15

16                 March 12, 2019
                  2:32 p.m.

17

18       John J. Moakley United States Courthouse
                Courtroom No. 12
                One Courthouse Way
19             Boston, Massachusetts 02210

20

21

22             Linda Walsh, RPR, CRR
              Official Court Reporter
     John J. Moakley United States Courthouse
23        One Courthouse Way, Room 5205
          Boston, Massachusetts 02210
24           lwalshsteno@gmail.com

25

```
 1   APPEARANCES:

 2   On Behalf of the Government:

 3        UNITED STATES ATTORNEY'S OFFICE
          By: AUSA Eric S. Rosen
 4            AUSA Justin D. O'Connell
              AUSA Kristen A. Kearney
 5            AUSA Leslie Wright
          One Courthouse Way
 6        Boston, Massachusetts 02210
          617-748-3412
 7        eric.rosen@usdoj.gov

 8
     On Behalf of the Defendant:
 9
          DONALD H. HELLER, A LAW CORPORATION
10        By: Donald H. Heller, Esq.
          2638 American River Drive
11        Sacramento, California 95825
          916-974-3500
12        dheller@donaldhellerlaw.com

13        FREEMAN MATHIS & GARY, LLP
          By: William E. Gildea, Esq.
14        60 State Street, Suite 600
          Boston, Massachusetts 02109
15        617-963-5981
          wgildea@fmglaw.com

16

17

18
                 Proceedings reported and produced
19                 by computer-aided stenography

20

21

22

23

24

25
```

```
 1                        P R O C E E D I N G S
 2              THE CLERK:  So this is United States versus William
 3       Rick Singer, and it's Criminal 19-10078.
 4              May I ask counsel to please identify themselves for
 5       the record, please.
 6              THE COURT:  Wait a minute.  Hang on.  Hang on one
 7       second, please.
 8              (Pause.)
 9              THE COURT:  I don't know why the Government always
10       comes second on the docket sheet.
11              Mr. Rosen?
12              MR. ROSEN:  Yes, Your Honor.
13              MR. O'CONNELL:  Justin O'Connell.
14              THE COURT:  Mr. O'Connell.  And?
15              MS. WRIGHT:  Leslie Wright, Your Honor.
16              THE COURT:  I'm sorry?
17              MS. WRIGHT:  Leslie Wright.
18              MS. KEARNEY:  Kristen Kearney.
19              THE COURT:  You need four prosecutors here for this?
20              And for the Defendant?
21              MR. HELLER:  Good afternoon, Your Honor.  Donald H.
22       Heller for Mr. Singer, who's present in the Court.
23              MR. GILDEA:  Good afternoon, Your Honor.  William
24       Gildea for William Singer.
25              THE COURT:  And the Defendant is sitting between you?
```

1    MR. HELLER:  He is, Your Honor.

2    THE COURT:  Now, I think I need to talk to counsel,

3 one from each side, and somebody needs to make room for

4 Probation in the jury -- can you slide over, one of you?

5    (SEALED SIDEBAR REMOVED.)

6    THE COURT:  I neglected to ask, has there been a

7 waiver, a formal waiver of indictment?

8    MR. ROSEN:  Yes, Your Honor.  I provided it to the

9 defense counsel.

10    THE COURT:  Was that done officially?

11    MR. HELLER:  We just signed it and --

12    THE COURT:  Well, in that case I need to address the

13 Defendant about that.

14    MR. HELLER:  Yes.

15    THE COURT:  Do I have it?

16    MR. ROSEN:  Did you give it --

17    MR. HELLER:  Yes.

18    MR. ROSEN:  Sorry.

19    THE COURT:  Please be seated.

20    Understand, Mr. Singer, the Government is accusing you

21 of a number of felonies.  Under the Constitution, you have an

22 absolute right to insist that if the Government wants to accuse

23 you of such felonies that it first go to a grand jury, a body

24 of 23 citizens who will hear whatever evidence the Government

25 wants to present to it and who will then decide by majority of

those present whether they believe there is probable cause that you committed this offense.  And only then, only if the majority of the grand jury believes that you -- that there's probable cause -- it's not reasonable doubt, just probable cause that you committed this offense, should you be accused.  That's what the Constitution says.  This is your right, and you of course have the right to give it up, but you should understand what it is that you are giving up.  And do you understand that?

THE DEFENDANT:  Yes, ma'am.  Yes, ma'am.

THE COURT:  You do?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  So we file the waiver of indictment. Lisa, it's yours.

THE CLERK:  Yes.  Thank you.

THE COURT:  And we will now proceed with the taking of the plea.

What we are here for today, as I understand it, Mr. Singer, is that you have said that you will plead guilty to the charges that have been brought against you, and there are four different crimes and four different counts.

I need to make a number of decisions.  I need to first instruct you on some of -- on what rights you have with respect to that process and also then make sure that you understand the nature of these offenses, that you understand what the maximum

penalty is, that you are doing this voluntarily, and that in fact you are guilty, and I can only do that by asking you a series of questions.

So we will swear you, and you should also understand that having been sworn, if you knowingly give false answers to any of the questions, the Government has the option of prosecuting you more, namely for perjury. Do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: Do you wish to go ahead?

THE DEFENDANT: Yes, ma'am.

THE CLERK: Okay. Mr. Singer, to these four counts of this information charging you with Count 1, 18 U.S.C. 1962(d), racketeering conspiracy; Count 2, 18 U.S.C. 1956(h), money laundering conspiracy; Count 3, 18 U.S.C. 371, conspiracy to defraud the United States; and Count 4, 18 U.S.C. 1512(c)(2), obstruction of justice. Sir, how do you plead to these four counts of this information, guilty or not guilty?

THE DEFENDANT: Guilty.

THE CLERK: Sir, could I just have you raise your right hand, please, sir.

(Defendant sworn.)

THE DEFENDANT: I do.

THE CLERK: Thank you.

THE COURT: Is there any agreement at this point about

restitution or is restitution not an issue given forfeiture and everything else?

MR. ROSEN:  Restitution is not an issue, Judge.

THE COURT:  Is not an issue?

MR. ROSEN:  Not in this case, no, Your Honor.

THE COURT:  Okay.  I object to Paragraph 6B to the extent that it requires a waiver of appellate rights with respect to any subsequent changes of law.  I understand that the Government insists on this canned version and the Defendant can't say much about it.

MR. ROSEN:  Yes, Your Honor.

THE COURT:  I don't have to sign this agreement.  I wouldn't.  But it's here, and it certainly governs whatever happens down the line, to some extent.  So let me start with the....

Mr. Singer, how old are you?

THE DEFENDANT:  58.

THE COURT:  58?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  How much formal education have you had?

THE DEFENDANT:  Through a master's degree.

THE COURT:  And this was in the United States?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  So I can safely assume that you can read and write English?

1    THE DEFENDANT:  Yes, ma'am.

2    THE COURT:  Have you take any medications of any kind

3    within the last day or two?

4    THE DEFENDANT:  No, ma'am.

5    THE COURT:  I ask that only to make sure that there

6    should be nothing that in any way clouds your ability to

7    understand what we're doing here today.

8    Now, the Government has accused you in this

9    information, as I said before, of four different offenses, and

10   we will go through that in a moment.  You have a right in a

11   felony case to a trial.  That is, the Government cannot take

12   that away from you, but you can agree not to go through with

13   the trial by pleading guilty.  But you understand that this is

14   an important right that you are giving up?

15   THE DEFENDANT:  Yes, ma'am.

16   THE COURT:  It implicates the choosing of a jury of 12

17   citizens who will hear not just the evidence the Government has

18   but any evidence that you may have to offer, who would then,

19   pursuant to instructions on the law that I would give them,

20   retire to a room by themselves, totally without anybody else,

21   to review that evidence and then to decide whether the

22   Government has proven you guilty beyond a reasonable doubt.

23   That is a high burden.  It is an important right that you're

24   giving up, and I just ask you, do you understand that that's

25   what you are doing by pleading guilty?

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  At the trial you also have a right to

3    cross-examine every witness whom the Government may call to

4    give evidence against you and to call your own witnesses.  You

5    have a right to decide whether you want to testify or not.  And

6    were you to choose not to testify at a trial, the jury would be

7    instructed that they may not use that fact in deciding their

8    verdict, that there are lots of reasons why somebody might

9    decide not to testify, and the fact that a defendant doesn't

10   testify is not something they can consider in deciding guilt or

11   innocence.  Do you understand that?

12         THE DEFENDANT:  Yes, ma'am.

13         THE COURT:  You have a right to have a lawyer at every

14   stage of the criminal proceeding.  And if you cannot afford to

15   hire counsel, the Court will appoint counsel for you, and

16   you're giving that up as well because if there's no trial, then

17   you won't have a lawyer.  Do you understand?

18         THE DEFENDANT:  Yes, ma'am.

19         THE COURT:  Are you satisfied with the advice that you

20   have received by your counsel in this case?

21         THE DEFENDANT:  Yes, ma'am.

22         THE COURT:  Now, let me go back for a moment and talk

23   about the penalties.  There are two sets of sentencing laws

24   that you should be aware of.  One is what the maximum sentence

25   is, which is usually, in fact always, part of the statute that

also defines the offense.  And in this case, since there are
four different offenses and four different statutes, there are
four different maximum sentences, and in the end, they largely
get added up.

So with respect to Count 1, the RICO conspiracy count,
the maximum sentence is 20 years imprisonment, three years of
supervised release, a fine of either $250,000 or twice the
amount of either gain or loss of the victims.  In addition to
that, this count, as well as every other count, requires me to
impose a $100 special assessment.

Count 2, which is the money laundering count -- my
list seems to have fallen apart.  Yes, Count 2, the money
laundering count, also has a maximum penalty of 20 years
imprisonment, and it has a maximum fine of $500,000 or twice
the gain or loss, and again the $100 special assessment as well
as supervised release.  Each of these offenses has a period of
supervised release of three years, and for some reason they
don't get added up.

The third count, which is the tax conspiracy, has a
maximum sentence of 20 years, maximum fine of $250,000 or twice
the gain or loss, and again, the $100.

In Count 4, the obstruction of justice count has a
maximum sentence of five years, three years supervised release,
and $250,000 fine as -- yeah, $250,000 fine, period.  No twice
or whatever.

1    So the maximum total sentence of imprisonment is 65

2    years, three years supervised release for all four, $1.25

3    million or for certain of the counts, one, two, three twice the

4    loss or gain, and $400 special assessment.  So that's the

5    maximum.

6    The other set of -- the other sentencing rules are

7    called Sentencing Guidelines, and they operate quite

8    differently.  They look at two sets of facts:  One, the facts

9    pertaining to the offense, and two, the facts pertaining to any

10   criminal record that a defendant may have.  Now, with respect

11   to the offense, they start usually with a numerical value

12   called an offense level, and they just designate a number.  I

13   think it's six in this case.  And then they add -- they add

14   levels based on facts pertaining to the offense.  So in this

15   case there are a bunch of them which are outlined in the plea

16   agreement, which, again, I have lost.  No.  Here it is.  I know

17   they're here.  Okay.

18   So the base offense level that has been calculated and

19   agreed to by both the Government and your counsel starts with a

20   base of seven.  It adds 22 levels because of the amount of

21   money involved.  Money offenses have particular brackets that

22   are set out in the guidelines that add levels to the base

23   offense level.  Then there is an additional amount of --

24   additional two levels because the offense is under the Hobbs

25   Act, Section 1956 of Title 18, which is a serious offense.  It

1  is increased by another four because you are deemed to be an

2  organizer or leader of this enterprise, and the offense level

3  is further increased by two because you intentionally engaged

4  in or caused conduct constituting sophisticated means, and

5  another two because of willful obstruction of the instant

6  offense of conviction.  There is a reduction of three levels

7  because you are deemed to accept responsibility.  So the -- I

8  don't know where all of this will end up, but that I think it

9  is also set forth in the plea agreement, 188 to 235 months

10 according to the guidelines.

11         Now, I should also explain to you the elements of the

12 offense and what the Government has to prove with respect to

13 each of these counts.  The first one is the RICO conspiracy,

14 and in fact, several of these counts are conspiracies, and what

15 we have to do is to look at the underlying substantive offense.

16         Conspiracy simply means that two or more people agreed

17 to do an illegal act that was illegal under the statute that

18 we're now talking about, whichever one that is.

19         And, second, that the Government has to prove that you

20 knowingly and willfully in understanding the purpose of this

21 agreement participated in it, agreed to become part of the

22 group that was doing this.  And knowingly and willfully means

23 doing something with an understanding of what you are doing,

24 not by accident or mistake.  And willfully means doing it with

25 an intent to violate the law.

1          So with respect to Count 1, which is the RICO

2     conspiracy, the Government has to prove the underlying RICO

3     violation in order to then prove the conspiracy that you

4     participated with others in carrying out these acts, so you

5     need to understand a little bit about the underlying statute,

6     the underlying offense.  It talks about an enterprise which is

7     either a partnership or corporation or association or a group

8     of individuals who are somehow associated to do something

9     illegal and in the context of an illegal activity.  Here these

10    -- the entities that are primarily referred to in the

11    indictment are the Key and KWF, whatever they are.  Then it has

12    to prove that that enterprise, Key, KWF, was engaged in

13    interstate commerce by movement of goods or services from one

14    state to another.  That is an essential element because it is

15    the element that gives jurisdiction to the Federal Government

16    and the Federal Courts under the Constitution; otherwise, we

17    wouldn't be here.

18          And the Government has to prove that the -- either

19    that the enterprise engaged in -- or that -- in the activity or

20    that the illegal activity -- that the enterprise engaged in an

21    activity that went across state lines or that the illegal

22    activities in some way affected interstate commerce.  It then

23    has to prove that you were employed by or associated with the

24    enterprise; and fourth, that you knowingly and willfully

25    conducted or participated in the conduct of this enterprise;

1    and five, that this was done through a pattern of racketeering

2    activity, that is, through the commission of at least two

3    racketeering acts.  And a racketeering act is anything that

4    falls within the compass of the activity -- of the planned

5    activity, and here it is facilitating cheating on exams, for

6    instance, or designating applicants for competitive college

7    athletic teams when they were not really able to do that.  So

8    that's the essence of Count 1.

9         And the RICO conspiracy, then, is two or more people

10   getting together, deciding to do this, and that you -- it

11   doesn't have to be you who thought it up, but that you did

12   participate in some way knowing what you were doing and with

13   the intention to violate the law.

14        Count 2 is the money laundering conspiracy.  And money

15   laundering means that you knew that property was involved in a

16   financial transaction that represented proceeds of some

17   unlawful activity.  In this instance, the things we just talked

18   about, the testing and the athletic teams.  And that you

19   conducted such activity with the intent to conceal the nature

20   of the transaction and the ownership.  That's what money

21   laundering is about.  Here, again, the Government doesn't

22   charge with you money laundering but the conspiracy to launder

23   money.  So, again, two or more people got together to hide the

24   proceeds in some fashion of the racketeering, and that you

25   participated knowingly and willfully, and it was the object

1  to -- with the desire to obtain the object that is planned.

2      The tax conspiracy, again, is, in this instance,

3  simply the use -- the failure to declare on your -- to file tax

4  returns that declared and included the income from these

5  illegal activities.  And here, again, since it's a conspiracy,

6  the Government has to prove that you participated in an

7  agreement with others to accomplish the failure to file

8  appropriate and honest tax returns.

9      Obstruction of justice, the fourth count, requires the

10  Government to prove that you in some way impeded an official

11  proceeding, in this instance the grand jury, or attempted to do

12  so, and that there was such a proceeding and that you did act

13  in some way to interfere with its activities, which I

14  understand had to do with notifying people that they should be

15  careful talking to the grand jury, as I understand it.

16      So that's what the Government has to prove as to each

17  of these four counts.  Do you understand that?

18      THE DEFENDANT:  Yes, ma'am.

19      THE COURT:  Okay.  Now, I will ask Mr. Rosen, I guess,

20  to outline the evidence that he would present, and I will then

21  come back to you with the ultimate question:  Did you do it?

22      Now, I have, kindly supplied by Mr. Rosen, a cheat

23  sheet that tells me what -- did you get one, too?  Did your

24  counsel get one?

25      MR. ROSEN:  We went through it yesterday, Your Honor.

1    THE COURT:  So you have reviewed it with counsel?

2    MR. ROSEN:  Yes, I have.

3    THE COURT:  So listen carefully because I will have to

4    ask you what did you do in conjunction with each of these

5    allegations.

6    MR. ROSEN:  Beginning in 2007 and continuing through

7    the present, Defendant operated a business registered in

8    California known as The Key.  In 2012, Defendant also formed a

9    nonprofit corporation known as The Key Worldwide Foundation,

10   known as KWF.  Together, these two entities constitute an

11   enterprise.  Although Defendant did engage in legitimate

12   college counseling services on behalf of some clients, for

13   other clients, Defendant's enterprise was engaged in

14   large-scale criminal activity that essentially had a singular

15   goal, gaining acceptance for his client's children to elite

16   universities by any means necessary.

17        Now, there are a number of interrelated schemes that

18   the Defendant engaged in:  Cheating on college entrance exams,

19   bribing college coaches to recruit students as athletes,

20   thereby facilitating admissions to various colleges, creating

21   and manufacturing fake extracurricular activities and awards to

22   put on college applications, and lying about students'

23   ethnicities and other biographical information in an attempt to

24   take advantage of perceived benefits from affirmative action

25   and other programs.  I will address the first two criminal

schemes as set forth in this information.

The Defendant operated a scheme to cheat on college entrance exams such as the ACT and SAT. In the beginning, back in 2011 and 2012, defendant used an individual named Mark Riddell. Defendant supplied Mark Riddell with false identifications and, on multiple occasions, flew him to Vancouver, Canada, and Orange County, California, where he took exams on behalf of the children of a prominent Canadian businessmen. The SAT and ACT enacted security measures whereby students' photos be placed on their admission ticket. Defendant's scheme then shifted such that he began bribing corrupt test administrators. First, parents paid Singer between $15,000 and $75,000, largely through donations to the KWF charity. Singer paid a test administrator in Los Angeles $10,000 for administering each ACT or SAT scam, generally in checks sent through the mail. Singer paid a Houston test administrator $5,000 in July of 2018, and before that he funneled the bribe payments through an intermediary, Martin Fox. And all the people I am mentioning today, Your Honor, have been charged in various indictments or other informations.

In exchange for these bribes, the test administrators allowed Riddell to serve as a proctor, whereby he would actively help the students with their answers during the tests or, after the student took the exam, he would then correct the student's answers to ensure that the student received the score

desired by the parent.  These fraudulently obtained scores were

then submitted to colleges, including those here in

Massachusetts, as part of the student's admissions

applications.  ACT tests are sent to and from the testing --

THE COURT:  How would he correct the scores?  How was

the correcting of the scores done?

MR. ROSEN:  Sorry?

THE COURT:  How was the correcting of the scores done?

MR. ROSEN:  How was it done?

Generally -- it varied by scheme.  Generally, and this

is probably for most or half the students, Mark Riddell was

proctor at the exam without the student knowing about it, and

after the exam was completed, Mark Riddell would then change --

THE COURT:  So before it went to the organization that

ran --

MR. ROSEN:  Before it went back to ACT.  Other times

they worked together as a group with the student or other

students.

And Singer would pay Riddell approximately $10,000 for

each test that he took on behalf of the student, and these were

checks mailed to and from Mr. Riddell.  Most of the payments to

Riddell and the other test administrators were made from the

KWF charity account and were done, at least in part, to

disguise the nature and origin of the payments.  This cheating

scheme occurred on approximately 30 separate occasions.

1    Singer also paid bribes to college coaches and

2  administrators who were employed by the colleges named in the

3  information, Yale, Georgetown, Stanford, UCLA, the University

4  of San Diego, the University of Texas at Austin, Wake Forest,

5  and Georgetown.  Each of these elite academic institutions

6  participates in at least some sports at the NCAA Division I

7  level, the highest level.  As such, the universities recruit

8  students onto their sports team, and admissions offices at the

9  university allot a set number of admission slots to each head

10  coach of a varsity sport for that coach's recruited athletes.

11  At each of the universities, the admissions prospects of

12  recruited athletes are high.  In some cases much, much higher

13  than those of non-recruited athletes with similar grades and

14  standardized test scores.

15    Thus, in exchange for bribes, the coaches would

16  recruit Singer's clients onto their sports teams as fake

17  athletes, thereby facilitating or helping to facilitate the

18  student's admission to the university at issue.  This scheme

19  occurred dozens of times over the course of the conspiracy, and

20  Singer euphemistically referred to the scheme as the side door

21  method of admission.  There are a number of examples set forth

22  in the information.  I'll go through a couple.

23    November of '17, Singer agreed to pay a $400,000 bribe

24  to the coach of the Yale women's soccer team.  He then

25  fabricated information about the student, claiming she was a

nationally ranked soccer player in China.  The student had no
experience playing competitive soccer.  The coach then
recruited the student, securing her admission to Yale.  In
January 2018, Singer's charity, KWF, paid the coach $400,000
via a check mailed to the coach.  Over the summer before her
freshman year, the student registered for the NCAA but at the
same time faked an injury that would force her to stop playing
soccer, a sport she just did not play.

        As for another example, Singer paid approximately $2.7
million in bribes to the head coach of the Georgetown tennis
team.  The Georgetown coach purchased a house on Cape Cod with
these bribe payments, and Singer, on at least one occasion,
mailed a $100,000 bribe payment to the coach's house in
Falmouth.  In exchange for these bribes, the coach recruited
Singer's clients to the Georgetown tennis team, almost all of
whom either did not play tennis or did not play tennis
competitively.  The students were granted preferential
admission to Georgetown through their status as
bought-and-paid-for tennis recruits.

        As a final example, Singer secured the admission of
dozens of students to USC through the payment of bribes to
coaches as well as Donna Heinel, the senior women's
administrator at USC.  Heinel served as the liaison between the
athletic coaches and the admissions office.  In exchange for
bribes, Heinel recruited Singer's clients to various athletic

teams, mixing them in with legitimate recruits to make it
appear that they were legitimate athletes.  They were not.

The bribes were paid by the parents in amounts of
between $100,000 and $400,000, and monies were then passed on
to Heinel both for her use as part of accounts she controlled
at USC as well as the $400,000 payment made to her personally.
Again, all the payments were made from the KWF charity account.

The obstruction of justice count.  After Singer began
cooperating with investigators in late September 2019, he knew
there was an active federal and grand jury investigation into
this large-scale fraudulent scheme that is at issue here.
Singer, however, warned several of his clients about the
investigation, instructing them to cease criminal activities
and their participation in the schemes.  Singer also told
clients that if they were to receive a call from him, it would
most likely be recorded, and they should deny participation in
the schemes.  Singer obstructed justice with approximately six
families who either had participated in the bribery or cheating
schemes or planning to do so in the future.

Finally, tax evasion.  One of the goals of the
conspiracy was to use the KWF 501(c)(3) charity, which was
registered to help so-called underserved or underprivileged
children, to funnel bribe payments from the parents to those
who were being bribed.  This had two functions.  First, the use
of the charity account enabled Singer and his co-conspirators

to disguise the source and nature of the monies, which
obviously goes towards the money laundering count.  Second, the
use of the charity account enabled the parents who are paying
bribes to deduct the cost of the bribes on their personal
income taxes, thereby passing on the cost of the bribes to the
United States taxpayer.  To that end, Singer's associates would
send the parents letters after they made their donation falsely
stating that no goods or services were exchanged for the
donation and that the monies paid would go to help underserved
or disadvantaged youth.

There's an example included in the information
regarding parents from Hillsborough, California who used bribes
to facilitate the 2016 recruitment of their daughter to the
UCLA women's soccer team which secured her admission to UCLA.
Singer paid the coach a $100,000 bribe and then invoiced the
parents for $250,000 as the fee for securing the admission
through bribery.  After making the donation, done through
Facebook stock, a KWF employee sent the parents a letter
stating "your generosity will allow us to move forward with our
plans to provide educational and self-enrichment programs to
disadvantaged youth."  The letter further stated that no goods
or services were exchanged for the donation, which was not
true.  The Hillsborough parents then filed tax returns which
included the purported contribution to KWF as a deduction on
their tax forms.

1      THE COURT:  Mr. Singer, can you please tell me what,

2  if anything, you had to do with the RICO scheme, the enterprise

3  of interstate -- the enterprise that I guess ran the show?

4      THE DEFENDANT:  Your Honor, I -- everything that

5  Mr. Rosen stated is exactly true.  All of those things, plus

6  many more things, I did on the SAT and ACT scam.

7      Essentially what I would do is a student would take

8  the exam at another site because they had learning differences

9  and they had documentation of that, that would allow them, if

10  they got multiple days, for myself to control the site.  And if

11  I could control the site, then I could bring in my own proctor

12  and work with the site coordinator so that we could ensure that

13  the young person, who did not know what was going on but the

14  family did, that we would secure a score that would be strong

15  enough for them to get into the schools that they wanted to go

16  to.

17      So on that particular day that family would either

18  drive to or fly to Houston or Los Angeles.  And Mark Riddell,

19  he would -- was my test proctor.  He would show up the night

20  before, and then the test site coordinator, who was already

21  there, would be already -- either the principal of the school

22  or what they call the SSD coordinator, the person who handles

23  all kids --

24      THE COURT:  That person was not involved or was?

25      THE DEFENDANT:  Yes, they were involved.

1      THE COURT:  He was also involved?

2      THE DEFENDANT:  Yes, ma'am.

3      So the only way that the scheme could work was if I

4  controlled the proctor and the site coordinator.

5      THE COURT:  The whole --

6      THE DEFENDANT:  Yes, ma'am.  Yes, ma'am.

7      So the family would come.  They would get there about

8  7:45 in the morning, and they would -- the young person would

9  take the test as though they were taking the test.  They worked

10  hard and -- but we also knew that they were not very good test

11  takers because of their learning difference.  So kids would

12  take the test, and when the test was over -- actually, if I can

13  digress for a second.  The student would take the exam and not

14  put the answers on the Scantron.  The answers would be put on a

15  separate sheet of paper so that they could be transferred over

16  at a later time, because the way I sold it was that the kids

17  make mistakes doing that, so then that way my proctor could

18  actually bubble in all the answers, and we wouldn't have erase

19  marks.  The kids still had to write their own essay in their

20  own handwriting, so that was the only legitimate part of the

21  test that the kids actually did.  The kids thought they really

22  took their tests, but the families, Mark, and the site

23  coordinator knew that that was not the case.

24      When the exam was over, the young student would leave

25  with their family, and then Mark would go through the exam over

several hours.  And I would already tell him the score that we
wanted to get, and Mark would get that score exactly.  Then the
site coordinator would sign off on everything.  That would be
sent in to ACT or SAT, and then between 11 and 17 days later,
the student would get their score, and it would be a
magnificent score.  So I am absolutely responsible for it.  I
put everything in place, and put all the people in place, and
made the payments to everybody directly.

THE COURT:  Did you know it was against the law to do
that?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Now, how about the money laundering?

THE DEFENDANT:  So on the money laundering, so I am
absolutely guilty of that as well, ma'am.

So I created, for the lack of a better word, since
Mr. Rosen used the word "side door," if I can make the
appearance that there is a front door getting in where a
student just does it on their own; and then there's a back door
where people go to institutional advancement and they make
large donations but they are not guaranteed in; and then I
created a side door that guaranteed families to get in.  So
that was what made it very attractive to so many families is I
created a guarantee.

So what I would do, depending on where the young
person wanted to go to school, their grades and their scores, I

1  would make contact with coaches that would fit the particular

2  sport that that young student would play or didn't play, but

3  because of their size or their speed or their ability, I would

4  go to that particular coach and make a recommendation and try

5  to get that coach to agree to take one of my students as one

6  the recruited athletes.  In that case, in most schools but not

7  all schools, I would create a profile, a sports profile that

8  would show that that student athlete was much better than what

9  they were.  If I could get a picture, what we did is we would

10  either have the student -- we would take the picture of the

11  student's face and put it on somebody else or make the photo

12  something that you really couldn't see the face, but it was

13  somebody playing that sport.  And then I would send that on to

14  the coach, and then the coach would provide that to their

15  liaison.  The liaison would take it to admissions, and then we

16  would be accepted as a recruited athlete.  Because the coaches

17  all have spots, and I was essentially buying or bribing the

18  coaches for a spot.  And that occurred very frequently, Your

19  Honor.

20          THE COURT:  How about the tax issue?

21          THE DEFENDANT:  The tax issue, so what would happen

22  would -- is a family, if they were involved in the ACT scam or

23  if they were involved in the side door --

24          THE COURT:  This is the payment through the so-called

25  charity?

1          THE DEFENDANT:  Yes, ma'am.  Yes, ma'am.  So what I

2     would tell a family is that if you make, for example, at a

3     particular school -- if you don't mind if I use an example of a

4     school.  If I were to go to USC, I would ask a family and tell

5     them that they would make a $250,000 payment.  That would not

6     be due until their child got in, but because they were a

7     student athlete, I was assured that they were going to be

8     getting in well before either their application was actually in

9     or before the final admissions date, that we already knew that

10    the student -- at that time student athlete was going to be in.

11    The child did not know, but the family would know.  And what I

12    would do, as an example for USC, most of their student athletes

13    are recruited and admitted in the fall of the student's senior

14    year.  So --

15         THE COURT:  Before early decision applications even?

16         THE DEFENDANT:  Sometimes, yes.  And sometimes -- what

17    happened was at certain institutions, that coach's program

18    would be presented to admissions at different weeks.  So I knew

19    on Thursdays -- every Thursday or every other Thursday, the

20    liaison, who is the senior women's administrator, would be

21    taking a certain sport to admissions, and at that end of

22    Thursday, I would know that my student was already admitted

23    with all the other real students who were admitted.  And then

24    she would tell me that they were admitted.  She would get me a

25    letter that would state that they were admitted, but this was

a -- this wasn't the final letter, but it was a letter strong
enough from the dean of admissions that said that this student
was going to be -- is accepted on a conditional basis.  Then,
at that time, I would have the family write a $50,000 check to
USC women's athletics, and that senior women's administrator
would do whatever she felt she needed to do with that money.

My charity would then at that point get ready so that
in March, when the real letter came in, on March 25th, around
that date, then we would send a notification to the family that
they would pay us $200,000 to my foundation.  They had already
paid the 50 to USC, so they had the write-off through USC, and
then they were expecting a write-off through my foundation.
And we would send them a $200,000 receipt stating that they
made a donation to our foundation to help underserved kids,
which, in fact, was not the case.  That was not the reason why
they did it.

THE COURT:  And of course the charity paid no taxes?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And the other people got a discount.

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Obstruction of Justice, what was it that
you did in that regard with the grand jury, I gather.

THE DEFENDANT:  I was told by Mr. Rosen and his team
and the FBI that when I was -- became a cooperating witness for
them that I could not tip anybody or couldn't talk to anybody

1  about things. They had me wired to go into some folks' homes,

2  plus my calls were being taped.

3       So, for example -- I'll give you an example, if that's

4  okay. I went to a student's home, and I got there early. And

5  the student was not there, nor was the mom, but the dad was,

6  because I saw the mom drive away. And I went into the home and

7  told the dad that I was wired and that I need you to know that

8  so that when we have this conversation with the whole family --

9  you haven't done anything wrong yet, so please don't say

10 anything that would be harmful to you guys because you haven't

11 done anything, which was absolutely illegal. I should have not

12 tipped them to do that. I am totally wrong, and I did that

13 kind of situation on multiple occasions to multiple families.

14      THE COURT: I find that the Defendant understands the

15 nature of the charges as well as the maximum penalty. I

16 further find that the plea is voluntary and that there is a

17 structural basis for it, and now I accept the plea to Counts 1

18 through 3 and 4.

19      Now, has the Defendant been to the magistrate? Has he

20 been processed at the marshals?

21      MR. ROSEN: No. I believe he has been interviewed by

22 pretrial and been processed this morning, if that's accurate.

23      THE COURT: So at the moment there's no order

24 concerning custody or conditions of release?

25      U.S. PROBATION: There is not, Your Honor. He has

1   been processed, but there hasn't been any order of conditions

2   or bond.

3           THE COURT:  Do you have any recommendations?

4           U.S. PROBATION:  I do, Your Honor.

5           THE COURT:  Has it been reviewed by counsel?

6           MR. HELLER:  It has by the defense, Your Honor.

7           THE COURT:  Is there any disagreement concerning it?

8           MR. HELLER:  May I just speak with Mr. Rosen for a

9   moment?

10          THE COURT:  Of course.

11          (Counsel confer.)

12          MR. ROSE:  Sorry, Your Honor.  We believe, in terms of

13  the bond amount, it would be $500,000 secured by property from

14  Mr. Singer's brother, and he is --

15          THE COURT:  So part of what is to be forfeited will

16  now serve as security?

17          MR. ROSEN:  No, that's not to be forfeited.  The

18  forfeiture has already been effected generally through the

19  forfeiture.  We have already seized the charity account, about

20  $5.2 million, and there's a money judgment in the plea

21  agreement.  But this property that's going to secure his

22  release pending sentencing is his brother's property in the

23  amount of $500,000 --

24          THE COURT:  I see.  Okay.

25          MR. ROSEN:  -- that will be entered into -- he lives

```
 1    in, I believe in California.  So within a month, California
 2    will have the signature bond there.
 3              THE COURT:  He's going to California?
 4              MR. ROSEN:  No.  The brother lives in California, Your
 5    Honor.
 6              THE COURT:  Oh, okay.
 7              MR. ROSEN:  So it will be secured on property in
 8    California, and the brother will have a month to put up that to
 9    accommodate scheduling.
10              THE COURT:  So the Government is prepared to release
11    him now on these conditions, including the subsequent payment
12    or the deposit of $500,000 bond as security?
13              MR. ROSEN:  Correct, including the travel,
14    restrictions on travel.
15              U.S. PROBATION:  Yes, Your Honor, including the
16    conditions listed on Pages 3 and 4 of my report.  Do you want
17    me to recite them for the Court?
18              THE COURT:  Well, I assume that he has to sign -- has
19    to go down to Probation and sign something, doesn't he?
20              U.S. PROBATION:  He will.  He will need to meet with
21    me.
22              THE CLERK:  I have them here.
23              (Judge and clerk confer.)
24              THE COURT:  In any event, the conditions that are set
25    forth -- I don't know.  Do you have this document?
```

```
 1              MR. HELLER:  Yes.

 2              THE COURT:  Pretrial services report?

 3              MR. HELLER:  Yes, I do, Your Honor.

 4              THE COURT:  So those conditions are satisfactory to

 5    both parties with the exception that the $500,000 bond will not

 6    be made available until a month from now by the brother who

 7    lives in California?

 8              MR. ROSEN:  That is correct, to accommodate

 9    scheduling.  Thank you.

10              THE COURT:  And the Government is agreeable to that?

11              MR. ROSEN:  Yes, fine.

12              THE COURT:  Okay.  I understand that Ms. Urso has

13    already prepared the conditions of release.  So when we're

14    done, we will take a recess so that it all can be signed right

15    here, and I guess everybody can be done.

16              MR. HELLER:  Your Honor, can I put something on the

17    record?

18              THE COURT:  Yes.

19              MR. HELLER:  The security for the bond will be in

20    California called the deed of trust, which will be

21    provided -- a copy of the title to the Government and the deed

22    of trust secured, so it has the correct description.

23              THE COURT:  This is a California term that we would

24    not know about?

25              MR. HELLER:  Yes, it's a California term.
```

1          THE COURT:  Okay.  Is there anything else that we need
2   to do with respect to Mr. Singer today?
3          THE CLERK:  Sentencing.
4          MR. ROSEN:  Just a sentencing date, Your Honor.
5          THE COURT:  Do we set a sentencing date now or later?
6          MR. ROSEN:  I think it would make sense to set one
7   now, and then we can --
8          THE COURT:  Okay.
9          THE CLERK:  What about June 19th at 2:00?
10          MR. ROSEN:  That's fine, Your Honor.
11          THE CLERK:  Okay.
12          THE COURT:  Okay.  So, Mr. Singer, you are, in a way,
13   free to go, subject to the conditions that you are about to
14   sign that are represented in this document, that I think you
15   have seen and you know about, and subject to the $500,000
16   security that your brother will furnish when he can do it.
17          Within a month, right?
18          MR. ROSEN:  That is correct.
19          THE COURT:  Okay.  And next time we get together will
20   be for sentencing on June 19th at 2:00.  And between now and
21   then, a probation officer will prepare a presentence report
22   that talks about the offense, that talks about -- gives
23   information about you and your family and your health and a
24   bunch of other stuff.  You will have an opportunity to read
25   that report before I get to see it.  I ask you to do that

1  carefully, please, and if there are mistakes in it, let

2  Mr. Heller know so that we can get them corrected before we

3  next meet.  In the meantime you are subject to these

4  conditions.  Please read them, as you go through that, and

5  adhere to them after that.

6          Mr. Heller?

7          MR. HELLER:  Your Honor, in doing that calculation, I

8  have a prepaid trip to Israel and Jordan, leaving the 25th of

9  March.

10          THE COURT:  It's more dangerous than here.

11          MR. HELLER:  Yes.

12          THE COURT:  What are the dates of your trip?

13          MR. HELLER:  I leave March 25th.  I return to my

14  office in Sacramento.  I come back to the United States on the

15  10th of April.  I'll be back in my office on the 12th of April.

16  What I would --

17          THE COURT:  That has nothing to do with us here, does

18  it?

19          MR. HELLER:  It will have nothing to do -- except

20  putting together the presentence report, I'm going to be gone

21  for a while.

22          THE COURT:  You won't get that until close to June

23  19th.  You will probably get it about two weeks before that.

24  Oh, you have to give information to them.

25          MR. HELLER:  Yes.  And so I'm -- I have other court

1  conflicts between now and the 25th with different court

2  appearances.

3          THE COURT:  Well, if there is a problem about getting

4  it done, then please talk to Mr. Rosen and talk to Probation,

5  and we will adjust the sentencing date to the extent that we

6  have to.

7          MR. HELLER:  Thank you, Your Honor.

8          THE COURT:  Thank you.  That's it.  Court is

9  temporarily in recess.

10          (Adjourned, 3:26 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3               I, Linda Walsh, Registered Professional Reporter

 4    and Certified Realtime Reporter, in and for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that pursuant to Section 753, Title 28, United States

 7    Code that the foregoing is a true and correct transcript of the

 8    stenographically reported proceedings held in the

 9    above-entitled matter and that the transcript page format is in

10    conformance with the regulations of the Judicial Conference of

11    the United States.

12                       Dated this 13th day of March, 2019.

13

14

15                       /s/ Linda Walsh_____

16                       Linda Walsh, RPR, CRR

17                       Official Court Reporter

18

19

20

21

22

23

24

25
```