# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

WILLIAM RICK SINGER,

        Defendant.

Case No.:19-10078-RWZ

 

## RICK SINGER'S SENTENCING MEMORANDUM

 

CANDICE L. FIELDS, Admitted *Pro Hac Vice*
Candice Fields Law, PC
cfields@candicefieldslaw.com
(916) 414-8050


A. NEIL HARTZELL, BBO #544752
Freeman Mathis & Gary, LLP
neil.hartzell@fmglaw.com
(617) 963-5966


*Attorneys for William "Rick" Singer*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT…………………………………………………..1

ARGUMENT………………………………………………………………....2

I.  Rick's History and Characteristics; Nature and Circumstances
    Of The Offense…………………………………………………………3

    A.  Rick Suffered Significant Trauma in His Youth……………………...3

    B.  Rick Was a Dedicated Athletic Coach and Counselor……………...5

    C.  Rick Later Succumbed to His "Win at All Costs" Obsession………..7

    D.  Rick Has Rededicated Himself to Atonement and Repair…………..8

II.  Rick Immediately Accepted Responsibility and Cooperated with the
     Government…………………………………………………………11

IIII.  A Sentence of Home Detention Plus Community Service or, Alternatively,
       a Short Term of Incarceration Will Achieve the Goals of Sentencing……..12

    A.  Rick's Cooperation Assisted the Government's Prosecution
        of More Than 50 Defendants and Warrants a Significant
        Downward Departure……………………………………………..12

        1.  Rick's Protracted Assistance Was Timely, Extensive,
            And of National Significance………………………..…….…12

        2.  Rick Has Suffered Deeply as a Result of His Cooperation…...14

    B.  Section 3553 Factors Support a Sentence of Home Detention
        or Short Incarceration Term Plus Community Service……………15

        1.  Rick's Personal History and Characteristics Warrant
            Special Leniency……………………………………………15

        2.  A Sentence of Home Detention or a Short Term of
            Incarceration Will Satisfy the Purposes of
            18 U.S.C. § 3553(A)(2) ……………………………………17

        3.  Rick Can Pay Restitution Now and in the Future……………...17

        4.  A Downward Variance Will Avoid Sentence Disparities
            Among Defendants…………………………………………18

CONCLUSION…………………………………………………………………..20

# TABLE OF AUTHORITIES

## Cases

*Dean v. United States*,
  137 S. Ct. 1170, 1175 (2017) ............................................................ 2, 3

*United States v. Adelson*,
  441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) ....................................... 3

*United States v. Brown*,
  26 F.4th 48, 69 (1st Cir. 2022) .......................................................... 18

*United States v. Cavera*,
  550 F.3d 180, 189 (2d Cir. 2008) (en banc) ...................................... 3

*United States v. Davila-Gonzalez*,
  595 F.3d 42, 49–50 (1st Cir. 2010) ................................................... 19

*United States v. Flores-de-Jesús*,
  569 F.3d 8, 38 (1st Cir. 2009) ........................................................... 16

*United States v. Grullon*,
  996 F.3d 21, 35 (1st Cir. 2021) ......................................................... 18

*United States v. Hector Monsegur,*
  1:11-CR-000666-LAP (S. Dist. NY) ................................................. 19

*United States v. Meredith*,
  1:19-CR-10075-MLW (Dist. Mass) ................................................... 11

*United States v. Reverol-Rivera*,
  778 F.3d 363, 366 (1st Cir. 2015). .................................................... 19

*United States v. Reyes-Santiago*,
  804 F.3d 453, 467 (1st Cir. 2015) ..................................................... 18

*United States v. Rosario-Peralta*,
  199 F.3d 552, 571 (1st Cir. 1999) ..................................................... 16

*United States v. Torres Santiago,*
   729 F.2d 38, 40–41 (1st Cir. 1984) ...................................................................... 16

*United States v. Vargas*, 560 F.3d 45, 52 (1st. 2009) ............................................. 19

## **Statutory Authorities**

18 U.S.C. § 3553(a) ..................................................................................................... 2

18 U.S.C. § 3553(a)(7) ............................................................................................... 17

18 U.S.C. § 3553(a)(2). ............................................................................................... 2

18 U.S.C. § 3553(a)(6) ............................................................................................... 18

Defendant William Rick Singer ("Rick") respectfully submits this memorandum in connection with his sentencing, currently scheduled to occur on January 4, 2023.

## PRELIMINARY STATEMENT

Rick has spent his life helping kids succeed. For decades, he worked tirelessly to support students in their athletic and academic pursuits. His success as a college admissions counselor eventually attracted wealthy clients who desperately wanted their children to attend the most elite schools. Driven by a need to "win at all costs," instead of governing the parents' unrealistic expectations, he satisfied them by means of bribery and fraud.

Once the government confronted Rick with his offenses, he accepted responsibility and agreed to cooperate with the government. For more than four years, since September 2018, he has assisted in the government's sweeping investigation. At the outset, he revealed the scope of the scheme. Thereafter, he provided evidence supporting the prosecution of parents, coaches, and others. Working closely with prosecutors and agents, he strategically planned and made recorded phone calls, attended wired meetings, and completed controlled financial transactions. With Rick's assistance, Operation Varsity Blues became the largest college admissions scandal ever prosecuted by the U.S. Department of Justice. His cooperation contributed to the conviction of more than fifty people and the widespread recognition of vulnerabilities in college admissions. Whatever may be said about Rick's crimes, his cooperation has led to important reforms at great cost to his own safety and reputation.

Since pleading guilty, Rick has lived a reclusive, humbled existence with a renewed commitment to his life's purpose: improving the lives of others. His unwanted notoriety has left him unemployable, depriving him of his self-esteem. He has tried to rebuild by volunteering in his community. He has boundless energy and ideas about programming for youth and the underserved. He would be an asset to society if permitted after sentencing to continue his community service efforts. As a man with little interest in wealth, he hopes to atone for his crimes through service to others.

Taking these factors into account – the gravity of his offenses, balanced against his substantial assistance in support of more than fifty prosecutions, the restitution payments he can make in the short and long-term, and Rick's proven commitment to work helping others, the Court must fashion a sentence "sufficient, but not greater than necessary" to serve the purposes of sentencing. 18 U.S.C. §3553(a). A three-year term of probation requiring twelve months of home detention and participation in 750 hours of community service will be a sufficient but not greater than necessary sentence. Alternatively, if incarceration is deemed necessary, a six-month sentence followed by a three-year term of supervised release that includes community service will satisfy the purposes of sentencing. *Id*. at (a)(2).

## ARGUMENT

A sentence must be "sufficient, but not greater than necessary," to vindicate the "four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a). A court fashioning a sentence must consider

"the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to serve the four overarching aims of sentencing." *Dean*, 137 S. Ct. at 1175.

The Court also "must ... consider the pertinent guidelines and policies adopted by the Sentencing Commission," *id.*, but must not "presume that a Guidelines sentence is reasonable," *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). Here, regardless of how the guidelines' "abstract arithmetic" is calculated, *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006), a sentence of home detention or, alternatively, a short term of incarceration is appropriate.

## I.    Rick's History and Characteristics; Nature and Circumstances of the Offense.

### A.    Rick Suffered Significant Trauma in His Youth.

Rick was born in Santa Monica, California in 1960. ███████████

████████████████████████████████

██████████████████████████ Ex. A, ██████████

██ .[1] ██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████ *Id.*

████████████████████████████████████

████████████████████████████████████

---

[1] Supporting exhibits are cited as "Ex. _"; information originating from exhibits for which a Motion to Seal Documents is pending has been redacted. ECF No. 88.



*Id.*

*Id.*

Ex. C,

Ex. A,



*Id.*

*Id.*

### B.   Rick Was a Dedicated Athletic Coach and Counselor.

Throughout Rick's coaching career, he made a point of recruiting poor and disadvantaged students to play on his teams. In many ways, he assumed the role of a de facto parent, ensuring his athletes attended school and teaching them life skills. One of his oldest acquaintances, Steve Williams, described Rick in those early years:

> Rick has always been very enthusiastic and passionate with everything he is connected to, and coaching basketball was certainly no exception […]. […] Rick has always been "all in" when it comes to his energy, coaching, teaching, and his work ethic to help students, (usually student-athletes of color) realize their full potential.

Ex. D, Steve Williams, Letter (February 10, 2022).



Ex. A.

In 2019, the Sacramento Bee interviewed Ron McKenna, a former coach who worked alongside Rick as a basketball assistant at Sacramento State. Mr. McKenna

reported admiring Rick's ability to coach and recruit, recalling him as someone who championed the underdog. McKenna noted, "I remember him as a workaholic. He did it 24 hours a day, seven days a week."

> [Rick] was the kind of guy who'd give you the shirt off his back to help, he was that generous. He was generous to a fault, even to strangers. And he was a great recruiter when we were at Sac State. He loved to go into places like East Los Angeles to recruit, and he'd get out there and play with prospects, talk their language.

Kasler, McGough, & Davidson, "Who is William Rick Singer, Sacramento man accused in college admissions scam?", *Sacramento Bee* (March 13, 2019).

In the early 1990s, Rick launched a college counseling service in Sacramento called Future Stars College & Career Counseling.  He helped parents and children understand the college admissions process. While he enjoyed working with kids, he did not like running a business and eventually sold it. He left his counseling work for several years opting instead to work at call center management jobs handling recruitment and training of new hires.

In around 2004, with private investment backing, Rick started a new company called The CollegeSource. Ted Mitchell, president of Occidental College and a member of CollegeSource's advisory group, remarked to The Sacramento Business Journal, "Rick has an encyclopedic knowledge of colleges and universities in America. Far more important, Rick is really great a getting at the heart of what kids and families want – and finding the right match." Robertson, "Thousands turn to college-prep coach," *Sacramento Business Journal* (February 6, 2005). In 2007, Rick transferred his interest in CollegeSource to his COO and started a new company named Edge College and Career Network, Inc. (aka "The Key").

The Key was a legitimate, for-profit, referral-based college counseling and preparation business. Like CollegeSource, The Key had many employees, including coaches, administrative staff, and part-time workers. ████████████████

██████████████████████████████████████████████████████████

█████████ Ex A, ███████████████████████████████████████████

█████████████████████████████████ *Id*. He got results for his clients and their children, lawfully, by studying the practices of nearly every institute of higher learning in the United States, determining what legitimate skills and interests the students possessed, and then matching those characteristics with well-suited colleges or universities. He later called this process the "front-door" to college admission. He helped thousands of students realize their dreams.

As his clients became more affluent, he found that some could afford to buy college admission through the "back-door," by making a very large donation to a school to promote the student's admission. While legal, such "development case" admissions are controversial due to the non-transparent influence of money on college acceptance decisions. D. Golden, *The Price of Admission: how America's ruling class buys its way into elite colleges – and who gets left outside the gates* (Crown 2007). The back-door approach is also affordable only for the wealthiest of families and, while offering a huge advantage, offers no guarantee of admission.

### C.     Rick Later Succumbed to His "Win at all Costs" Obsession.

Rick knew a third way students could gain college admission:  what he termed the "side-door" or paying a college sports department to secure a student's admission as a member of the team. Faced with parents' unrealistic hopes to place their children

at elite universities, and motivated by his early life-trauma to win at all costs, Rick failed to distinguish the moral difference between the iniquitous but lawful "back-door" approach and the fraudulent sale of academic spots through the "side-door." In his push to achieve results his clients desired, he arranged to manipulate admission applications and test scores.

Around 2012, Rick created a purported charity, KWF. While his genuine intent was to develop programs for students – plans that did exist to varying degrees – he also used KWF to disguise parental payments for side-door transactions as charitable contributions. From KWF's deposits totaling around $27.6 million, more than $11 million went to investments, business development projects mostly focused on enhancing services to under-resourced students,[2] and philanthropic gifts,[3] while he paid around $7.5 million to further the "side-door" scheme. PSR, ¶ 40.

### D.   Rick Has Rededicated Himself to Atonement and Repair.

Rick now lives in a trailer park in St. Petersburg, Florida.[4] Because he is widely known for his role in "Operation Varsity Blues," and his pending sentence, he has been unable to get a job while on pretrial release. PSR, ¶ 146.  Instead, Rick

---

[2] *See, e.g.*, Bluestone Partnership/International Life (content platform to help international students acquire U.S. undergraduate/graduate education; hosted students and teachers from China at a 2018 assimilation summer program at UCLA); Counting Stars (educational and sports performance program providing boys and girls with academic, athletic and psychometric evaluations by Division 1, 2, and 3 coaches); Getting In (low-cost college admission and career life-coaching platform); and Virtual Ph.D (re-engineered business model providing career and academic opportunities for Masters and Ph.D. students).

[3] *See, e.g.*, 1736 Family Crisis Center ($72,877); Banyan Foundation ($13,280); Generation Wow ($100,000); Harold Pump Cancer Foundation ($26,500); Joseph's Storehouse ($35,000) Ex. E, Chaplain Richard "Butch" Berget, Letter (October 15, 2022); Ladylike Foundation ($30,000).

[4] From the proceeds of the sale of his residence, Rick has paid $1,213,000 towards an anticipated $3.4 million forfeiture money judgment. PSR, ¶153.

has refocused his energy to help others. ██████████████████



Ex. C, ████████████████████████

Rick is grateful to be able to do some good. He travelled to Chicago to put on

a summer program for inner city kids, ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████ PSR, ¶ 146; Ex. F.████████████████████

████████ In Florida, Rick offers twice-weekly paddleboarding lessons to autistic

kids and veterans. PSR, ¶ 146; *also see* Ex. G., Pat Adair, Letter (undated); Ex. H,

Paige Haggbloom, Letter (January 14, 2022). One day, he paddled up to a man sitting

on a sunken, salvaged sailboat in the middle of the Gulf. That man was homeless

and attempting to raise the boat as a long-term home. Upon hearing this, Rick offered

---

██ ████████████████████████████████████████

his assistance and friendship. He helped the man buy a phone, find short-term housing, and raise the boat. *Id*.

He has also continued to offer free counseling services (after disclosing his identity and status to parents) to students who, during COVID, lacked access to guidance counseling through their regular schools. For one family,  Ex. I, ████████████████████ For another family, ████████ Ex. J, ████████████████

Rick has also continued to develop community programs for free. He has worked with a Los Angeles artist and small business owner on a project that uses coaching to develop creative talents among the underserved. Ex. K, ████████ He is currently in discussions with a non-profit organization in Hot Springs, Arkansas, High Impact Movement, Inc., to develop programming in the areas of leadership, employability, and the education of minority undeserved and underprivileged youth. The first webinar with Rick and its students and parents will be held in late January. Ex. L, Amos O. Gray IV, Letter (undated).

Rick recognizes that, by being caught, he has been given the opportunity for insight, atonement, and redemption. His federal prosecution, public infamy, and rigorous self-discovery have shown him that being honest is the only way to live

with purpose. He has no wish to return to the life he led but does hope to earn an honest living helping others. Despite his current situation, Rick believes he can help and is grateful for every opportunity he is given to do so. Ex. B, William Rick Singer, Statement of Responsibility & Relapse Prevention Plan ("Statement") (November 2022).

## II. Rick Immediately Accepted Responsibility and Cooperated with the Government.

Operation Varsity Blues began with a tip in an unrelated investigation that a Yale soccer coach, Rudy Meredith, accepted bribes in exchange for college admissions slots. Mr. Meredith told investigators about Rick and cooperated in obtaining evidence against him. *See United States v. Meredith*, 1:19-CR-10075-MLW (Dist. Mass). Once approached about his role with Meredith, Rick agreed to cooperate with federal authorities. He admitted to conspiring with university coaches and administrators, standardized test administrators, and dozens of parents to falsify their children's applications and secure their admissions to elite universities. After revealing the full scope of the government's case, he then assisted in gathering evidence leading to the prosecution of more than fifty confederates.

The nature and extent of Rick's efforts spanned almost six months, during which he served at the government's beck and call. He engaged in four formal proffer sessions with federal prosecutors (both in California and Florida), took part in hundreds of preparation calls with agents, placed approximately 1,600 monitored calls with targets, participated in more than twenty in-person, wired meetings (sometimes at personal risk due to the target's background of wealth and power).

He traveled often to Boston for additional meetings with agents.  He supervised bank transactions while maintaining a full work schedule for both the Key and KWF to protect the investigation's secrecy.[6] Later, Rick again flew repeatedly to Boston for extensive trial witness preparation.

### III.   A Sentence of Home Detention Plus Community Service or, Alternatively, a Short Term of Incarceration Will Achieve the Goals of Sentencing.

A sentence requiring home detention or a short term in custody – with a significant community service component – is sufficient but not greater than necessary to achieve the goals of sentencing.

#### A.   Rick's Cooperation Assisted the Government's Prosecution of more than 50 Defendants and Warrants a Significant Downward Departure.

It bears repeating that, all criticisms of his conduct aside, Rick's cooperation contributed to the prosecution and conviction of more than fifty defendants. His value to the government in consideration of a downward departure is self-evident from this remarkable fact. Universities who, as a result of his cooperation, were embarrassed have reexamined and altered their practices, as UCLA attests in a letter to the Court.

##### 1.   Rick's Protracted Assistance was Timely, Extensive, and of National Significance.

Almost immediately after being confronted by federal agents, and without demanding review of the evidence against him, Rick accepted responsibility for his

---

[6] With few exceptions, Rick did not maintain notes regarding his activities as a government witness, so this list contains only estimates.

conduct and agreed to serve as a cooperating witness.[7] His cooperation was crucial

and, from the beginning, he broadened the scope of the government's investigation.

As Andrew Lelling, former United States Attorney for the District of Massachusetts,

explained in 2021:

> So this case slowly expanded. Then once we had secured the
> cooperation of Rick Singer, the mastermind, if you will, then the entire
> scheme was opened up for us, and then we saw the true scope of it.
> Then it's just a matter of filling in gaps and anticipating defenses. So
> we knew at that point pretty much all the parents who were involved,
> the coaches who were involved. It was a matter of trying to build cases
> against as many of them as we could, and then bring the case down all
> at once.

Dalton (Host), "Operation Varsity Blues and the Need for Internal Controls at

Academic Institutions," [Audio podcast episode]," Jones Day Talks® (May 2021).

Indeed, over a period of years, Rick helped build cases against more than fifty

individuals by proffering repeatedly to prosecutors, opening controlled bank

accounts, conducting bank transactions under the supervision of investigators,

rehearsing and carrying out thousands of recorded calls and dozens of face-to-face

meetings, regularly debriefing, and preparing three times to testify at trial. The

investigation, its participants, their crimes, and the universities involved were

covered not only in the major press, but also in movies, books, and the tabloids,

bringing unrivaled notoriety and promoting deterrence on a massive scale.

    Going public with Rick's cooperative efforts played a significant role in

securing most, if not all, of his co-conspirator's guilty pleas. Acting at the direction

---

[7] Admittedly, Rick initially struggled with his new role and warned several targets of the
investigation for whom he felt sympathetic. He immediately self-reported this to federal agents
and pled to an obstruction count.

of law enforcement, Rick obtained incriminating recorded statements that constituted strong proof of each defendant's guilt. On a larger scale, current Massachusetts United States Attorney, Rachael Rollins, recently commented on the significance of the college admissions prosecutions:

> "'[…A]ll of the college admissions prosecutions have led to significant reforms at colleges and universities across the country aimed at curtailing the ability of those with means and access to flagrantly ignore the rules that apply to everyone else.'"

Durkin, "Former Harvard coach, dad acquitted in college bribery," *AP News* (Dec. 21, 2022) (quoting e-mailed statement). That outcome was the direct result of Rick's cooperative efforts.

### 2. Rick Has Suffered Deeply as a Result of his Cooperation.

Due to intense publicity surrounding his involvement in the investigation and threats to his safety, Rick has suffered many hardships. He was forced to relocate to avoid physical threats and harassment. PSR, ¶ 138. He has been the subject of a Netflix documentary ("Operation Varsity Blues: The College Admissions Scandal"), books, and frequent print and online articles in all media. While he takes the blame for casting an unfavorable light on himself, the attention directed to him has been protracted and amplified by his highly publicized cooperation. For almost four years, he has been hounded by the media, vilified by the public, and ostracized, living an isolated, lonely life punctuated only by regimented exercise and a commitment to doing good things for others. PSR, ¶ 146.

Whatever criticism Rick endures for his crimes, committed to help wealthy parents get their children admitted to elite colleges, and for the mistakes he made

along the way as a government witness, his voluntary cooperation contributes substantially towards his redemption. Pursuant to Section 5K1.1 of the USSG, he respectfully requests a substantial downward departure that reflects the scale and helpfulness of his cooperation which has no analogue in recent annals of federal prosecution.

**B.    Section 3553 Factors Support a Sentence of Home Detention or Short Incarceration Term Plus Community Service.**

    **1.    Rick's Personal History and Characteristics Warrant Special Leniency.**

For most of his life, Rick has been driven to win at all costs. Childhood trauma broke his moral compass and, increasingly over time, choosing right over wrong became less important than doing what needed to be done to be the best. This personal history does not *excuse* Rick's crimes, but it does help explain his motivation and mitigates his offense. Ex. B, William Rick Singer, Statement (November 2022).

He is not a fraudster out to cheat others; he is a damaged man who lost his moral compass after many years of service.  Given the chance, he will provide honest support, and with guidance from federal supervision, will atone for his crimes by helping others. Those who know him best attest to this fact:


Ex. C.

- Steve Williams: "[…] I hope that all the good work Rick has done for the benefit of the underrepresented children of color and poor children will [be] part of the conversation that determines the outcome of his mistakes." Ex. D.

- Pat Adair: "This man made so many people smile and feel good about themselves without any glory but rather he shared in [in the glory of] those who participated [sic] glory." Ex. E.

- Paige Haggbloom: "There needs to be more people like Rick who are willing to reach out and do acts of kindness daily." Ex. H.

Rick has proven throughout his life that he is a compassionate, hard-working man capable of contributing to society through legitimate work. His prior work as an athletic coach and college counselor proves this. PSR, ¶ 147. His decision to accept responsibility and plead guilty while providing substantial assistance – informing the government of the scope of the college admissions scheme and then gathering evidence to support more than fifty prosecutions – further shows his true character as someone full of regret who wishes to lead a law-abiding life.

The First Circuit has long held that defendants who accept responsibility and express remorse are not similarly situated to those who do not. *See, e.g., United States v. Flores-de-Jesús*, 569 F.3d 8, 38 (1st Cir. 2009) (noting that "a defendant who chooses to enter into a plea bargain is not similarly situated to a defendant who contests the charges") (citation omitted); *United States v. Rosario-Peralta*, 199 F.3d 552, 571 (1st Cir. 1999) (defendants who accept responsibility and express remorse are eligible for "special leniency"); *United States v. Torres Santiago*, 729 F.2d 38, 40–41 (1st Cir. 1984) (same). A non-custodial or short-custodial sentence will recognize Rick's true character and promote the best use of his positive personal characteristics.

/ / /

/ / /

### 2. A Sentence of Home Detention or a Short Term of Incarceration Will Satisfy the Purposes of 18 U.S.C. § 3553(a)(2).

Rick's sentence must satisfy the purposes of 18 U.S.C. § 3553(a)(2). He does not need to be imprisoned to experience sufficient punishment for his crimes. At age 62, with no prior experience with the criminal justice system, he must endure the anguish of being recognized as the "mastermind of the college admissions scandal" and the lead defendant in Operation Varsity Blues. He is already serving a life sentence of sorts. Having lost everything, including his assets, his business, and – most importantly – the trust and respect of family, friends, and those involved in college admissions, he needs no additional deterrence from committing future crimes. Others who would consider similar offenses have been well-warned not to follow Rick's path. He would benefit from long-term mental health treatment to address his childhood trauma. That would best be provided not through incarceration but as a component of the terms of probation or supervised release.

### 3. Rick Can Pay Restitution Now and in the Future.

One of the factors to be considered at sentencing is the need to provide restitution to any victims. 18 U.S.C. § 3553(a)(7). Fortunately, Rick did not squander the income derived from the college admissions scheme: More than $5.3 million was on deposit in KWF's bank account, and several additional assets were recovered by the government to be liquidated pursuant to the Plea Agreement. Plea Agreement, p. 7; PSR, ¶ 153. It is anticipated that all forfeited assets will be paid in restitution to the IRS through restoration.[8]

---

[8] It is the defense's understanding that the government has requested from the Money Laundering and Asset Recovery Section (MLARS) of the Department of Justice preliminary approval of

Rick's ability to pay additional restitution in the future will depend, in part, upon the speed by which he is able to return to the workforce. A probationary sentence would allow him to continue applying for jobs. While he has had difficulty obtaining one while his case has been pending sentencing, he is optimistic about finding gainful employment soon. Rick is eager to do so and has valuable skills as he is capable of developing and delivering skill-advancement programs to a myriad of consumers. He is willing to relocate anywhere in the United States and is already in discussions with a Reverend from Hot Springs, Arkansas to introduce his concepts there. For these reasons, a lengthy incarceration period would interfere with restitution prospects and be "greater than necessary" to achieve the goals of sentencing.

### 4.    A   Downward   Variance   Will   Avoid   Sentence Disparities Among Defendants.

Section 3553(a)(6) codifies "the need to avoid unwarranted sentence disparities among similarly situated defendants." The First Circuit has considered the reasonableness of a sentence because of a disparity relative to a co-defendant's sentence. *See United States v. Brown*, 26 F.4th 48, 69 (1st Cir. 2022), *citing United States v. Grullon*, 996 F.3d 21, 35 (1st Cir. 2021). Things that may throw off a direct comparison include a co-defendant's cooperation, the nature of his cooperation, and his choice to plead guilty instead of going to trial, as well as his relative culpability or role in the crime. *Id*. at 69, *citing United States v. Reyes-Santiago*, 804 F.3d 453,

/ / /

---

restoration of forfeited funds to restitution to the IRS.

467 (1st Cir. 2015) (collecting cases); *United States v. Reverol-Rivera*, 778 F.3d 363, 366 (1st Cir. 2015).

No Operation Varsity Blues defendant is precisely identical to Rick.[9] However, Rudy Meredith's sentence is informative. As a coach, Mr. Meredith participated with parents and Rick in selling admissions to Yale. Upon getting caught, he agreed to cooperate and led investigators to Rick. Compared to Rick, Mr. Meredith's role in the conspiracy was much smaller – he accepted $860,000 in bribes, a small portion of the scheme for which Rick has accepted responsibility. But Mr. Meredith's assistance, while pivotal, was not as robust. Mr. Meredith was sentenced to five months in custody followed by a one-year term of supervised release.

The First Circuit has observed that Congress's concern with unwarranted disparities was mainly concerned with minimization of disparities among defendants nationally rather than with disparities among codefendants engaged in a common conspiracy. *See United States v. Vargas*, 560 F.3d 45, 52 (1st. 2009); *United States v. Davila-Gonzalez*, 595 F.3d 42, 49–50 (1st Cir. 2010) ("A district court's consideration of sentencing disparity "aims primarily at the minimization of disparities among defendants nationally," and collecting cases). An apples-to-apples similarity between this and any other case seems doubtful. However, the defense has

---

[9] Except for those whose guidelines fell into Zones A and B, who were sentenced to no imprisonment when such an outcome was contemplated by the guidelines, every defendant in the Varsity Blues investigation has been sentenced well below the guidelines – even without cooperation. The government has consistently recommended below-guidelines sentences. For example, in *United States v. Gordon Ernst*, 1:19-CR-10081-IT (Dist. Mass.), the government recommended a 48-month sentence based on a range of 87 to 108 months. *Id.,* at ECF No. 1343. Mr. Ernst, a coach who pocketed $3.5 million in bribes, was sentenced to 30 months.

identified *United States v. Hector Monsegur,* 1:11-CR-000666-LAP (S. Dist. NY), as somewhat comparable.

Mr. Monsegur was a prolific computer hacker who engaged in several major hacks into, and thefts from, government and corporate computer servers. He pleaded guilty to a twelve-count superseding information that included conspiracy charges relating to his involvement as a member of Anonymous, a collective of computer hackers. After violating the terms of his pretrial release, he was detained for seven months. He cooperated, working with the FBI for over ten months to identify other hackers, prevent millions of dollars in losses, and point out infrastructure vulnerabilities. At the time of his sentencing, his cooperation had not resulted in any prosecution. Based upon an offense level of 38, Mr. Monsegur's USSG range was 259 to 317 months' imprisonment. *Id.* at ECF No. 30. He was sentenced to "time served" with a one-year term of supervised release. Rick has agreed that his offense level is 39 (prior to any adjustment for acceptance of responsibility), while the Probation Office calculates that it is 31. PSR, ¶ 114. A sentence of one year of home detention or, alternatively, six months in custody would avoid an unwanted disparity between these two defendants.

## CONCLUSION

For the foregoing reasons, a three-year term of probation requiring twelve months of home detention and participation in 750 hours of community service will be a sufficient but not greater than necessary sentence. Alternatively, if incarceration is deemed necessary, the purposes of sentencing will be satisfied with a six-month sentence followed by a three-year term of supervised release that includes community service.

Respectfully submitted,

Dated: December 28, 2022

/s/ *Candice L. Fields*
CANDICE L. FIELDS, Admitted *Pro Hac Vice*
Candice Fields Law, PC
cfields@candicefieldslaw.com
(916) 414-8050
Attorney for Defendant William Rick Singer

/s/ *A. Neil Hartzell*
A. NEIL HARTZELL, BBO #544752
Freeman Mathis & Gary, LLP
neil.hartzell@fmglaw.com
(617) 963-5966
Attorney for Defendant William Rick Singer

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ *Candice L. Fields*
CANDICE L. FIELDS