## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

WILLIAM SINGER,

      Defendant,

and

JOHN B. WILSON,

      Movant.

No. 1:19-cr-10078-DJC

**LEAVE TO FILE GRANTED
ON NOVEMBER 8, 2023**

### JOHN WILSON'S REPLY IN SUPPORT OF MOTION TO
### ADJUDICATE THIRD-PARTY PETITION FOR RETURN OF FUNDS

Having failed to convict John Wilson of any crime that could serve as a forfeiture predicate, the government is nevertheless determined to keep his $1 million that it purports to have forfeited from Defendant William Singer. The forfeiture of the $1 million that the government claims to have obtained is legally flawed and based on repeated misrepresentations and incorrect statements:

- In seeking forfeiture from Mr. Singer, the government told the Court that the money it was forfeiting was involved in Mr. Singer's criminal offenses, even though the government knew that the conspiracies with which it charged Mr. Singer ended well before Mr. Wilson transferred the $1 million to Mr. Singer's company, and Mr. Singer received the funds while he was acting as an FBI undercover cooperator. Thus, the $1 million was never within the scope of the government's forfeiture claim.

- The government purported to forfeit Mr. Wilson's $1 million when it requested forfeiture of "all funds on deposit in" a specific bank account, even though the government knew the $1 million was not "on deposit in" that account when it requested, and the Court granted, forfeiture. Thus, the $1 million was never within the scope of the Court's forfeiture order.

- To induce the Court to grant forfeiture, the government falsely told the Court that it had notified all interested persons, even though it knew it had not notified Mr. Wilson.

The government now asks this Court to look past these errors and allow it to keep Mr. Wilson's $1 million, primarily because Mr. Wilson's request for his money back ostensibly came too late.

The Court should reject the government's bid to keep money to which it has no legitimate claim.

To hold otherwise will only encourage the government's bad behavior. In this case, the government used its cooperating witness to induce transfers from numerous third parties who the government thought were engaged in criminal acts. It lacked the humility to consider the possibility that some of the targets of its investigation might be innocent. Instead, it sought forfeiture of their money before establishing guilt, getting Mr. Singer, as part of his plea arrangement, to consent to the forfeiture of other people's property to which he obviously had no claim. Then—whether deliberately or negligently—the government gave no notice of that forfeiture to those third parties, Mr. Wilson included, which guaranteed the forfeiture would be uncontested. The government also botched the forfeiture, purporting to have forfeited the $1 million even though that money clearly falls outside the scope of the charges that served as forfeiture predicates, and even though bank records clearly show that the $1 million was not on deposit in the bank account whose contents the government sought to forfeit. The Court should order the government to return Mr. Wilson's $1 million plus interest from the dates of seizure.

## BACKGROUND

On September 24, 2018, Mr. Singer opened a Bank of America checking account with account number ending in x0486 in the name of Key Worldwide Foundation ("KWF") (the "Account"). Wilson DE 2391, at 151-53 (9/21/21 Trial Tr.).[1] Mr. Singer was, at that time, a cooperating witness for the FBI, and Mr. Singer opened the Account at the direction of FBI agents. *Id.* The FBI had Mr. Singer open the Account to receive illicit payments from parents and to make illicit payments to coaches and university administrators as part of the FBI's investigation.

Mr. Wilson was unlike the other parents who Mr. Singer induced to send money to the Account because when Mr. Wilson wired two payments of $500,000 each on October 17, 2018,

---

[1]    Mr. Wilson references filings in this case by "DE ___," and he references filings in his separate criminal case by "Wilson DE ___."

and December 11, 2018 (collectively, the "Wilson Funds"), Mr. Wilson believed that Mr. Singer would use the money to make lawful donations to Stanford University and Harvard University. Mr. Wilson was wrong. In fact, the FBI had directed Mr. Singer to induce Mr. Wilson to transfer the Wilson Funds as part of a ruse to build a case against him. *Id.* at 199.

Thus, on October 15, 2018, Mr. Singer, at the FBI's direction, asked Mr. Wilson to make a $500,000 wire transfer to KWF, promising that KWF would donate the money to Stanford on Mr. Wilson's behalf. *Id.* Mr. Wilson's company then wired $500,000 to the Account two days later. Ex. A, at 13. On November 29, 2018, Mr. Singer, at the FBI's direction, instructed Mr. Wilson to make a further wire transfer of $500,000 to KWF for KWF to donate to Harvard on Mr. Wilson's behalf. Wilson DE 2392, at 14 (9/23/21 Trial Tr.). On December 11, 2018, Mr. Wilson's company wired $500,000 to the Account. Ex. A, at 27. The Wilson Funds were never donated to Stanford and Harvard as Mr. Wilson had expected and Mr. Singer had stated.

Although the FBI told Mr. Singer that he could not access the money in the Account without the FBI's permission, Mr. Singer did not obey that instruction and withdrew over $86,000 from the Account apparently for personal use, including endorsing numerous checks payable from the Account on March 4, 2019.[2] One week later, on March 11, 2019, Mr. Singer withdrew $5,148,328.16 from the Account via a cashier's check payable to the United States Marshals Service. Ex. A, at 43, 45, 123. After this withdrawal, the Account had a balance of $4,938.96. *Id.* at 43. Records the government produced to Mr. Wilson in discovery and presented at Mr. Wilson's

---

[2]  Mr. Singer endorsed checks payable to: (1) PG&E (a California electric utility), in the amount of $2778.91; (2) Martin Edwards (a Netflix screenwriter), in the amount of $7,500.00; (3) Waste Management of Alameda County, in the amount of $998.46; (4) AT&T, in the amount of $58.38; (5) KikiNetwork, LLC (a PR firm), in the amount of $7,500.00; and (6) Orender Unlimited (a company owned by Mr. Singer's business associate), in the amount of $68,030.00. Ex. A, at 135-37, 141-43. Several of these charges appear to be related to a sports facility Mr. Singer owned in Oakland, California.

trial do not reflect further activity in the Account.[3]

FBI agents arrested Mr. Wilson on March 12, 2019, and he was charged in a Second Superseding Indictment on April 9, 2019. Wilson DE 314. On October 22, 2019, the government charged Mr. Wilson in a Third Superseding Indictment. Wilson DE 610. The government filed the Third Superseding Indictment during the period for third parties to object to the Singer Forfeiture. The Third Superseding Indictment contained a criminal money laundering forfeiture allegation, *id.* at 59-60, and a civil forfeiture allegation that states:

> Upon conviction of the offenses . . . set forth in Counts One through Two and Four through Twelve of this Third Superseding Indictment, the defendants, [including Mr. Wilson,] shall forfeit to the United States . . . any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

*Id.* at 57. Of the counts subject to this forfeiture allegation, Mr. Wilson was charged in Counts One, Two, Six, Nine, Eleven, and Twelve. Counts Six, Nine, Eleven, and Twelve expressly concerned the two $500,000 transfers of the Wilson Funds to the Account.[4] *Id.* at 54, 56. Other than the Wilson Funds, there are no other funds that could conceivably have been involved in Counts Six, Nine, Eleven, and Twelve and for which Mr. Wilson could have a forfeitable interest.

The government filed a Fourth Superseding Indictment on January 14, 2020, which for purposes of this Motion is not materially different from the Third Superseding Indictment. Wilson DE 732. In particular, Counts Six, Nine, Eleven, and Twelve—the counts predicated on the transfers of the Wilson Funds—are identical in both indictments, as are the forfeiture allegations. The Fourth Superseding Indictment was the operative pleading at Mr. Wilson's trial.

Mr. Wilson's trial began in September 2021. On the eve of trial, the government dismissed

---

[3]     The Account records reflect no activity in April 2019. Ex. A, at 47. The government did not produce statements for the Account for subsequent months.
[4]     Count One concerned some parents', but not Mr. Wilson's, cheating on SAT and ACT tests. Count Two concerned payments to University of Southern California officials. Wilson DE 610, at 49-51.

the money laundering count. Wilson DE 2042. The jury convicted Mr. Wilson of the remaining charges. The First Circuit, however, vacated all of Mr. Wilson's convictions except for a tax count not relevant here. This ruling vacated the convictions as to every count that was a basis for the civil forfeiture allegation. The First Circuit's mandate issued on June 29, 2023. Wilson DE 2685. The government sought dismissal of the vacated counts on the same day. Wilson DE 2683.

Because forfeiture in Mr. Wilson's case was predicated on the money laundering count and the vacated counts, there was no longer any basis for forfeiture of the Wilson Funds. Thus, counsel for Mr. Wilson requested that the government return the Wilson Funds on July 17, 2023. Ex. B, at 4. Counsel for the government refused to consent or to engage substantively on the basis for its refusal. *Id.* Mr. Wilson thus filed a motion in his own criminal case seeking return of the Wilson Funds on July 25, 2023. Wilson DE 2701. In the government's opposition, Wilson DE 2708, Mr. Wilson learned for the first time that the government purports to have forfeited the Wilson Funds as part of the forfeiture proceedings in Mr. Singer's case (the "Singer Forfeiture").

On March 5, 2019, the government charged Mr. Singer in a four-count criminal Information with racketeering conspiracy, money laundering conspiracy, conspiracy to defraud the United States, and obstruction of justice. DE 1. The Information alleges that each of the conspiracies ended in September 2018, *id.*, when Mr. Singer became a government cooperator.

The Information contained forfeiture allegations predicated on the racketeering and money laundering conspiracy counts. *Id.* at 22-25. Both forfeiture allegations state that Mr. Singer would forfeit, among other things, "[a]ll funds on deposit in Bank of America checking account in the name of Key Worldwide Foundation ending in x0486." *Id.* at 22, 24. Mr. Singer pleaded guilty to the Information on March 12, 2019, when the Court accepted Mr. Singer's plea agreement. DE 19.

On September 10, 2019, the government filed a Motion for Preliminary Order of Forfeiture

("Preliminary Forfeiture Motion"), seeking forfeiture of, among other things, "[a]ll funds on deposit in" the Account. DE 42, at 2. At the time of that motion, the Account had $4,938.96 on deposit. Ex. A, at 43. The government represented that all the property to be forfeited "[was] involved in [Mr. Singer's offenses] or traceable to such offenses; were acquired or maintained in violation of 18 U.S.C. § 1962; constitute, or are derived from proceeds obtained directly or indirectly, in such offenses; or were otherwise forfeitable under 18 U.S.C. § 1963." DE 42, at 4.

On September 12, 2019, the Court granted the Preliminary Forfeiture Motion. DE 43. The Court ordered the government to post notice of the forfeiture on www.forfeiture.gov, and that "[p]ursuant to 21 U.S.C. § 853(n)(1), as incorporated by 18 U.S.C. §§ 1963 and 982(a)(1), the United States shall give, to the extent practicable, *direct written notice to any person known to have alleged an interest in the Properties to be forfeited*." *Id.* at 5 (emphasis added). The Court ordered that any person alleging an interest in the property could contest the forfeiture within the earlier of (a) 60 days from the date of publication, and (b) 30 days after receiving actual notice. *Id.*

It is undisputed that (1) the government did not give direct written notice to Mr. Wilson, and (2) Mr. Wilson did not challenge the Singer Forfeiture within the period set by the Court. Thus, on February 3, 2020, the government filed the Motion for Final Order of Forfeiture ("Final Forfeiture Motion"). DE 48. In the Final Forfeiture Motion, the Government represented that, "Notice of the Preliminary Order of Forfeiture was sent to all interested parties." *Id.* at 1. The government submitted a declaration from counsel certifying the list of persons the government notified of the forfeiture. DE 46 ¶ 2. Neither Mr. Wilson nor his counsel were among them. *Id.* On February 5, 2020, the Court entered a Final Order of Forfeiture. DE 49.

Based on the government's statements that it had forfeited the Wilson Funds in the Singer Forfeiture, Wilson DE 2708, Judge Sorokin denied Mr. Wilson's request for their return without

prejudice to be filed in this session in an oral ruling at Mr. Wilson's September 29, 2023, resentencing. This Motion followed.

## ARGUMENT

**A.      Due Process Requires the Court To Hear the Merits of Mr. Wilson's Petition**

**1.      Rule 60(b) Does Not Bar the Court from Considering Mr. Wilson's Claim to the Wilson Funds**

The government faults Mr. Wilson for not filing a Rule 60(b) motion to reopen the Singer Forfeiture. Opp'n 15-18. Mr. Wilson did not intend for the instant Motion to resolve any issues on the merits, including whether Rule 60(b) applies. Indeed, the only relief Mr. Wilson sought was (a) leave to file a pleading (as a non-party), and (b) an order directing the parties to meet and confer to identify the disputed issues and set a briefing schedule on those issues. DE 110, at 3 (Motion); DE 110-2, at 1 (Proposed Order). The government nevertheless presented all of its merits arguments in its response, necessitating this reply on the merits of issues Mr. Wilson intended to present to the Court in later motion practice, including whether Rule 60(b) applies. In light of these circumstances, the Court should construe the instant Motion and Reply as a Rule 60(b) motion.

Rule 60(b) poses no bar to relief because the Final Forfeiture Order is void as to Mr. Wilson. *See* Fed. R. Civ. P. 60(b)(4). Courts have made clear that Rule 60(b)(4) is a proper vehicle for setting aside "a judgment obtained without due process." *Irvin v. Harris*, 944 F.3d 63, 68 (2d Cir. 2019). Indeed, the First Circuit has held, in a civil forfeiture proceeding under 21 U.S.C. § 881, that "[i]f the notice [to interested parties] turns out to have been inadequate, *the forfeiture is void.*" *United States v. Giraldo*, 45 F.3d 509, 511 (1st Cir. 1995) (emphasis added).[5]

There is no time limit on a Rule 60(b)(4) motion, and the Court has no discretion to deny

---

[5]      *See also Price v. Wyeth Holdings Corp.*, 505 F.3d 624, 632 (7th Cir. 2007); *United States v. One Toshiba Color Television*, 213 F.3d 147, 156-57 (3d Cir. 2000) (holding that a forfeiture judgment was void where there was "improper notice given by the government of the forfeiture proceedings").

a Rule 60(b)(4) motion when a judgment is void. *See Sea-Land Serv., Inc. v. Ceramica Europa II, Inc.*, 160 F.3d 849, 852 (1st Cir. 1998). As discussed in the sections that follow, the government did not give Mr. Wilson the direct written notice to which he was entitled, and Mr. Wilson did not have actual notice, in violation of due process. The Final Forfeiture Order is therefore void, and, accordingly, the Court must reopen the Singer Forfeiture under Rule 60(b)(4).

### 2.      The Government Was Required To Give Mr. Wilson Direct Written Notice

Federal Rule of Criminal Procedure 32.2(b)(6)(A) provides, "If the court orders the forfeiture of specific property, the government must publish notice of the order *and send notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture* in the ancillary proceeding." (Emphasis added.) Likewise, 21 U.S.C. § 853(n)(1) states,

> Following the entry of an order of forfeiture under this section, the United States shall publish notice of the order and of its intent to dispose of the property in such manner as the Attorney General may direct. *The Government may also, to the extent practicable, provide direct written notice to any person known to have alleged an interest in the property that is the subject of the order of forfeiture as a substitute for published notice as to those persons so notified.*

(Emphasis added.) Direct written notice is mandatory for interested third parties under § 853(n)(1). *See United States v. Erpenbeck*, 682 F.3d 472, 476 (6th Cir. 2012) (stating that § 853(n)(1) "merely gives the government discretion to employ direct notice as a substitute for published notice").

The government does not dispute that direct written notice is mandatory under both Rule 32.2(b)(6)(A) and § 853(n)(1), and was also required under the Preliminary Forfeiture Order. It only argues that Mr. Wilson was not a person "who reasonably appear[ed] to be a potential claimant" and that its failure to give direct written notice was harmless because Mr. Wilson had actual notice. Opp'n 9-15. Neither of these things is true, as discussed herein. *See infra* Sections A.3 (no actual notice), B (Mr. Wilson is the owner of the Wilson Funds). The remedy for the government's failure to give notice is for the Court to hear Mr. Wilson's claim, any purported time

bar notwithstanding. *See Erpenbeck*, 682 F.3d at 474, 476-77; *United States v. Sah*, No. 3:20-CR-484-S, 2022 WL 1643956, at *4 (N.D. Tex. May 23, 2022).

     **3.**     **Mr. Wilson Did Not Have Actual Notice**

The government attempts to remedy its failure to give direct written notice by suggesting that Mr. Wilson had actual notice that the Singer Forfeiture included the Wilson Funds. Opp'n 9-10. This is not true. "Proof of 'actual notice' means proof that the property owner or his counsel actually received advance notice of the forfeiture." *United States v. Gagliardi*, 201 F.3d 429, 1999 WL 1338351, at *1 n.1 (1st Cir. 1999) (unpublished table decision). The government bears the burden of proving notice. *See, e.g.*, *United States v. One Parcel of Land Together With Its Bldgs.*, No. 1:94-cv-40137, 1997 WL 567945, at *3 (D. Mass. Sept. 4, 1997). The government cannot prove that Mr. Wilson received actual notice because the facts available to Mr. Wilson prior to the government's August 7, 2023, opposition to Mr. Wilson's Motion for Return of Property did not inform him that the government had purported to forfeit the Wilson Funds in the Singer Forfeiture.

     **a.**     **The Wilson Funds Were Not "On Deposit In" the Account**

The government never stated in any pleading related to the Singer Forfeiture that the Wilson Funds, specifically, were subject to forfeiture. Rather, the government sought forfeiture of "all funds on deposit in" the Account. DE 42, at 2; DE 48, at 1. The Court ordered forfeiture of the same. DE 43, at 2; DE 49, at 1. The government argues that this put Mr. Wilson on notice because Mr. Wilson's counsel (a) reviewed the Preliminary Forfeiture Motion and (b) knew that the Wilson Funds were transferred to the Account. Opp'n 9-10.

The government's own evidence, however, conclusively shows that when the government filed the Preliminary Forfeiture Motion, the Wilson Funds were *not* "on deposit in" the Account and, therefore, *not* among the property the government sought to forfeit. The Account statements to which the government refer clearly show that the Wilson Funds (among other funds) were

withdrawn from the Account on March 11, 2019, some six months before the government initiated the Singer Forfeiture. Ex. A, at 43, 45, 123. Indeed, when the government filed the Preliminary Forfeiture Motion, seeking forfeiture of "all funds on deposit in" the Account, the Account had a little under $5,000 on deposit. *Id.* at 43. As far as Mr. Wilson knows (or could have known at the time), the Account had the same amount in it when the Court ordered forfeiture. *See supra* note 3.

The government overlooks this fact in its Opposition, asserting that the pleadings in the Singer Forfeiture "made clear . . . that the government sought forfeiture of the BOA x0486 account to which Wilson wired $1 million." Opp'n 9. This is true so far as it goes: the government's pleadings do say that the government sought forfeiture of the money in the Account, and it is true that Mr. Wilson wired $1 million to the Account. But the government's conclusions—that the Singer Forfeiture included the Wilson Funds and that Mr. Wilson knew or should have known this—do not follow because the Wilson Funds flowed out of the Account before the government filed the Preliminary Forfeiture Motion and before the Court ordered forfeiture.

That Mr. Wilson's counsel had the Preliminary Forfeiture Motion and Account statements was not sufficient to give actual notice. To the contrary, reviewing these documents would give notice that the Wilson Funds were ***not*** part of the Singer Forfeiture because these documents make clear that the government did not seek, or obtain, forfeiture of the Wilson Funds. Rather, the Court's order only authorized forfeiture of the almost $5,000 that was "on deposit in" the Account.

The government could have sought forfeiture of the Wilson Funds, for example, by seeking forfeiture of "all funds *formerly* on deposit in" the Account "and now in the custody of the U.S. Marshals Service." But this is not what the government did. Combined with the government's failure to give Mr. Wilson direct written notice—even though it was required by the Constitution, statute, Rule, and Court order to do so—it was not incumbent upon Mr. Wilson to read the

government's mind and to assume that the government meant something other than what it represented to the Court on multiple occasions.

> **b.** **The Wilson Funds Are Outside of the Temporal Scope of the Singer Information and the Singer Forfeiture**

The Singer Forfeiture *did not* include the Wilson Funds, as explained above, and, moreover, *could not* have lawfully included the Wilson Funds because there was no nexus between Mr. Singer's offenses and the Wilson Funds—a fact that is plain from the face of the Information. Indeed, the Wilson funds were not transferred to the Account until October 17, 2018, and December 11, 2018, while the Information confirms that the predicate racketeering and money laundering conspiracies ended in September 2018. DE 1, at 17, 19.[6] The Preliminary Forfeiture Motion and the Final Forfeiture Motion track the Information's forfeiture allegations; these motions do nothing to alter the Information's clear indication that the Wilson Funds could not have been forfeitable in connection with Mr. Singer's offenses. DE 42, at 2; DE 48, at 1-2.

That the government considered Mr. Singer's predicate crimes to have ended in September 2018 is not surprising. Mr. Singer's decision to become a cooperating witness in September 2018 terminated his membership in any alleged conspiracy. *See United States v. Pizarro-Berrios*, 448 F.3d 1, 10 (1st Cir. 2006). Accordingly, money transferred to the Account after the charged conspiracies ended and not otherwise linked to criminal activity—like the Wilson Funds—could not have been involved in such conspiracies.

The government all but concedes that inclusion of the Wilson Funds in the Singer Forfeiture was unlawful, offering only unserious responses in a footnote. First, the government states that "Singer's cooperation did not end the scheme as to all participants," Opp'n 3 n.2,

---

[6]     Furthermore, although the Information contains 88 paragraphs of detailed factual allegations outlining the conspiracies to which Mr. Singer pleaded guilty, it does not mention the Wilson Funds.

implying that others implicated in the so-called "conspiracy" the government charged continued to be part of said conspiracy. As the government well knows, the First Circuit emphatically rejected the government's theory of conspiracy liability in connection with this case. *See United States v. Abdelaziz*, 68 F.4th 1, 40-60 (1st Cir. 2023). Simply put for Mr. Wilson, there could be no conspiracy without Mr. Singer.

Second, the government asserts that "Wilson contacted Singer about entering into the side-door scheme for his daughters before Singer began cooperating." Opp'n 3 n.2. The FBI agent affidavit to which the government cites, however, discusses a conversation that occurred on September 29, 2018, *after* Mr. Singer began cooperating. *See* Aff. of L. Smith ¶ 304, Wilson DE 3-4, at 4. In any event, the government has waived any argument as to why a pre-cooperation conversation between Mr. Singer and Mr. Wilson would be relevant here, given that such argument was developed only in a footnote and without citation or elaboration. *See United States v. Greig*, 717 F.3d 212, 218 n.3 (1st Cir. 2013). Moreover, there is no evidence of such a conversation that suggests Mr. Wilson's involvement in any crime, and the government did not obtain a conviction of Mr. Wilson that suggests his involvement in a crime during any such conversation.

Regardless of its footnoted arguments, the government did not purport to use the Singer Forfeiture to forfeit money that was part of a non-Singer conspiracy. Instead, it clearly represented to the Court (and the world) that the Singer Forfeiture was for Mr. Singer's crimes, which was all the government lawfully could have obtained in the Singer Forfeiture.

Rather than defend the legality of the Singer Forfeiture, the government argues that Mr. Wilson lacks standing to challenge its validity on this ground. The government's contention misses the mark with respect to the notice issue. On the question of whether Mr. Wilson had actual notice, the fact that the Singer Forfeiture was legally flawed, insofar as it purported to include the Wilson

Funds, is highly relevant. The government cannot seriously maintain that Mr. Wilson should have realized the government was pursuing an unlawful forfeiture of his money, particularly given the government's failures to give direct written notice and to clearly state in any pleading that the Wilson Funds were intended to be forfeited. It was far more reasonable under the circumstances for Mr. Wilson to believe that the government was complying with the law. Thus, the illegality of including the Wilson Funds in the Singer Forfeiture strongly supports a lack of actual notice.

### c.     The Government Badly Mismanaged the Account

The bank statements that the government produced to Mr. Wilson display the FBI's stunning lack of control over the Account. The FBI allowed Mr. Singer to induce numerous parents to transfer funds to the Account, resulting in their commingling. For some reason, the FBI then used those same funds to make payments to coaches and college administrators in sting operations. The FBI also allowed Mr. Singer to repeatedly draw from the Account, including over $86,000 in checks endorsed by Mr. Singer for his personal benefit on March 4, 2019. *See supra* note 2.

The government's mismanagement of the Account in these ways made it impossible to properly track the movement of the Wilson Funds after they reached the Account. The confusion over whether the Wilson Funds were—or were even intended by the government to be—part of the Singer Forfeiture is a direct result of the government's failure to impose any semblance of accounting discipline over the funds that were flowing into and out of the Account. In particular, it was negligent, at best, for the FBI to allow commingled funds to sit in the Account at a time when the government had no way of knowing that all such funds would eventually be linked to criminal activity and therefore subject to forfeiture. Having failed to convict Mr. Wilson of any crime that serves as a forfeiture predicate, the government cannot now fall back on its slipshod handling of the Account to assert that it gets to keep Mr. Wilson's money simply because the government commingled it with other funds, some of which may have been forfeitable.

> **d.** **The Government Indicted Mr. Wilson and Expressly Sought Forfeiture of the Wilson Funds Concurrently with the Singer Forfeiture**

The government expects Mr. Wilson to have known that it was seeking to forfeit the Wilson Funds in the Singer Forfeiture despite giving explicit notice that it would seek such forfeiture in Mr. Wilson's case. On October 22, 2019, the government charged Mr. Wilson in the Third Superseding Indictment. Wilson DE 610, at 54, 56-57. In marked contrast to the pleadings in the Singer Forfeiture—which never expressly reference the Wilson Funds—the Third Superseding Indictment sought forfeiture "[u]pon conviction of the offenses . . . set forth in Counts One through Two and Four through Twelve of this Third Superseding Indictment." *Id.* at 57. Counts Six and Eleven were expressly predicated on the first $500,000 transfer, while Counts Nine and Twelve were expressly predicated on the second $500,000 transfer. *Id.* at 54, 56.

As the government acknowledges, the deadline for third-party objections in the Singer Forfeiture was November 29, 2019. Opp'n 8. Thus, for Mr. Wilson to conclude that the Wilson Funds were part of the Singer Forfeiture and file an objection thereto, he would have needed to realize (without any hint from the government) that the government included an entirely vacuous forfeiture allegation as to the Wilson Funds in the Third Superseding Indictment. A more reasonable conclusion under the circumstances would have been that the government was actually doing what it said it was doing, namely (a) only forfeiting "all funds on deposit" in the Account in the Singer Forfeiture, and not funds that had been withdrawn from the Account months earlier, and (b) pursuing forfeiture of the Wilson Funds separately. To the extent that a reasonable person might have thought the Wilson Funds were subject to the Singer Forfeiture, those concerns would certainly have been laid to rest when the government filed the Third Superseding Indictment.

> **e.** **The Government's Remaining Arguments on Actual Notice Are Unpersuasive**

The government makes several additional attempts to show that Mr. Wilson had actual

notice, none of which have merit. First, the government references an email from government counsel to Mr. Wilson's counsel dated September 30, 2021—in the midst of trial—that makes vague references to the Singer Forfeiture and the Account. Opp'n Ex. H. This email does not mention the Wilson Funds, and it lumps together the Account with another, unrelated Wells Fargo account. The email certainly does not state that the government accomplished a forfeiture of the Wilson Funds in the Singer Forfeiture, particularly in light of the facts (explained above) that (a) the pleadings in the Singer Forfeiture, by their terms, did not encompass the Wilson Funds, and (b) the Singer Forfeiture could not lawfully include the Wilson Funds.

The government next points to its February 28, 2022, letter filed in this case. DE 67. That letter, like the email discussed above, says nothing about the Wilson Funds. It merely states that the government has obtained "more than $6.5 million" in forfeiture from Mr. Singer, with no indication of the source of those funds. *Id.* at 6. This letter did nothing to give Mr. Wilson notice.

The government asserts that Mr. Wilson knew the Wilson Funds were forfeited in the Singer Forfeiture because the government did not pursue forfeiture at Mr. Wilson's February 2022 sentencing. This is not true. For one, the failure of the government to seek forfeiture in Mr. Wilson's case does not necessarily mean the government sought forfeiture in Mr. Singer's case. Again, for Mr. Wilson to reach that conclusion, he would have had to figure out that the government undertook an illegal forfeiture in the Singer Forfeiture. The government can point to no case holding that it was Mr. Wilson's responsibility to realize that the government was violating the law, including by (a) purporting to take title to property not listed in the Preliminary Forfeiture Motion, the Final Forfeiture Motion, or the Final Forfeiture Order, (b) forfeiting property that it knew was not related to the crimes that authorized forfeiture, and (c) violating due process, § 853(n)(1), Rule 32.2(b)(6)(A), and the Preliminary Forfeiture Order by failing to give notice.

Moreover, the government could have pursued a civil forfeiture as to the Wilson Funds because the Double Jeopardy Clause does not bar a subsequent civil forfeiture after conviction. *See United States v. Ursery*, 518 U.S. 267, 292 (1996). The government, not Mr. Wilson, is responsible for its refusal to make a clear statement about its intended disposition of the Wilson Funds.

The government lastly points to counsel's statements at the February 2022 sentencing that the government says demonstrate Mr. Wilson knew he had already forfeited the Wilson Funds. Opp'n 6-7, 11. This attempt to parse oral statements as if they were statutory text is unpersuasive. These statements in no way suggest an awareness that the Wilson Funds were involved in the Singer Forfeiture. In fact, one of the statements, on its face, reflects that no such forfeiture had taken place and that Mr. Wilson's counsel expected it to occur in the future. Wilson DE 2554, at 36 ("[T]he government *is getting* a million dollar forfeiture from him." (emphasis added)).

These statements reflect the reality that, at Mr. Wilson's first sentencing, he had been convicted of several crimes related to the Wilson Funds, and there was no expectation (barring reversal on appeal) that Mr. Wilson would be entitled to their return. Obviously, the government had not informed Mr. Wilson or his counsel of its intended disposition of the Wilson Funds, but it stood to reason that the government was not going to return them, having obtained convictions on the counts that were related to that money. These statements do not show that Mr. Wilson or his counsel knew the government had already forfeited the Wilson Funds in the Singer Forfeiture.

**B.      Mr. Wilson Is Entitled to the Return of the Funds**

Mr. Wilson should prevail on his third-party petition because his right, title, and interest in the Wilson Funds is superior to that of Mr. Singer's. *See* 21 U.S.C. § 853(n)(6)(A). As set forth below, Mr. Wilson owns the Wilson Funds under either a constructive trust or a resulting trust.

### 1.      Mr. Wilson Is the Owner of the Wilson Funds Under a Constructive Trust

Under Massachusetts law, "[a] constructive trust is a flexible tool of equity designed to

16

prevent unjust enrichment resulting from fraud, a violation of a fiduciary duty or confidential relationship, mistake, or 'other circumstances' in which a recipient's acquisition of legal title to property amounts to unjust enrichment." *Maffei v. Roman Cath. Archbishop*, 867 N.E.2d 300, 312 (Mass. 2007) (internal citations omitted). The weight of authority holds that an interest in property via a constructive trust is a superior legal interest under 21 U.S.C. § 853(n)(6)(A).[7]

Mr. Wilson's interest in the Wilson Funds was preserved via a constructive trust. In any context other than a law enforcement operation, Mr. Singer's deception of Mr. Wilson to induce the transfer of the Wilson Funds to the Account would be fraudulent. Whether or not it is properly characterized as fraud under these circumstances, it would constitute unjust enrichment for either Mr. Singer or the government to retain the Wilson Funds. The sole justification for soliciting the transfers was the prospect of implicating Mr. Wilson in an undercover sting. Having failed to convict Mr. Wilson of any crime relating to the transfers of, or supporting the forfeiture of, the Wilson Funds, the government's retention of the Wilson Funds is unjust. Accordingly, Mr. Wilson is the beneficiary of a constructive trust as to the Wilson Funds.

The government's argument against a constructive trust consists of just two sentences:

- "In the First Circuit, constructive trusts are not substantive rights that confer a cause of action; they are remedial devices employed by courts once liability is found and where equity requires."

- "Further, the First Circuit adopted the rule that unsecured creditors do not have standing to challenge forfeiture."

---

[7]      *See Willis Mgmt. (Vermont), Ltd. v. United States*, 652 F.3d 236, 244-45 (2d Cir. 2011); *United States v. Wilson*, 659 F.3d 947, 953-54 (9th Cir. 2011); *United States v. Salti*, 579 F.3d 656, 670 (6th Cir. 2009); *United States v. Shefton*, 548 F.3d 1360, 1366 (11th Cir. 2008); *United States v. Marx*, 844 F.2d 1303, 1308 (7th Cir. 1988). Even the D.C. Circuit, the only circuit to adopt a contrary position in *United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185 (D.C. Cir. 1995), has indicated its willingness to reconsider its position. *See United States v. Emor*, 785 F.3d 671, 682 (D.C. Cir. 2015) ("Every circuit to consider the constructive trust question in the context of criminal forfeiture has rejected the analysis in *BCCI Holdings* . . . . However, since we cannot overrule a prior panel's decision, except via an *Irons* footnote or en banc review, we leave this issue for another day.").

Opp'n 14. Neither of these contentions gives the government the right to keep the Wilson Funds.

First, Mr. Wilson is not seeking to use a constructive trust as a standalone cause of action. Mr. Wilson is entitled to the remedy of a constructive trust for an unjust enrichment claim. *See Cavadi v. DeYeso*, 941 N.E.2d 23, 33 (Mass. 2011) (stating that a constructive trust may be "implied by law as a result of . . . unjust enrichment"). Massachusetts law recognizes a common law claim for unjust enrichment. *See Fox v. F&J Gattozzi Corp.*, 672 N.E.2d 547, 552 (Mass. App. Ct. 1996). The government's first argument, therefore, has no bearing on Mr. Wilson's argument.

Second, the government's observation that an "unsecured creditor" lacks standing to challenge a forfeiture is similarly irrelevant because Mr. Wilson is not an unsecured creditor. He is, as explained above, the beneficiary of a constructive trust. *See, e.g.*, *Willis Mgmt.*, 652 F.3d at 243 (distinguishing prior case in which third parties were "general unsecured creditors"). Accordingly, the government's second argument against a constructive trust fails as well.

### 2.     Alternatively, Mr. Wilson Has Title by Operation of a Resulting Trust

Mr. Wilson intended the Wilson Funds as gifts to Stanford and Harvard:

> The owner of personal property may make a gift thereof to another person (the donee) by delivering it to the donee, or to a third person for the donee, with the manifested intention that the donee be the owner of the personal property.

Restatement (Second) of Property: Donative Transfers § 31.1 (1992). Hence, Mr. Wilson did not transfer the Wilson Funds for Mr. Singer to do whatever he wanted with them. Rather, Mr. Singer held the Wilson Funds in express trust. *See Ventura v. Ventura*, 407 Mass. 724, 726 (1990) (stating that an express trust exists where there is "an intention that the legal estate be vested in one person to be held in some manner or for some purpose on behalf of another"). And when Mr. Singer failed to deliver the Wilson Funds to Harvard and Stanford, a resulting trust was created.

"A resulting trust 'is a reversionary, equitable interest implied by law in property that is held by a transferee, in whole or in part, as trustee for the transferor or the transferor's successors

in interest.'" *Citizens Bank v. Coleman*, 987 N.E.2d 1282, 1286 (Mass. App. Ct. 2013) (quoting

*Eaton v. Fed. Nat'l Mort. Assn.*, 462 Mass. 569, 577 n.10 (2012)). Accordingly,

> [a] resulting trust arises when a person (the "transferor") makes or causes to be made a disposition of property under circumstances (i) in which some or all of the transferor's beneficial interest is not effectively transferred to others (and yet not expressly retained by the transferor) and (ii) which raise an unrebutted presumption that the transferor does not intend the one who receives the property (the "transferee") to have the remaining beneficial interest.

Restatement (Third) of Trusts § 7 cmt. a (2003). This is precisely what occurred here. There is no

evidence that Mr. Wilson intended for Mr. Singer to take title to the Wilson Funds if Mr. Singer

failed to deliver them as promised. Instead, Mr. Singer held them in a resulting trust for Mr.

Wilson's benefit. *See id.* Mr. Wilson's claim to the Wilson Funds is therefore superior to Mr.

Singer's, and he is entitled to their return. *See United States v. Marx*, 844 F.2d 1303, 1310 (7th Cir.

1988) (interest arising from a resulting trust is cognizable under § 853(n)).

### 3.    To Deny Relief Would Create Perverse Incentives for the Government

In this case, the government used Mr. Singer, its cooperator, to induce targets of its

investigation, including Mr. Wilson, to transfer money to the Account. Then, the government

purported to forfeit that money *in Mr. Singer's criminal case*, without giving notice. Obviously,

Mr. Singer had no incentive to oppose forfeiture, since he had no claim to the money at issue. And

the government purports to have accomplished such forfeiture before it secured a conviction of

Mr. Wilson, meaning the government saw fit to take Mr. Wilson's money before there was any

determination of whether Mr. Wilson was involved in criminal activity.

Remarkably, the government's argument necessarily means that it believes Mr. Wilson

would lack standing *even if the government had concluded in 2018 that Mr. Wilson was not

involved in criminal activity and never indicted him*. Nothing in the government's opposition

depends on Mr. Wilson having been involved in any crime. Rather, the government asserts that

19

Mr. Wilson lost his ownership interest in the Wilson Funds simply because he "voluntarily wired funds" to the Account, irrespective of Mr. Wilson's culpability or lack thereof. Opp'n 12.

To say that the government can retain money under such circumstances, without any finding that Mr. Wilson was involved in criminal activity and without any notice, offends the most basic notions of fairness and due process. And any suggestion that the Court should disregard such unfairness because "prosecutors will act responsibly" in the future, *Dubin v. United States*, 599 U.S. 110, 131 (2023), is belied by Supreme Court precedent and the facts of this case. The Supreme Court has repeatedly instructed that courts should rule against the government in criminal cases where the government seeks broad holdings and indicates that it will use discretion to protect against overzealous prosecutions. *See id.* (citing cases).

This case demonstrates the wisdom of the Supreme Court's refusal to defer to prosecutorial discretion in such circumstances. The purported forfeiture of the Wilson Funds rested on numerous deceptions and misrepresentations, as discussed herein. Moreover, it is apparent that, when conducting the Singer Forfeiture, the government did not consider the possibility that any parent would have the audacity to challenge the government's charges and win. Now that that has happened, the government must reckon with its multiple mistakes. But rather than admit its errors, the government clings to a false version of events, despite the clear evidence of its misrepresentations to the Court and due process violations. The Court should not condone the government's actions in this case.

## **CONCLUSION**

Mr. Wilson requests that the Court grant his request for return of the Wilson Funds, plus interest from the dates of seizure.

DATED: November 7, 2023        Respectfully submitted:

*Counsel for John Wilson*

/s/ Michael Kendall
Michael Kendall (BBO #544866)
Lauren Papenhausen (BBO #655527)
Daniel Medici (BBO #705650)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com
lauren.papenhausen@whitecase.com
dan.medici@whitecase.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above document is being filed on November 7, 2023, through the ECF system, which will send true copies to all counsel of record.

<u>/s/ Mike Kendall          </u>
Mike Kendall