UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA,

                    Plaintiff,          Criminal Action
                                        No. 19-10078-DJC
V.
                                        January 16, 2024
WILLIAM RICK SINGER,                    10:58 a.m.

                    Defendant.
_____


TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE DENISE J. CASPER

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210




DEBRA M. JOYCE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
joycedebra@gmail.com

APPEARANCES:

FOR THE GOVERNMENT:

CAROL E. HEAD, ESQ.
STEPHEN E. FRANK, ESQ.
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3244
stephen.frank@usdoj.gov
Carol.Head@usdoj.gov

FOR MOVANT JOHN B. WILSON:

MICHAEL KENDALL, ESQ.
DANIEL MEDICI, ESQ.
White & Case, LLP
75 State Street
Boston, MA 02109
617-939-9310
michael.kendall@whitecase.com
dan.medici@whitecase.com

P R O C E E D I N G S

1
2          (The following proceedings were held in open
3  court before the Honorable Denise J. Casper, United States
4  District Judge, United States District Court, District of
5  Massachusetts, at the John J. Moakley United States Courthouse,
6  1 Courthouse Way, Boston, Massachusetts, on January 16, 2024.)
7          THE CLERK:  All rise.
8          (The Court entered the courtroom.)
9          THE CLERK:  Court is in session.  Please be seated.
10:58 10          Criminal action 19-10078, United States v. Singer.
11          Would counsel please state your name for the record.
12          MS. HEAD:  Good morning, your Honor.  Carol Head for
13  the United States.
14          MR. FRANK:  And Stephen Frank for the United States.
15  Good morning.
16          THE COURT:  Good morning to you both.
17          MR. KENDALL:  Good morning, your Honor.  Michael
18  Kendall, and with me is Daniel Medici for Mr. Wilson.
19          THE COURT:  Good morning to you both as well.
10:58 20          Counsel, I know we're here on Mr. Wilson's two motions
21  related to the return of the forfeited transfers into
22  Mr. Singer's accounts.
23          I'll just let both sides know I've read all of the
24  motion papers on either side, and the attachments as well.  And
25  to the extent that there were references to docket entries, I

1  tried to review those as well.

2  Counsel, with all of that said, I'm prepared to hear

3  argument.

4  I see in front of me --

5  (Discussion off the record.)

6  THE COURT:  Mr. Kendall, I see you've given me some

7  kind of chalk here?

8  MR. KENDALL:  Yes, your Honor.  It consists of two

9  things.  The binder and the documents are just the most

10:59 10  important pages from the docket.  You've seen them all already.

11  THE COURT:  Yes.

12  MR. KENDALL:  I just thought putting them in one

13  place -- it was such a huge pile of paper, I wanted the most

14  essential boiled down and consolidated.

15  THE COURT:  Counsel, these look familiar to me, yes.

16  MR. KENDALL:  And obviously, to make life easier, I

17  highlighted what I thought were the key portions of the pages.

18  THE COURT:  Okay.

19  MR. KENDALL:  Then the chronology is simply a summary

11:00 20  of the key entries in the docket.  It's really my talking

21  points for today.

22  THE COURT:  Counsel, for what it's worth, I made my

23  own timeline as well to keep things straight, so I appreciate

24  it.

25  MR. KENDALL:  Sure.

1    Would you like me to proceed, your Honor?

2    THE COURT:  You may.

3    MR. KENDALL:  Okay.

4    I wanted to start off by citing a couple of the basic

5    legal concepts that I know the Court is familiar with, but I

6    think it gives a good framework for my then further comments.

7    There are two issues we're focused on: nexus, the lack

8    of the connection of the Wilson million dollars to any crime

9    for which Mr. Singer pled guilty to and for which would give

11:01 10    Mr. Singer a basis to say he had an ownership interest in those

11    proceeds such that the government could forfeit something from

12    Mr. Singer; and second, the lack of notice, and notice, of

13    course, is a constitutional issue, a statutory issue, an issue

14    in the rule, and an issue in Judge Zobel's order.

15    THE COURT:  Counsel, I'm assuming that you're talking

16    about the first, lack of nexus, as it relates to the lack of

17    notice, because there's certainly a line of cases that I think

18    the government had cited about what a third-party can challenge

19    in regards to an underlying order of forfeiture.

11:01 20    MR. KENDALL:  Your Honor, I think nexus and notice are

21    two separate issues.  Nexus, as I'm referring to it, is there

22    was simply no legally recognized basis to forfeit the million

23    dollars through the Singer forfeiture.  That's because, under

24    the rule in the statute, there has to be a connection between

25    the offense for which the defendant is charged and that the

1   money is proceeds of that offense is somehow connected to it.

2          THE COURT:  No, I understand the argument.  I guess

3   what I was jumping to was I understand the government to be

4   challenging the premise that you can -- that Mr. Wilson can

5   challenge the underlying basis for the forfeiture as opposed to

6   the lack of notice, meaning, how the lack of nexus, and, as I

7   understand it, the sequence of events about what Mr. Wilson and

8   counsel knew about that forfeiture, bearing at least on lack of

9   notice.

11:02 10          MR. KENDALL:  Certainly the nexus issue supports our

11   claim on lack of reasonable notice.  Because if it's obvious in

12   the face of the charging document that there's no connection

13   between the Wilson million dollars and the offense giving rise

14   to the forfeiture, it was reasonable for us to think they

15   weren't pursuing the forfeiture in that case.

16          THE COURT:  Understood.

17          MR. KENDALL:  And so with respect to those two

18   concepts, I think it's worth repeating the government has the

19   burden of proof of proving both.  They have the burden, not us,

11:03 20   for both of those issues.

21          And the other concept is with respect to notice,

22   there's two subparts of it that I think are, again, just worth

23   focusing on, although I know the Court has read then.

24          One is, if they know we have a claim or are disputing

25   the issue, they're supposed to give us direct notice, they

can't rely on publication.

Second, it's a constitutional issue. The notice has to be something reasonably calculated to let us know that our rights are being decided in a court proceeding.

THE COURT: As a matter of due process?

MR. KENDALL: Yes. And that's under the chronology points 1, 2, and 3 on my quick sort of summaries of those points, and they're discussed in our briefs, too. But, you know, you can't give a notice that is inadequate to inform a defendant that their rights are being challenged. I mean, you can't sort of whisper it so softly that no one hears it, to say it in such a confusing way that no one understands it. And that's, I think, again, how the nexus issue reinforces our position, though we have more than just that to do with it.

And what I think -- well, the reason I put together the chronology -- and I hope you saw it when you put your chronology together -- is the fact that it's so apparent that the government wants us to believe that there were two simultaneous forfeiture proceedings going on and that we were supposed to be aware that we had to be fighting in both of them.

You know, in one, there's a case before Judge Gorton we're a named defendant, the two $500,000 transfers are specifically discussed in the indictment several times, they're subject of specific counts that are isolated only to those

$500,000 transfers.  And there's a forfeiture claim that says we want the $500,000 from those two counts, the million dollars, to be forfeited.  In terms of notice and nexus, it could not be clearer that we had a fight in Judge Gorton's case for a criminal forfeiture for our million dollars.

THE COURT:  And so, counsel, am I correct that it is the allegation as to forfeiture comes up against Mr. Wilson in that case in the third superseding indictment?

MR. KENDALL:  It actually comes up in the second superseding indictment, which is the first time Mr. Wilson is charged.

In the second superseding indictment --

THE COURT:  Is that in April?

MR. KENDALL:  Let me check my chronology.  I believe it is.

THE COURT:  I see it.

MR. KENDALL:  Yeah, April 19.

It's not as broken out and specific as in the third and fourth.  The third and fourth treat the forfeiture exactly the same, the fourth just added the tax count, but it didn't change the forfeiture.

So, in the third and fourth, it's broken out in specific counts and with great particularity, but in the second, it's subject to forfeiture under the second.

There are counts in the second superseding indictment

that specifically refer to the 500,000 transfers and then the

forfeiture count says we want to forfeit all of the proceeds --

THE COURT:  And, counsel, I'm correct that the

forfeiture -- the only charges that gave rise to forfeiture

against Mr. Wilson are the counts that have now been vacated.

MR. KENDALL:  Yes.

THE COURT:  Right, so not to the tax count.

MR. KENDALL:  Unrelated.

THE COURT:  Okay.

MR. KENDALL:  And so what we have, your Honor, is the

government wants you to find that --

THE COURT:  And so let me just ask you another

question.

MR. KENDALL:  Sure, better your questions than mine.

THE COURT:  So, in your view, if the government had

sought forfeiture against Mr. Wilson in his case of the $1

million dollars, then subsequently the convictions giving rise

to that forfeiture were vacated, as they were, would we be

having this fight now?

MR. KENDALL:  Your Honor, I suggest that's what

happened.  I suggest the government --

THE COURT:  No, but, meaning, would there be any basis

for the government to still retain the $1 million if the money

had been forfeited in the case against Mr. Wilson and the

convictions giving rise to that forfeiture being vacated?

1    MR. KENDALL:  No, there would be no basis for it, your

2   Honor.  I would suggest that's what the government was doing in

3   this situation.

4        You know, you raise a good question, your Honor.  Part

5   of the tab book that I gave you was my email exchanges with the

6   government.  We spent three weeks trying to have a

7   meet-and-confer on this to discuss it with them.  During those

8   three weeks I repeatedly e-mailed the government.  I would

9   rarely get a response, and when I'd get a response, it would be

11:08 10   just to blow me off.

11        I went to the supervisors; the supervisors wouldn't

12   talk to me either.

13        The government has never answered the question, and I

14   would suggest, respectfully, the Court may want to ask this of

15   the government, are they telling us that they all along

16   intended to forfeit the Wilson million dollars in the Singer

17   case and they purposely and explicitly with forethought kept us

18   out of every notice, never mentioned our name, didn't include

19   us in the letter that went to all of the other persons giving

11:08 20   them notice, that they intentionally knew it when we were

21   fighting the forfeiture in the case before Judge Gorton?  Or is

22   it their position that they really didn't think about it until

23   afterwards but they think it fits within the Singer case?

24        And the reason why I ask that, your Honor, is twofold:

25        First, for three weeks in a meet-and-confer nobody

1  would tell me what was going on or sort of answer those types

2  of questions.

3        Second, if their position is we always intended to

4  forfeit the Wilson million dollars from the moment we brought

5  the Singer case -- I hate to use this phrase, your Honor, but

6  it smells a little of sharp practice, for them to see us

7  fighting so hard and so resolutely before Judge Gorton where

8  they named the forfeiture and where they give us explicit

9  notice and then to hide and keep our name off of every document

11:09 10  in Judge Zobel's case and they write the information that it's

11  perfectly legally correct and it excludes the Wilson money.  I

12  mean, I prefer to think that this is an afterthought by the

13  government when they don't want to give us back the million

14  dollars.  But if they're saying every time we go through this

15  chronology and docket --

16        THE COURT:  Counsel, I wasn't getting to any argument

17  about nefarious practice.  I guess I was just asking as a

18  practical matter, where I think we have the unusual

19  circumstance, right, where your client is coming in as a third

11:10 20  party but there were separate criminal forfeiture allegations

21  in his own case that were not pursued.

22        MR. KENDALL:  Your Honor, you're saying they were not

23  pursued.  I would suggest they were pursued until they lost the

24  case.  I mean, at sentencing before Judge Gorton --

25        THE COURT:  Yeah, but I guess what I meant by not

 1  pursued is at the sentencing they weren't seeking forfeiture.

 2       MR. KENDALL:  At the sentencing when we were

 3  discussing the fine to be imposed, I assumed they would be

 4  seeking forfeiture.  And I said to Judge Gorton, You don't need

 5  to give that much of a fine because they're going to be seeking

 6  a million dollar forfeiture.

 7       We expected the forfeiture papers would come that day

 8  or soon thereafter.  Nobody ever told us they had given up on

 9  the forfeiture in the Wilson case.  So if they indict it, they

11:11 10  win the criminal case in District Court, we had reason to

11  assume they were going to pursue the forfeiture, not abandon.

12       Nobody told us after the Singer forfeiture was entered

13  by Judge Zobel, Oh, your million dollars is no longer at issue.

14       Your Honor, if you take a look at it from our

15  perspective, Singer gets arrested in March.  Wilson gets

16  arrested -- Singer pleads guilty or it's filed on March 5th.

17  Wilson gets arrested the next month.  We immediately looked at

18  the Singer case.  We looked at the docket, and we were entitled

19  to rely on what the government said, that Singer's forfeiture

11:12 20  are for proceeds of his offense that ended in September of

21  2018.  And it is an absolute matter of black letter law from

22  the 1st Circuit that Singer's criminal offenses ended in

23  September 2018 with respect to college admissions.

24       THE COURT:  And is my recollection correct from the

25  papers that even the charging documents against Singer say as

much?

MR. KENDALL:  They do, your Honor.  And I'd like to point out the government made a mistake, I don't think it was intentional, but it was significant.  If you take a look at tab 1 in the binder I gave you, you see Count One under the racketeering conspiracy, that's the count that gives rise to the forfeiture that they claim includes the million dollars.

And if you look at paragraph 90, it says from in or about 2011 and continuing through September 2018, clearly saying it ends in two thousand -- in September, it doesn't go beyond.

What the government said in their consolidated sur-reply at page 7, that they did not use that language, but they used on or about September 2018, which the courts do give the government a bit of leeway with.

If you flip the page and look at Count Three, the only "on or about" or "in on or about" language is from Count Three on the tax count against Rick Singer.  It had nothing to do with the RICO or the college admissions charges.  It's the tax count.  It's an error by the government in its sur-reply.  I obviously don't think it was intentional, I think it was mistaken, but it is significant.

They explicitly told us it ended in September 2018. Anybody reading the discovery in the Wilson case would have said that makes perfect sense because that's when Singer

1      renounced his conspiracy and agreed to do an undercover

2      operation with the government.  That's appropriate 1st Circuit

3      caselaw.

4          And so I just point that out, your Honor, because I

5      think there's a level of certainty to the endpoint that the

6      sur-reply I think confused.

7          THE COURT:  Well, as I read the papers -- and I'll ask

8      the government this as well -- I don't think there's any

9      dispute that Singer opens the account we're talking about,

11:14 10      right, September 24, 2018, and he's acting as a cooperator with

11      federal agents at that point.

12          MR. KENDALL:  Yes.  The agents actually accompany him

13      to the bank, and I would assume they selected the bank because

14      Singer doesn't know banks in Boston.  I think the bank was in

15      Chelsea, which is where we all know the FBI headquarters is.

16          THE COURT:  So at least of, if not before, at least as

17      of September 24th.

18          MR. KENDALL:  Yes, your Honor.

19          We have given you the testimony where it says as of

11:14 20      September 21st, he was giving a download of his activities to

21      the government, which I think is sufficient to end the

22      conspiracy.  If you renounce the conspiracy and cooperate,

23      giving information to the government I think is sufficient to

24      end the conspiracy.

25          But, certainly, the 24th is an active thing.  And it's

noteworthy, that account, it's opened in Singer's name for the

undercover purposes, but Singer is an agent of the government.

The government has told him that that's their account that

they're controlling, and the government's position is that we

should have thought that once Singer became an undercover

operative he had a personal claim to the million dollars.

Your Honor, we were both in the OCDETF unit, we've

both seen a bunch of drug undercover operations.  If a drug

undercover cooperating witness goes out and gets a million

dollars or $100,000 in a reverse sting where they're promising

to deliver cocaine, the government has never taken position

that the cooperating witness has a personal claim for the

undercover money.  They're an agent of the government.  That is

the government's money to claim for forfeiture.  They've never

said that the bad -- that the person who entrapped the bad guy

could claim that money.

THE COURT:  What do you say to the government's

argument on this point, which I think is even if Singer has

withdrawn from the conspiracy at that point, others had not?

MR. KENDALL:  Well, there's a few things with that.

First, your Honor, it has to be Singer's nexus to the

money.  If some uncharged person has a nexus to the money,

they're not part of the Singer case.

Second, your Honor, the 1st Circuit made very clear

that this came of a mega conspiracy did not apply.  Wilson, if

1   he conspired with anybody, was with Singer.

2          With respect to the million dollars of money that

3   involved the Harvard-Stanford, which is what we're talking

4   about, if Singer is not a co-conspirator, there was no one for

5   Wilson to conspire with.  He's not talking to any of the

6   coaches or people that Singer's involved with.  Singer has told

7   him this money is for donations to the school.

8          The 1st Circuit opinion was very clear on that, that

9   they viewed the Wilson monies as being donations to the school,

11:17 10   never to be a payment to an individual coach.  There's no RICO

11   enterprise for Wilson to be a part of.

12          Perhaps other Singer confederates were in a Singer

13   enterprise, but giving the holdings of the 1st Circuit as well

14   as just the practical facts as we know, there's no other person

15   for Wilson to be conspiring with.  He's had no contact with

16   anybody from Wilson's (sic) organization at that time, he's

17   only -- I mean from Singer's organization, he's only speaking

18   to Singer.

19          I mean, Singer's bookkeeper or Singer's office workers

11:18 20   or Singer's coaches are part of some continuing RICO

21   enterprise, that is not the conspiracy John Wilson is a part

22   of, and no court has even found that, even one that's been

23   reversed.

24          THE COURT:  Thank you.

25          Counsel.

1          MR. KENDALL:  Okay.

2          What I'd ask you to consider, your Honor, is the point

3     of the chronology, is it would be one thing if we had a civil

4     and a criminal forfeiture; we're all used that that scenario.

5     It would be one thing if we had a two criminal forfeitures with

6     different people and they were to give notice and they were to

7     be explicit.  But with the Singer forfeiture, they make it

8     clear there is no nexus to the Wilson money.  And then, if you

9     take a look, they make it public on March 5th, they indict

11:19 10    Wilson on April 19, there's about a four-, five-week

11    difference.  The idea that we are from the beginning of this

12    case to see them both go simultaneously, each time they are

13    excluding us from any notice, from any nexus, from any

14    indication, it's ridiculous.

15          Further, I'd ask the Court to take a look at -- if you

16    look at tab 3, we gave you the bank records.  You know, the

17    bank records show that the government is just comingling all

18    sorts of funds here that are not properly being treated for

19    forfeiture.

11:19 20          They take money from Singer's prior criminal activity,

21    that's the $300,000 transfer you see at the very top of the

22    first page.  That's money that is forfeitable under the RICO

23    forfeiture theory because that's money that Singer earned prior

24    to the end of September 2018.

25          Then they have Wilson's $500,000.

          Then they have $100,000 from another parent, Nazie

Saffari, who was never charged.

          Then they have another $100,000, a 99,985 from a

Mrs. Sui, who I believe was eventually charged.

          In addition, they're putting other parents' monies --

Gordon Kaplan -- other people's monies into this account,

comingling altogether.  Then they're using this to fund their

undercover operation.  They're paying about $145,000 of this

money to the coaches they're trying to ensnare in the

undercover operation.  Your Honor, that's not the way

forfeitures are done.

          I mean, Wilson's million dollars should be isolated

and subject to forfeiture.  You can't take some of that money

to pay some of the coaches, take some of that money for your

finances.

          Then, of course, we have Singer taking the $86,000,

which he's stolen from that account, which the government has

never admitted to, but Singer clearly stole $86,000 to pay for

a screenwriter, a public relations person, as well as his

business partner and business associates.

          Your Honor, I suggest that this account was never set

up to do a forfeiture properly; the money was never treated

that way.

          For us to try to unravel, there's various cominglings

after they told us the forfeiture ends with a nexus after

1  September 2018.  There are only so many times they can give us

2  information to steer us away to say that we should be able to

3  figure this out.

4         To meet a constitutional standard of notice, your

5  Honor, we're not supposed to be clairvoyant, we're not supposed

6  to follow bread crumbs for a thin trail.  It's supposed to be

7  something reasonable and fair-minded.

8         And I would pose the question that I hope you could

9  ask the government:  Why didn't you give Wilson notice?

11:22 10       If you take a look, your Honor, at tab 6, in the last

11  page, paragraph 12, what did Judge Zobel -- what did the

12  government say it was going to do to Judge Zobel?  Paragraph

13  12:  "The United States may also, to the extent practicable,

14  provide direct written notice in any person known to have

15  alleged an interest in the properties."

16        Wilson has certainly alleged an interest in the

17  properties, and they could certainly have provided a direct

18  notice.  They just had to shoot me an email in the <u>Wilson</u> case,

19  Hey, Michael we're going to forfeit this in the other case,

11:22 20  too, for published notice.

21        That's what the government told Judge Zobel they would

22  do.  That's what Judge Zobel eventually ordered them to do.

23  That's what we read and we relied on when we were wondering

24  what does the <u>Singer</u> case have for us?  What impact does the

25  <u>Singer</u> case have for us?

1    And for them to say that their judgment was we are not

2  a person known to have alleged an interest in the properties,

3  is simply ridiculous, your Honor.  We're fighting for those

4  properties in Judge Gorton's case.

5    That's why I ask, your Honor, it is a mystery to me

6  why notice was not given.  Are they wanting us to believe --

7    THE COURT:  So, counsel, I think you're probably

8  turning to this, but what do you say to the government's

9  argument that you had actual notice?  And I'll just at the same

11:23 10  tab, tab 6, page 2, it's identifying funds on deposit in

11  identifying the same account, and I think they also make

12  reference to discovery that was produced I think the reference

13  was in May of 2019.

14    MR. KENDALL:  Your Honor, all funds on deposit in Bank

15  of America checking account.  The funds were not on deposit at

16  the time the court enters its order.  You know, there was

17  $4,500 on deposit when the Court enters its order.

18    THE COURT:  I saw that.

19    MR. KENDALL:  And the government wants -- are they

11:24 20  saying all funds that were ever on deposit?  Does that mean

21  they're going after the $86,000 that Singer stole or they're

22  going after the money that was paid out to the coaches?  There

23  was so much comingling and such a mess in this account they

24  should be held to the words that they used.

25    THE COURT:  Counsel, what, if anything, should the

1    Court make of the fact that Singer signed and entered into and

2    executed a plea agreement in which he agreed to forfeit funds

3    in this account?

4         MR. KENDALL:  He signed the plea agreement, I believe,

5    before the funds were transferred out.  But when the Court --

6    when it was entered as an order -- I want to check the exact

7    date so I can give it to you --

8         THE COURT:  So, counsel, my chronology was that Singer

9    voluntarily gives the government the funds in this account

11:25  10    March 11, 2019, which I think is around the time of his plea.

11         MR. KENDALL:  It's March 5th they filed the documents.

12    He steals the money around March 4th, or before, and then

13    that's done March 12th with the transfer, your Honor.  And

14    we're indicted a month later.

15         THE COURT:  And I guess what I'm asking is, from your

16    perspective, what, if anything, should I make of Singer's

17    agreement as to the funds in this account in connection with

18    his plea agreement?

19         MR. KENDALL:  None, your Honor, because it's ambiguous

11:25  20    language drafted by the government.

21         You know, we all like that in civil practice if you

22    draft a contract, you're responsible for the ambiguities in the

23    language.  I would suggest in the forfeiture, the failure to

24    write the nexus issue properly, the failure to give the proper

25    notice and then the failure to write the forfeiture order,

which is what you're pointing out, you know, your Honor, it's
not like I'm nitpicking here over one small little detail,
trying to do something when it was kind of obvious to
everybody.  Here at every step they're affirmatively telling us
to look away from the Singer forfeiture.

I mean, if the nexus had said "through December of
2018," that would have set off alarm bells from us, because we
knew our money was paid at that time frame.  It said the
opposite.

If the letter of giving personal notice to people
included us on the list, we would have done something.

If the Singer information had specifically referenced
the two $500,000 transfers as acts in furtherance of the RICO
conspiracy, maybe that would have been of some help for the
government's case.

But at every point, your Honor, they're pointing us
away.

For us to keep thinking the government's getting it
wrong, the government is not disclosing it, the government is
hiding it, I'd ask you to take a look at tab 10.

This is the people that they gave notice to
explicitly:

Don Heller, that's Singer's criminal defense lawyer.
He's got no claim in these assets.  Certainly Wilson's got a
better claim than Don Heller.

1      Michael Ferreira, he's a civil lawyer in Columbus

2   Ohio.  I don't know what his role is.

3      Paula Chambers, she's some business person.

4      And then these businesses that he's invested in:

5   Swansea Football, Swansea Football, and you turn the page.

6      There's no one there that is a parent, that I'm aware

7   of, whose money or payment into that account is being

8   discussed.

9      If they wanted to do this in a straightforward way to

11:28 10   meet their constitutional obligation and to meet what they

11   promised Judge Zobel they would do in their pleadings, why

12   didn't they just add John Wilson to it?

13      That's all we're asking, your Honor, that -- are they

14   telling us they purposely decided to keep John Wilson's name

15   off that letter and they actually thought they were going to

16   forfeit his million dollars when they wrote this letter?  Then

17   I suggest, your Honor, that's not a practice that this Court

18   wants to encourage and make a precedent for how they can

19   conduct forfeitures in the future.

11:28 20      I mean, the constitutional standard is we don't have

21   to have a winning case for our forfeiture claim, we have to

22   have alleged an interest.  We have to have a plausible -- I'm

23   not going to get the exact language, but you know what it is,

24   we have to have some sort of colorable claim or reasonable

25   claim that they're aware of.  And that they could exclude us

1   from this letter after we are fighting the case in front of

2   Judge Gorton so specifically, I suggest, your Honor, they're

3   affirmatively telling us with this letter you don't have to

4   worry about the Singer forfeiture.

5        I mean, is the government going to get up and say that

6   Don Heller had a bigger claim to these monies or a better claim

7   to these monies than John Wilson did?

8        What's really going on here, your Honor, is they

9   expected everybody was going to plead guilty and that all these

11:29 10 parents would fold and they would never have to defend what

11  they did in a contested court hearing.

12       You know, of the 50 or so people charged in the Singer

13  Varsity Blues part of the case, the only two parents who went

14  to trial were my client and the co-defendant Gamal Abdelaziz.

15       So they were right, most people did plead guilty, and

16  most of this never came for a court to look at it with a

17  skeptical eye.

18       But it cannot be that they can have -- one error we

19  can understand if there's clear indications to the contrary.

11:29 20 But every step they make the same error to reinforce the belief

21  that we're not part of the Singer forfeiture.

22       I was in email communications with Mr. Frank for

23  four-and-a-half years in the case.  At one point he could have

24  sent an email saying, Hey, you know, we decided to leave you

25  off the letter, we decided to have an end date before the

1   payments were made, we told Judge Zobel we would give notice

2   and we never gave notice to you, so, by the way, you should

3   realize there's a million bucks of your client's money we're

4   going to take a year or two ahead of the trial you're waiting

5   for.

6           I mean, what is the government going to say?  That

7   that's admirable practice, that's the gold standard in how to

8   conduct a forfeiture?

9           THE COURT:  And so, counsel, I know you have other

11:30 10   arguments, but one of the issues that the government takes

11   issue with is the mechanism by which Mr. Wilson has brought

12   this challenge.  Do you want to address that?

13          MR. KENDALL:  Yes, your Honor.

14          Part of the issue is the government would not give us

15   a meeting for a meet-and-confer.  I had no conversation before

16   we filed our papers.  I asked them, they wouldn't respond to

17   me.  I went to the chief of the criminal bureau in the U.S.

18   Attorney's Office, they wouldn't talk with me.  Nobody would

19   discuss it.

11:31 20          So when we first started filing, we filed assuming

21   that the money was a forfeiture only in the case before Judge

22   Gorton and asked for it to be returned that way.  Because

23   nobody told us anything to indicate the Singer case was

24   involved.

25          It's only three weeks after we started that email

1    exchange they finally filed a response and they said, Oh, no,

2    no, it's the <u>Singer</u> case where the money is.

3          Your Honor, there are -- depending upon what the Court

4    finds happened, there are different motions that will allow you

5    to return the money.

6          If we find that it's not within the <u>Singer</u> forfeiture,

7    then it may be 41(g) just so say, Hey, it's money they're

8    holding on to, they've got to return it, the case is over.

9          THE COURT:  And, counsel, aren't there exceptions

11:32 10    there for property that were -- was subject to forfeiture as

11    opposed to things that were otherwise seized?

12          MR. KENDALL:  Your Honor, I don't accept their

13    representation that this was property subject to forfeiture in

14    the <u>Singer</u> case.  They say that.  Everything else they've said

15    prior to the victory in the Gorton case was to the contrary.

16          You have to understand, your Honor, this claim that it

17    was forfeited in <u>Singer</u> only came up three weeks after my email

18    meet and confer.  It was never hinted in any way prior to that

19    which was just a few months ago over the summer.  I mean, so it

11:32 20    was four-and-a-half years of litigating the Wilson forfeiture

21    in the Gorton case when the first time they said something

22    contrary.

23          If you take a look at the email that Mr. Frank sent

24    me, he said, What million dollars are you talking about?  As if

25    like, Oh, we're not aware of any million dollars that John

1  Wilson has.  Nobody took us very seriously.  Nobody wanted to

2  give us information to have a meaningful discussion.

3         So we started under one avenue.  Then the government

4  raised that it was really done in the Singer.

5         So we're trying to find whatever sort of procedural

6  finding you have occurred, we want to make sure there's a

7  motion under the right and applicable rule that will deal with

8  it.

9         And we started out under Rule 60 thinking it should be

11:33 10  returned in Judge Sorokin's case, formerly Judge Gorton's case.

11  And Judge Sorokin said he wanted it really handled in this

12  docket, so that's why we're here.

13         THE COURT:  So, I guess, counsel, this is less of a

14  legal question, but -- so -- so after -- after the September --

15  excuse me, after the February 22 sentencing, right, and before

16  the 1st Circuit renders its decision, what, in June of 2023 --

17         MR. KENDALL:  Yes.

18         THE COURT:  -- what did you think had happened to the

19  $1 million?

11:34 20         MR. KENDALL:  After the sentencing, I was expecting

21  there would be some pro forma filing to perfect the forfeiture.

22  That's typically what happens.  It didn't happen in that case.

23  I can't tell you I was following my calendar waiting for it to

24  come.  It didn't happen, and we assumed if the government

25  wasn't filing it -- didn't really think why the government

1   didn't file it.  Didn't focus on that.  He was sentenced.  We

2   told the Court we expected the forfeiture to come, and it

3   didn't; we were focusing on the appeal.

4       Once the appeal came down, we looked at it, we did see

5   that they did not file the docket to perfect the forfeiture,

6   and that's when we started the meet-and-confer, to try to

7   discuss can you just give us back the money to see what the

8   issue was.

9       THE COURT:  Okay.

11:35 10    MR. KENDALL:  I mean, my understanding, it's pretty

11  standard that forfeitures can be done, you know, at the time of

12  the sentencing or immediately thereafter.  But once the case

13  went up to the 1st Circuit, there was nothing to do on the

14  forfeiture until the case was returned to the 1st Circuit

15  because the District Court doesn't have jurisdiction at that

16  point.  I certainly wasn't going to raise it in the appeal,

17  that would be a little obnoxious because we hadn't won the

18  appeal yet.

19      THE COURT:  Thank you.

11:35 20    Counsel, Ms. Head.

21      MS. HEAD:  Thank you, your Honor.

22      There's a couple of things, obviously, to discuss.

23      THE COURT:  Sure.

24      MS. HEAD:  And I want to answer any questions that

25  your Honor has.

1    I was tempted to start with a procedural posture,

2  which you alluded to, which is what are we here for?

3    They had filed a motion to adjudicate a third-party

4  petition.  It's the government's position that's time-barred

5  for the reasons we've set forth in our briefing.

6    They've also alluded in their reply to a motion to

7  reopen the forfeiture proceedings under 60(b)(4).  We address

8  that in the papers that that would fail because they had actual

9  notice of the order.

11:36 10    And I'd like to -- and I think that is something that

11  your Honor could construe the papers in this case to address.

12  This is a motion under Rule 60(b)(4).

13    In regard to motions under Rule 60(b)(4), the Supreme

14  Court in the Espinoza case made clear that actual notice, which

15  we believe they had here, they've conceded that they read every

16  filing in the Singer case promptly and quickly.

17    And by the way, your Honor, there was no hide the ball

18  going on here.  We identified the account, the account number,

19  the account holder, the institution where the account was in

11:37 20  the Singer information, plea agreement, all the motions and

21  stuff, and they knew that's where he filed --

22    THE COURT:  Counsel, I understand -- I understand the

23  government's position in that regard.

24    In a moment I'm going to ask you to walk me through

25  the actual notice here, because I think your brother has a

point.

　　　　But I guess I wanted to start -- and I appreciate you starting with the procedural posture, but I think, in my view, the procedural posture is complicated by sort of equitable considerations here.  And I want to pose the question I asked Mr. Kendall to you:  If the government had sought forfeiture on the basis of the convictions which have now been vacated in Mr. Wilson's case, would the government have any basis to maintain its forfeiture of his $1 million?

　　　　MS. HEAD:  So if we had moved for a forfeiture order in John Wilson's criminal case, which we did not, we didn't identify the $1 million in any of the indictments, we put a notice of forfeiture allegation in the indictment, as we are required to do pursuant to Rule 32.A, but we did not list any specific assets in any of the parent cases, nor seek forfeiture from any of the parent cases.

　　　　But assuming we had actually moved for a preliminary order of forfeiture and a final order of forfeiture in John Wilson's case and it was incorporated into his criminal judgment, that judgment being vacated, yes, the forfeiture would be vacated.

　　　　THE COURT:  And so I guess you can understand what my next question is, which is, why should it be any different here?

　　　　MS. HEAD:  Okay, yes.

1          And I think --

2          THE COURT:  And again, I'm focused on a lot of things.

3    I put together the chronology for myself because you all are

4    not new to this case, but obviously I am.  And it seems clear

5    to me that Mr. Singer was already cooperating with, what, the

6    FBI, as of September of 2018.

7          He opens the account we're talking about as part of

8    that cooperation.

9          Mr. Wilson, right, the other alleged co-conspirator,

11:39 10   makes the two deposits in October and December of 2018.  At

11   that point, Mr. Singer is no longer a part of the conspiracy

12   for all of the reasons that I think both sides have

13   acknowledged, he's cooperating.

14         So the only conspirators, as I understand the record,

15   who's involved in the transfer is Mr. Wilson.  And now we know

16   his convictions for criminal conduct related to these two

17   transfers don't stand.

18         So, I guess, counsel, from an equitable point of view,

19   I'm sort of befuddled.

11:40 20   MS. HEAD:  I understand.  I understand precisely what

21   you're asking.

22         So it is the government's position that the proper

23   case and the case that we did indeed forfeit the funds in this

24   account was the Singer case.

25         Your Honor noted that we had cited cases -- this goes

1    to the nexus issue --

2              THE COURT:  Yes.

3              MS. HEAD:  -- and we stand by our fact that nexus is

4    not appropriate for a third party to challenge.

5              THE COURT:  But to me -- and that's why --

6              MS. HEAD:  But I'm going to go on, I'm not stopping

7    there.

8              THE COURT:  It does bear, I think, upon notice here,

9    at least notice.  Let's put aside equity for a moment.  It at

11:41 10   least bears upon whether or not there was notice to Mr. Wilson,

11   I think.

12             MS. HEAD:  Okay.

13             So let me -- I will try my best to explain why

14   Singer -- why we sought the forfeiture in Singer's case,

15   starting with -- I'm going to quote the Supreme Court here, The

16   purpose of criminal forfeiture is to punish wrongdoing, deter

17   future illegality, and lessen the economic power of a criminal

18   enterprise.  And that's the Kaley decision from the Supreme

19   Court.

11:41 20             So here we are dealing with a criminal enterprise that

21   continued until February 2019.

22             The RICO statute is the most expansive forfeiture

23   statute, save terrorism.  In terrorism cases we can forfeit

24   anything of the defendant.  RICO is the most expansive statute

25   here.

So when -- when Mr. Kendall refers to proceeds Singer received, proceeds is a beginning point in a RICO forfeiture, it is not the endpoint.

So we laid it out in the indictment. I'm not going to read the whole forfeiture statute for RICO, but it is broad. And the Supreme Court and the 1st Circuit have noted that the RICO forfeiture statute should be broadly interpreted consistent with Congress' intent, which was to, you know, as I alluded to in the first Supreme Court case, lessen the economic power of criminal enterprises.

So you can forfeit property of the enterprise. This was a bank account in KWS' name that Singer controlled. So we contend that was entirely proper to forfeit in Singer's case.

So it's also mandatory. So the statute says -- this is 1963(a) -- that the defendant shall forfeit any interest in the enterprise in any -- and I'm paraphrasing because it's a long statute -- and it also goes on to say the court imposing sentence shall order this forfeiture.

The 1st Circuit has said --

THE COURT: So -- and I get that, counsel, and I think some of that was paraphrased in your papers, so I understand that.

I guess two things. What about -- I'm not sure I fully understand the lack of direct notice to Mr. Wilson here. So maybe you can talk about that.

1     MS. HEAD:  So -- first of all, the 1st Circuit has

2 said even if we -- the government botches -- and that's their

3 word, not mine -- botches the notice obligations, if a

4 third-party had notice of the forfeiture proceedings -- which

5 was the case here, they've submitted an affidavit that they

6 read anything -- it doesn't matter that the government botched

7 notice here.

8     So that's first thing.  The actual notice should -- we

9 need to get to why we gave notice.

11:44 10     THE COURT:  I guess -- I'm asking a different

11 question.

12     MS. HEAD:  Okay.

13     THE COURT:  Why not give notice?

14     MS. HEAD:  Why not give notice?

15     Well, as your Honor knows, we forfeit many things in

16 this jurisdiction, and it is not our practice, nor I think is

17 it reasonable, to go through a bank account and notice every

18 person who has transferred funds into those bank accounts,

19 anybody who has touched property.

11:45 20     We notice, as is our obligation, we publish notice, we

21 notice people who we reasonably believe to have standing.

22     We have addressed this our briefing.  They contend

23 that they have a right to this property.  We say -- and thus,

24 had a right to direct notice.  We counter that, no, we don't

25 think you did.

         1          They argued at one point that they had a bailment in

         2    the property.  We argued, no, you don't because a bailment

         3    applies to tangible personal property.  They're not claiming

         4    it's a constructive trust theory of ownership.  We say, no,

         5    that's not what the 1st Circuit has said.  The 1st Circuit has

         6    said bank depositors, people who have constructive trust aren't

         7    entitle to notice.  And then they have a resulting trust theory

         8    which I will -- I could try to address but we've addressed in

         9    our papers, but basically a resulting trust would be there was

11:46 10    a failed trust relationship.

        11          So, essentially, the way the government saw it is that

        12    this money was voluntarily transferred to KWT, the KWT BOA

        13    account; it was a depositor; it was -- you know, we are not in

        14    the practice of notifying every depositor, and we hear -- nor

        15    did we notify every parent who sent money --

        16          THE COURT:  I think -- I'm following -- I follow your

        17    argument.

        18          I guess -- and I think you were about to turn to the

        19    actual notice.

11:46 20          But what do you say your brother's arguments about the

        21    lack of actual notice here, particularly where the bank

        22    records, which I think were attached to one of the papers here,

        23    indicate that as of September 12, 2019, which is the date of

        24    the preliminary order, those funds were not -- what is the

        25    language here -- give me a second -- were not on deposit in the

1   Bank of America account because, as I recited before, I think

2   Mr. Singer, right, had handed over those funds to the

3   government six months before on March 11, 2019, so that even

4   the careful attorney, I think it was an associate that filed

5   the affidavit who's following the docket or who's reviewing

6   discovery, would necessarily put together that you're talking

7   about Mr. Wilson's million dollars because, one, it's not

8   reflected in the BOA records that were produced as being on

9   deposit at that time, counsel?

11:48 10   MS. HEAD:  I mean, they have -- they had the benefit

11   of knowing that the funds were transferred to the government,

12   right from the bank records and from correspondence with

13   Mr. Frank later in the trial.

14   So I don't -- you know, I have a hard time

15   understanding, I guess -- I'm searching for the right words

16   here, but kind of comprehending that argument.

17   It is the case, the way the forfeiture motion and

18   order reads is the information identified this property, he --

19   you know, his plea agreement, he agreed to forfeit this

11:48 20   property, and that's what was forfeited.

21   So at the time of the information, the money was in

22   that account and, yes, he subsequently transferred it but -- I

23   mean, so what?  I mean, I don't -- and what's important --

24   THE COURT:  No, but he subsequently transferred it

25   before the preliminary order of forfeiture.

1          MS. HEAD:  But if you look at the preliminary -- I

2     mean --

3          THE COURT:  I have it in front of me.

4          MS. HEAD:  Yeah, so it --

5          THE COURT:  42 --

6          MS. HEAD:  Here's the -- sorry, I'm just trying to

7     gather myself.

8          So the information -- you know, the information listed

9     this property for forfeiture, collectively the properties.

11:49 10   Those are the properties that were forfeited.  It's just the

11    way it reads, I guess is -- that's how we typically do stuff.

12    So we're referring back to the information.

13         THE COURT:  No, and I guess, Ms. Head, I -- a few

14    things -- and I appreciate you explaining the regular practice

15    and the reason the regular practice proceeds in regards to, as

16    you said, direct notice as opposed to publication notice; and I

17    certainly even understand having, as you might imagine,

18    reviewed a bunch of these orders myself, right, about how

19    they're framed.

11:50 20        But I guess here, where the government is now asking

21    me to rely on actual notice, don't the actual words matter?

22         MS. HEAD:  Of course they do, your Honor.  And actual

23    words tell the world that the government was forfeiting this

24    bank account of KWF.  And the defendant surely knew that that

25    was the bank account to which he sent money.  It was the

1  instructions that Singer texted Mr. Wilson, it was the bank
2  account that Wilson told his assistant to wire funds to, and it
3  was the money -- it was reflected on the wire transfer.
4       It was a checking account of Mr. Singer's.  So it's
5  entirely appropriate -- you know, it's identified sufficiently
6  in the papers, in the notice, to provide notice to somebody who
7  thinks they have an interest in that bank account to come
8  forward.
9       Now, by the way, just to make clear, the preliminary
11:51 10  order of forfeiture, which Mr. Wilson's attorneys acknowledged
11  they read promptly after being filed, is the notice that we
12  provide to third parties.  So they had in front of them exactly
13  what we would have sent to Mr. Wilson, Mr. Kendall, or any
14  other parent charged or uncharged that had sent money to
15  Mr. Singer.  That's the notice.
16       MR. KENDALL:  We didn't get that.
17       MS. HEAD:  You got it from reading the ECF docket.
18       THE COURT:  I understand the argument.  I'll give you
19  a chance for rebuttal.
11:52 20       MR. KENDALL:  I'm sorry, your Honor.  I shouldn't have
21  said anything.  I apologize.
22       THE COURT:  Ms. Head.
23       MS. HEAD:  So -- so I think we've talked about several
24  things.
25       The one thing I would say is there is -- you know,

1  Congress has acknowledged there's a gap between -- you know,

2  there are people that when we do forfeiture, it doesn't -- you

3  know, they fall into some sort of space, right, that they can't

4  file a claim but they might have some equitable interest, and

5  those matters of equity are specifically reserved for the

6  Attorney General to decide.

7      If Mr. Wilson wants to file a petition for remission

8  to the Attorney General to seek remission or mitigation, he has

9  ample right to do that if he wants to.  That's the safety valve

11:53 10  here in these cases.

11      (Discussion off the record.)

12      THE COURT:  And the government, the U.S. Attorney's

13  Office would support that petition?

14      MS. HEAD:  I don't know if we'd support it.  We'd have

15  to see it, but it's not our decision.  That's what I'd like to

16  convey.  This is not something that we have a decision on, it's

17  the Attorney General's designee.

18      THE COURT:  Anything else you wanted to add?

19      MS. HEAD:  I believe Mr. Frank has some factual points

11:54 20  that he'd like --

21      MR. FRANK:  Just to clarify a couple of quick factual

22  points.

23      First of all, on the last point your Honor made on the

24  bank statements reflecting the money had been transferred prior

25  to the actual entry of the forfeiture order, if your Honor -- I

believe somewhere in the record in front of your Honor is the

email that I transmitted to Mr. Kendall and co-counsel during

the Wilson trial in which we were discussing this very account,

the Bank of America account --

THE COURT:  Is this the whole curative instruction?

MR. FRANK:  Exactly.

THE COURT:  Counsel, I don't know where it is in these

tabs, but I've read it, counsel.

MR. FRANK:  It took me a while to find it, but it's in

there.

The point is, Mr. Kendall was actually cross-examining

the government's witness about the residual funds in this very

account, and I believe that the questioning left the jury with

a misimpression, which is why we had the exchange.

THE COURT:  Meaning, the misimpression that Mr. Singer

still had access those monies?

MR. FRANK:  That the government had permitted

Mr. Singer to keep what was left over in that account when it

was my belief that counsel knew that all of that money had

already been -- was already subject to forfeiture to the

government.  And so that's what we were debating back and

forth.  And so in my email to counsel, I said, In fact, as you

are aware --

THE COURT:  Counsel, do you have a tab -- or do you

have --

1    MR. FRANK:  It's Docket 114, your Honor, and it's an

2    exhibit to Docket 114.

3        MS. HEAD:  It's at 8.

4        MR. FRANK:  It's Exhibit 8.

5        THE COURT:  It's in --

6        MR. FRANK:  I have it, if your Honor wants to see it.

7    It has my slight notation on it.

8        THE COURT:  Counsel, I do remember it, Exhibit 8.

9        MR. FRANK:  What I said was, In fact, as you are

11:55 10   aware, Singer forfeited all the remaining funds in the Bank of

11   America and Wells Fargo accounts in 2019.  I cited to Docket 49

12   in the Singer case, which was the final order of forfeiture,

13   and Docket 55, which was the marshals disposal form.

14       And then I went on to say -- and this is to address

15   your Honor's point about the bank transfers prior to the

16   entry -- These funds totalled approximately $5.1 million.

17       So it was very clear from my email in September of

18   2021 -- so now more than -- more than three years ago --

19       THE COURT:  But, by the government's argument, that

11:56 20   would have been well past the time that Mr. Wilson could object

21   to the forfeiture anyway because the government has taken the

22   position that he needed to object by November 29, 2019.

23       MR. FRANK:  And yet, your Honor, we would have been

24   two-and-a-half years closer to the time of the entry of the

25   order than we are today.

1    And so my point is, there was no surprise there.

2  There was no -- there was no confusion on the part of the

3  defense that this money had, in fact -- which was -- which

4  included the money that Mr. Wilson had transmitted to the Key

5  enterprise had been forfeited as of September 2021.

6    We might have made procedural arguments about it being

7  out of time at that point, but that was two-and-a-half years

8  ago, your Honor, and they did nothing.

9    And as your Honor pointed out, they also did nothing

11:57 10  when we did not pursue forfeiture in Mr. Wilson's case.

11    Mr. Wilson surely knew at the time of his own

12  sentencing and certainly at the time judgment entered when

13  there was a box checked -- I believe there was a box checked

14  "no forfeiture" that we had not pursued forfeiture in that

15  case --

16    THE COURT:  But, I guess -- I guess let me pose a

17  version of my question that I posed to Ms. Head, which is to

18  look at the posture of this case now, Mr. Frank, right?

19    So the monies go into the account, right, as part of

11:58 20  the, you know, alleged conspiracy back in the fall of 2018.

21  Mr. Singer is no longer a member of the conspiracy.  The only

22  person that can be a member of that conspiracy as to these

23  funds is Mr. Wilson.  We know that at least all but the -- I

24  think the tax count are no longer, are void.

25    So fast-forward to our situation now where,

understandably, given the 1st Circuit's decision and in the

government's discretion you dropped the vacated charges, why

doesn't it also follow that the government would exercise its

discretion in regards to the return of the million dollars?

MR. FRANK:  So I think that's a great question, your

Honor, and I'm glad you're giving me an opportunity to answer

it.

That money was never seized pursuant to any -- from

Mr. Singer's enterprise pursuant to any conspiracy that

Mr. Wilson was a part of.  It was seized from the enterprise

pursuant to the RICO conspiracy that Mr. Singer was charged

with.  And in fact, Mr. Wilson was never even charged with RICO

conspiracy; none of the parents were charged with RICO

conspiracy.

THE COURT:  But how that can be true if that

conspiracy is alleged to have ended in September of 2018 and

Mr. Wilson makes his deposits on October 15th and --

MR. FRANK:  December.

THE COURT:  -- December 11th?

MR. FRANK:  Because Mr. Singer's role in the

conspiracy was over as of the time he cooperated, but the

conspiracy, the RICO conspiracy did not end and the enterprise

continued.

And that's an unexceptional proposition, we would

submit, your Honor.

1          In fact, it's no different if there were an ongoing

2     drug enterprise, a drug trafficking organization, and the

3     government introduced a cooperating witness or even an

4     undercover at the apex of that organization.  The mere fact

5     that we had a cooperator in the organization with control over

6     the bank accounts of the organization doesn't mean that the

7     organization doesn't continue past that point.

8          And that's why the fact that this was -- this

9     forfeiture proceeded under the RICO forfeiture provisions is so

12:00 10   critical because that money, once it was transmitted by

11    Mr. Wilson to the Key enterprise, regardless of Mr. Singer's

12    cooperation as of that point, that money was an asset of that

13    enterprise and we seized the assets of that enterprise.  And

14    there were other assets of that enterprise that we also seized.

15         And this is important because it gets at your Honor's

16    equitable concerns, which I totally understand.  But Mr. Wilson

17    is no differently situated with respect to our seizure of the

18    assets of the enterprise than anyone else who transmitted money

19    to that enterprise and had those assets seized after the --

12:01 20   after the money was transmitted, whether he was -- in fact,

21    there are parents whose assets were transmitted to the

22    enterprise and then seized who were never even charged in this

23    case.

24         If your Honor were to enter an order here suggesting

25    that Mr. Wilson could recover his assets years after the

1  forfeiture, then that would open the floodgates to others who

2  transmitted assets to the enterprise who were never even

3  charged saying, Well, we can now claim that we're entitled to

4  get our money back.

5          And that's why the procedures that are in place for

6  forfeiture are so important, because another equitable

7  consideration and important consideration is finality.  This

8  happened years ago.  And so, you know, all of those people --

9  and there are others, your Honor, who were never charged --

12:01 10          THE COURT:  Right, right.  But, unlike -- to

11  Mr. Kendall's point -- Mr. Wilson and only I think he said one

12  other parent sort of put the charges to the ultimate test of

13  trial.  Doesn't a similar argument apply here?

14          MR. FRANK:  Well, no, because its irrelevant whether

15  he was even charged.

16          He wasn't charged with RICO conspiracy.

17          THE COURT:  No, I meant broadly speaking.  Meaning,

18  the arguments he's making now -- meaning -- I understand your

19  point about, I don't know, perhaps the floodgates, I don't

12:02 20  know, but only Mr. Wilson is before me and only Mr. Wilson is

21  making these equitable claims.

22          MR. FRANK:  I understand that, but -- my argument is

23  that with respect to those claims, he's no differently situated

24  than any parent who was never even charged in the first place.

25          The charges against him are not relevant to the RICO

conspiracy pursuant to which we seized these assets.  We seized

these assets because they were assets of the enterprise.

And as of his trial, we had already moved to forfeit

those assets.  That's -- because his -- whether he was ever

convicted and whether or not he was even charged was completely

irrelevant to the seizure of those assets.

And by the way, you know, I understand the equitable

concern, and that's why Ms. Head points out that there is a

path forward for him that goes over our heads, it goes to the

Department of Justice and they make a decision --

THE COURT:  And again, I'll ask the same question:

With the assent of the U.S. Attorney's Office?

MR. FRANK:  I don't know what the position of the U.S.

Attorney's Office would be, we've never discussed that, it's a

decision that would be over my head.  But the point is that

it's a different branch of the Department of Justice and there

is a path forward.

But the bottom line, your Honor, is that he's

equitably no differently situated than other people with assets

in those accounts.

I just want to clarify one point.  I understand that

his conviction on some of the counts was vacated, but it's not

as though he put the charges to the test and he was acquitted.

The government -- the court, in fact, found that there was

sufficient evidence that he was involved in a conspiracy with

1  Mr. Singer, just not the breadth of the conspiracy as we

2  charged it.  They upheld certain of the legal theories of the

3  case, they vacated and set aside other legal theories of the

4  case and remanded it for further proceedings consistent with

5  that opinion.

6  The government, having secured a conviction that

7  survived the appeal on the tax count, elected for resource

8  considerations not to proceed with another trial.  But this

9  defendant was never acquitted.  There was no adjudication of

12:04 10  his lack of guilt in this case.  We just --

11  THE COURT:  I understand the sequence here, but as it

12  stands, he's not convicted of charges giving rise to

13  forfeiture.

14  MR. FRANK:  True --

15  THE COURT:  And I understand your distinction about

16  the RICO.

17  MR. FRANK:  Certainly.  But he's certainly guiltier

18  than all of the parents who transmitted assets to that

19  enterprise who were never charged in the first place as to whom

12:05 20  we didn't even have sufficient evidence to charge them.

21  They're all similarly situated for purposes of this forfeiture.

22  MS. HEAD:  I'm sorry to tag team here, your Honor, but

23  the 1st Circuit has made some rulings in the area of

24  conspiracies and enterprise, and we cited one in our case, the

25  Angiulo -- one in our briefing, the Angiulo, Any interest in an

enterprise, including the enterprise itself, are subject to

forfeiture, regardless of whether some portion of that

enterprise is not tainted by the racketeering activity.

And I'd also refer your Honor to United States v. Cox,

which is another 1st Circuit decision, which holds that in a

conspiracy or scheme to defraud, the government may forfeit

assets from uncharged, dismissed or even acquitted conduct, and

that is 853 F.3d, 113.

So it doesn't necessarily turn on the fact that

certain conduct was the subject of conviction.

THE COURT:  Thank you.

Mr. Kendall.

MR. KENDALL:  Your Honor, a few factual issues.  I

want to try to avoid too much argument and just go to, I think,

factual points that should be clarified.

Both my brother and sister keep talking about this

being seized from the RICO enterprise and a RICO bank account.

The FBI opened the bank account with Mr. Singer.  It had

nothing to do with the RICO enterprise.  That bank account was

something that the FBI decided to do to further its undercover

operation.

THE COURT:  After the end of the alleged conspiracy.

MR. KENDALL:  Exactly, your Honor.  So this money had

nothing to do with the RICO enterprise.

And your point, I may not have been as nuanced in my

1　first time speaking of how nexus informs notice.

2　　　　We do believe we have a basis if there's no nexus,

3　it's an illegal charge.  But, of course, the nexus really

4　informs the notice issue, because we relied on that and

5　Mr. Malkiel put that in his affidavit.  I've known Mr. Malkiel

6　for years.  We was a clerk for Judge Wolf; he clerked at the

7　SJC.  He's a fine lawyer.  He's a superb lawyer.  He read it in

8　September.  He felt what all of us would think reading that.

9　　　　So the main point it was an asset of a RICO enterprise

12:07 10　is just down the tubes, your Honor.  It was something that the

11　FBI got in on an undercover operation, like every reverse sting

12　you supervise in OCDETF and that I worked on when I was there

13　as an assistant, your Honor.  I think that really is critical

14　to destroying the government's case.

15　　　　Other things.  We acted the first time we could.  We

16　were reasonable to assume they were going to file some order of

17　forfeiture.  I told it to Judge Gorton, I said we're

18　expecting --

19　　　　　　　THE COURT:  At the sentencing.

12:07 20　　　　　　　MR. KENDALL:  At the sentencing.

21　　　　　　　THE COURT:  But what do you say to Mr. Frank's

22　argument about the exchange about the curative instruction?

23　There's a sidebar, there's some back and forth, Judge Gorton

24　says curative instruction --

25　　　　　　　MR. KENDALL:  Mr. Frank does not do my

cross-examination justice.

They put on an FBI summary witness who is testifying about all the amounts that Singer had gathered during his criminal activities -- and I'm not going to get the numbers right -- I think she talks about, you know, 8 million went off for payments and donations to schools and this and that.

And I cross-examined her. There were several million that were not accounted for, and it wasn't not accounted for because of the transfer that we're talking about, it's 6 million or so she couldn't account for.

Why did I raise that? Because it's in the docket of this case, Mr. Frank knows it, I had done my own research.

Singer had several millions of dollars stashed in overseas bank accounts, and I was trying to prod him, prod the agent on this issue that they didn't cover all the money that Singer and his brother -- I've given the government the names of the bank accounts, and they've just sort of blown me off on it, your Honor.

But the point being, your Honor, that was the point of my cross-examination. It had nothing to do with trying to figure out what happened to the monies after the RICO enterprise --

THE COURT: Ms. Head, you can sit down. I'll come back to you.

MS. HEAD: Yes.

1    THE COURT:  Counsel.

2    MR. KENDALL:  So, your Honor, whether they agree with

3    my view or not, that's what I was talking about.

4    In the middle of trial, for him to send me an email

5    that contradicts everything filed in the Singer docket that I'm

6    supposed to realize, oh, my million dollars has already been

7    forfeited, is, your Honor, not the point I was cross-examining

8    on.  I wasn't touching that money in my cross-examination.  I

9    was talking about money that was gathered by Singer prior to

12:09 10    the end of September 2018 that the FBI summary witness could

11    not account for.  So it's just apples and oranges.

12    THE COURT:  Well, but I thought, counsel, that your

13    brother was bringing it up for the rebuttal that the government

14    had seized whatever it was, $5 million from Mr. Singer, and the

15    implication of that was it was from an account in which

16    Mr. Wilson's $1 million had gone?

17    MR. KENDALL:  There may have been an implication, but

18    nobody told us that was the implication.  Again --

19    MR. FRANK:  That's --

12:10 20    THE COURT:  Counsel, counsel -- only one attorney at a

21    time.

22    MR. KENDALL:  Nexus informs notice, your Honor.

23    Because -- not just because they said it, but because it made

24    so much sense under the law.

25    His RICO enterprise did end in September of 2018.  Any

1   rational person would think when the head of the RICO

2   enterprise becomes a government informant and is taking all the

3   monies in an FBI supposedly controlled bank account, that he's

4   not acting in furtherance of the RICO enterprise.

5           Your Honor, just a few more factual issues I'd like to

6   respond to.

7           My sister said that they did not list any specific

8   assets in the parents' case.  If you look at tab 11, it

9   specifically identifies the $500,000 transfers mentioned in the

12:11 10  count as being subject to forfeiture.  They're highlighted in

11  tabs -- tab 11, Counts Six, Nine, Eleven and Twelve are only

12  based upon a $500,000 transfer by my client, two counts for

13  each transfer.

14          And the forfeiture allegation at the end of tab 11

15  specifically says it includes the proceeds from Counts Six,

16  Nine, Eleven and Twelve.  It could not be a more specific

17  statement to me and to my team that our $500,000 transfers are

18  being forfeited in the Wilson case the way they wrote

19  paragraphs 3, 8, 1 of the -- I think that's the fourth

12:11 20  superseding indictment.  It's the same language in the third,

21  your Honor.

22          So I would suggest there is very specific mention of

23  the assets in the parents' case and not in the Singer

24  information.

25          Next, your Honor, and if there's any doubts about the

factual support that it wasn't a bank account of the RICO

enterprise, tabs 2 and 4 have the testimony of the FBI agents

of how they controlled it and set it up.

Next, my sister said, you know, it would be too much

work to give all the parents who we had gotten money from in

that bank account notice.  There are four parents:  Mr. Kaplan,

Ms. Sui, Ms. Saffari, and my client.  They could have taken it

right out of the bank account and added it to that list.

They give the Swansea Football Team in England and

they give all these businesses that are never going to file a

claim, that have never disputed anything notice, but they

couldn't bother to just say, "John Wilson," given that they

know how explicitly that we are fighting the case.

Next, your Honor, the government looks at this from

their perspective, if we didn't think you had a colorable claim

or a good claim, we don't have to give you notice.  I suggest

that's the whole point of notice, is when the government thinks

they're going to win but you have a legal right to defend that

you believe in, that they're supposed to tell you about it so

you can show up in court and win or lose, but at least fight

for your rights.

It may be that Ms. Head thought we had no basis.  We

beat the criminal case.

And Mr. Frank wants to say, Well, it's not such a good

victory, this, that.  My client is innocent until proven

1   guilty.  He spent four-and-a-half years to get a fair trial,

2   and when the conviction was reversed, the government refused to

3   retry the case and walked away from it.  Given the publicity,

4   the pressure, the sort of attention to this case, if they had

5   had a triable case, we would have gone back for a second trial.

6        He spent four-and-a-half years fighting to vindicate

7   himself.  For them to say that they can keep the million

8   dollars simply because you didn't piece together these sort of

9   obscure hints, you know, there's -- I forget the writer up in

12:14 10   New Hampshire who writes the book about the Vatican's -- the

11   movie with Tom Hanks and how everything is like a secret -- you

12   know what I'm talking about.

13        THE COURT:  Dan Brown.

14        MR. KENDALL:  Thank you.  All of his books are like

15   these complicated, subtle, nuanced hints that you have to be a

16   scholar, an expert of history to figure out.  That's how they

17   want to treat notice for forfeiture, that you have to realize

18   they made a mistake when they gave the wrong date for nexus,

19   they made a mistake or they weren't meaning it when they told

12:14 20   Zobel they would -- Judge Zobel they would give direct notice

21   to anybody that had a basis to make a claim, that all of those

22   things we should not have believed, your Honor.  And we should

23   have relied on one thing, an ambiguous statement that funds on

24   deposit in the account meant sometime prior to when the court

25   made that an authorized action.  It's simply, your Honor -- it

1    doesn't pass constitutional muster.

2         Another point, your Honor.  They treat us like we're a

3    general creditor of Mr. Singer, like, you know, he just owes us

4    some money, the RICO enterprise has some of our money and we're

5    just in line with all the other creditors.

6         First, your Honor, we're not a creditor.  The FBI put

7    together a rouse where they lied to my client.  They're

8    entitled to an undercover operation, but they lied, and Singer

9    lied.  And they said if you make a donation, that's tax

12:15 10    deductible and fully tax deductible under IRS rules to Stanford

11    and Harvard, your kids will be treated like the children of

12    big-time donors and you'll get a preference.

13         If you take a look at the 1st Circuit opinion --

14         THE COURT:  Counsel, I will do that.

15         Anything else on rebuttal?

16         MR. KENDALL:  Well, your Honor, the point being, we're

17    not a general creditor, we're something different.  We're

18    somebody who gave money under certain promises and

19    representations by the government agent, and if they didn't

12:16 20    intend to honor their promises and representations, we get our

21    money back.

22         You know, if it wasn't the government in an undercover

23    operation, it would be a fraud case.  I'm not saying it's a

24    fraud, but I'm saying the legal concept of it isn't the

25    transfer, they have it.

1    THE COURT:  Understood.

2    MR. KENDALL:  Next, your Honor, we're supposed to

3    figure all this out in the middle of trial when we're debating

4    my cross-exam of an FBI witness.  We had millions of pages from

5    the government, millions of pages of bank records and emails

6    and other parents' stuff.  To say that I'm to sift through and

7    know everything and realize in the middle of trial the hidden

8    message I think is simply not meeting the constitutional

9    standards.

12:16 10    The fact that my sister says we got direct notice when

11    we read the docket of the preliminary order of forfeiture.  So

12    what they're saying is we didn't send it to them, we would

13    ordinarily expect depositors to get notice by getting the

14    preliminary order of forfeiture but we didn't send it to them.

15    So if they thought that was going to be adequate notice to meet

16    the direct notice standard because they were intending to

17    forfeit his million dollars, why didn't they send us the

18    preliminary order of forfeiture?  The only reason they know we

19    saw it is because we filed an affidavit from our associate.

12:17 20    So up until they got that affidavit they had no reason

21    to believe they met the direct notice standard under this

22    reduced concept that we'll mail you the preliminary order of

23    forfeiture and that will be sufficient.  If I had not been

24    transparent with the Court, they wouldn't be able to make that

25    argument.

1        That's it, your Honor, and I thank you for -- if I may

2   just confer one second.

3        (Discussion off the record.)

4        MR. KENDALL:  I thank you for your patience, your

5   Honor.

6        THE COURT:  Thank you.

7        Briefly.

8        MR. FRANK:  Briefly, your Honor.

9        The case begins and ends with actual notice.  The

12:18 10  actual notice that the government transmits when it transmits

11  notice is the preliminary order of forfeiture.  That is the

12  identical document that counsel, under oath, affirmed to the

13  Court that they read.  That is the notice that we would have

14  provided.

15       With respect to the email communication during trial,

16  which was, yet, another form of notice that counsel received in

17  September of 2021, counsel says, Well, I didn't realize, how

18  was I supposed to know that was the million dollars?

19       Your Honor, there were no millions of pages of

12:18 20  documents that counsel needed to go through.  There was a

21  chart, here it is.  It was on the screen when counsel was

22  conducting his examination.  It's Docket 114-6.  And it shows

23  $500,000 in two installments going from Hyannisport Capital, a

24  total of $1 million, to KWF BOA 0486, the exact account we've

25  been talking about, which I told him that same day in writing

was the account from -- that we had seized, and the total

amount that we had seized was $5.1 million.  There were other

chalks entered, Docket 114-4, Docket 114-5, further detailing

Singer's -- the assets in the Key enterprise.

And finally, your Honor, the enterprise did not end

with Singer's cooperation.  And the best evidence of that is,

your Honor, is that others pled guilty through February '19 as

being associates and members of that enterprise, which

continued through February '19 when it finally ended.

This transaction with Mr. Wilson that we have been

talking about was initiated before Rick Singer even began

cooperating.  It was Mr. Wilson who reached out to the

enterprise on September 15th of 2018 to initiate this side door

transaction.

Mr. Singer later continued to engage with Mr. Wilson

on behalf of the enterprise while he was a cooperator.  But

Mr. Wilson was the one who reached out before --

THE COURT:  Counsel, I saw that allegation made in

your papers, but you cite to something --

MR. FRANK:  I might have cited -- we might have cited

to the wrong call, your Honor, but there were two phone calls.

There was one phone call that was interrupted and resumed by

Mr. Wilson to Mr. Singer on September 15th before Mr. Singer

began cooperating.

And if your Honor doesn't have them, we can certainly

1 provide them.

2 (Pause.)

3 THE COURT: There was reference to the complaint,

4 Docket 3 at paragraph 304, but that makes reference, I believe,

5 to side-door opportunities for his daughter on September 29th.

6 MR. FRANK: Correct, your Honor.

7 We might have cited to the wrong -- I thought at a

8 later point we corrected that, your Honor. Perhaps it was in

9 our reply brief or in our sur-reply.

12:21 10 THE COURT: Well, I'll go back --

11 MR. FRANK: But, in any event, if the Court doesn't

12 have it, it's easy enough for us to provide.

13 There were two phone calls on September 15th, I don't

14 think it's disputed, on September 15, 2018, when Mr. Wilson

15 reached out to Mr. Singer, who was not cooperating at that

16 point, and began the conversation about the side doors for his

17 two daughters. They had an extensive conversation about what

18 sport would it be that we would be putting them in for and can

19 we make the payment tax deductible, like a donation. That was

12:22 20 all on September 15, 2018, before Mr. Singer began cooperating.

21 And certainly he continued that conversation and the

22 funds were finally transmitted after he began cooperating when,

23 it's our position, they became assets of the enterprise.

24 But it is emphatically true and it's really not

25 disputed that his cooperation did not end the enterprise. The

enterprise continued.  And in fact, the reason the FBI had him

set up that account was in part so that he could continue the

affairs of the enterprise through that account rather than

through the prior accounts he had been using.

THE COURT:  Thank you.

MR. KENDALL:  Your Honor, may I suggest that one last

issue --

THE COURT:  Very briefly.

MR. KENDALL:  The September 15th call.

12:22 THE COURT:  Yep.

MR. KENDALL:  It is not in furtherance of a RICO

enterprise.  If you'd like, we can give you a copy of the

transcript of the government.

Wilson has a college counseling call with his college

counselor.  They're talking about his daughter applying to

schools and what has the best engineering and math/science

programs, they're both STEM types, the two daughters.  And in

it, Wilson asked, you know, can I make a donation to the school

that may have an impact?  There was no discussion of bribery or

12:23 any criminal activity.  And Singer assures him -- Singer is

telling him, I speak to the president of Harvard -- which was

not true -- I speak to the president of Brown, I speak to the

president of Tufts, I'm negotiating these donations.  If you

want your child to be treated as a donor's child, I can do

that.  It has nothing to do with the RICO enterprise, your

1    Honor.  And --

2         THE COURT:  So that will be the last word, counsel,

3    all right.

4         So I appreciate the arguments on either side and I'll

5    give further thought to them and we'll go from there.

6         I don't know what my ruling on this matter will be.  I

7    think I had some challenging questions for both sides.

8         In the interim, I suppose there's nothing barring the

9    parties from any conversation or any petition to the Attorney

12:24 10   General's office, even as I proceed to decide this matter.

11        Thank you.

12             THE CLERK:  All rise.

13             (Court adjourned at 12:24 p.m.)

14                  - - - - - - - - - - -

15                       CERTIFICATION

16        I certify that the foregoing is a correct transcript

17   of the record of proceedings in the above-entitled matter to

18   the best of my skill and ability.

19

20

21

22   /s/Debra M. Joyce_____          February 23, 2024_____
     Debra M. Joyce, RMR, CRR, FCRR    Date
23   Official Court Reporter

24

25