UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 19-cr-10078-DJC |
| | ) | |
| WILLIAM RICK SINGER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM AND ORDER

CASPER, J.                                                                     April 19, 2024

I.      Introduction

        In the fall of 2018, John Wilson ("Wilson") transferred one million dollars into a Bank of

America checking account in the name of "Key Worldwide Foundation" after Defendant William

Rick Singer ("Singer") told Wilson that he could help secure his children college admissions slots.

D. 125-1; D. 125-2; see D. 110-1 ¶¶ 1–3; DW. 732 ¶¶ 238–44.[1]  Unbeknownst to Wilson, Singer

at the time was cooperating with agents in an investigation into alleged misconduct in connection

with college admissions.  See DW. 2391 at 150–53, 199; DW. 2392 at 14.  In March 2019, Singer

pled guilty to racketeering and money laundering conspiracy offenses and other charges, D. 2 at

1–2; D. 19, and in September 2019, the government sought forfeiture of Singer's assets including

all funds on deposit in Singer's Key Worldwide Foundation account at Bank of America ("BOA

x0486 account") to which Wilson had transferred one million dollars.  D. 41 at 2; D. 42 at 2.  On

_____

        [1] References to docket filings in this case shall be to "D. ___."  References to docket filings
in United States v. Wilson, No. 19-cr-10080-LTS-17 (D. Mass.) shall be to "DW. ___."

February 5, 2020, this Court (Zobel, J.) entered a Final Order of Forfeiture against Singer, ordering the forfeiture of, among other assets, all funds on deposit in the BOA x0486 account.  D. 49.

Meanwhile, in a separate criminal case, the government charged Wilson and others initially in March 2019 with mail fraud conspiracy.  DW. 3.  By October 22, 2019, the government charged Wilson (and others) in a third superseding indictment and added forfeiture allegations of "any property" tied to substantive charges of mail and wire fraud and federal programs bribery which specifically alleged Wilson's transfers to the BOA x0486 account were criminal offenses. DW. 610 ¶¶ 320, 322–23.  A fourth superseding indictment, returned on January 14, 2020, added a filing false tax return charge against Wilson.  DW. 732 ¶¶ 379–80.  Wilson's case proceeded to trial in September 2021, DW. 2169, resulting in convictions for the 2018 transfer of one million dollars to Singer, DW. 2376; Wilson was sentenced on February 16, 2022.  DW. 2535.  Wilson appealed the convictions, and, in May 2023, the First Circuit vacated all convictions except the filing false tax return charge.  DW. 2677; DW. 2679.

Now, in Singer's criminal case, as an ancillary forfeiture proceeding, Wilson has filed a third-party petition for the return of the one million dollars.  D. 110.  Wilson, alternatively, has moved for the return of funds under Fed. R. Crim. P. 41(g).  D. 116.  The government has opposed both motions.  D. 114; D. 125.  For the reasons stated below, the Court ALLOWS Wilson's motion to return the funds, D. 110, and DENIES AS MOOT Wilson's alternative Rule 41(g) motion, D. 116.

## II.    Factual Background

The following relevant facts are drawn from the parties' submissions and the record in Singer and Wilson's criminal cases.

A.      **Singer Sets Up the BOA x0486 Account and Wilson Transfers the Funds**

On September 21, 2018, FBI and IRS agents approached Singer, informed him that he was under investigation and eventually secured his cooperation.  DW. 2391 at 151–52.  Several days later, while accompanied by agents, Singer opened the BOA x0486 account, a Bank of America checking account in the name of "Key Worldwide Foundation" with an account number ending in "x0486."  Id. at 153; see D. 110-1 ¶ 1; D. 114-1 at 1.  Agents had the ability to access the BOA x0486 account.  DW. 2391 at 153.

On or about September 29, 2018, Singer discussed with Wilson "side door" opportunities for two of his children for potential admissions spots at Stanford University and Harvard University.[2]  See D. 110-1 ¶¶ 2–3; DW. 2391 at 170–78.  On October 17, 2018 and December 11, 2018, Wilson made two transfers of $500,000 each to the BOA x0486 account, totaling one million dollars (the "Funds").  D. 125-1; D. 125-2.  Singer represented to Wilson that the Funds would be held in the BOA x0486 account and subsequently transferred to Stanford University and Harvard University.  D. 110-1 ¶ 2.

---

[2] It appears from the record that Singer's first discussion with Wilson concerning "side door" opportunities at Stanford and Harvard occurred on September 29, 2018, at which point Singer already was cooperating with the government.  See DW. 732 ¶ 238 (alleging that "[o]n or about September 29, 2018, WILSON asked Singer about 'side door' opportunities for his twin daughters"); DW. 2391 at 170–78 (agent testifying about September 29, 2018 call); see also id. at 153 (agent testifying that agents escorted Wilson to the bank to open the BOA x0486 account on September 24, 2018).  The government asserts, however, that "Wilson contacted Singer about entering into the side-door scheme for his daughters *before* Singer began cooperating."  D. 114 at 3 n.2 (emphasis in original).  The government cites the complaint in Wilson's case, DW. 3-4 ¶ 304, but that paragraph refers to the same September 29, 2018 call, that occurred soon after the agents escorted Wilson to the bank to open the BOA x0486 account.

At oral argument, see D. 132 at 58–59, the government noted that another call between Wilson and Singer occurred on September 15, 2018 and pointed to a one-page excerpt of the call transcript attached to its surreply.  D. 125-3.  According to the excerpt, Wilson and Singer discussed the recruiting standards of an unspecified college or university's rowing program and whether some (again, unspecified) transactions would be "tax deductible as like donations to the school."  Id. at 2.

**B.**    <u>**Singer and Wilson Are Charged in Separate Criminal Cases**</u>

On March 5, 2019, the government filed an information and a plea agreement under seal charging Singer with racketeering conspiracy in violation of 18 U.S.C. § 1962(d), money laundering conspiracy in violation of 18 U.S.C. § 1956(h), conspiracy to defraud the United States in violation of 18 U.S.C. § 371 and obstruction of justice in violation of 18 U.S.C. § 1512(c)(2). D. 1 ¶¶ 89–97; D. 2.  As to the conspiracy charges, the government alleged that Singer had engaged in the racketeering conspiracy from in or about 2011 to September 2018, the money laundering conspiracy from in or about 2013 to September 2018 and the conspiracy to defraud the United States from in or about 2013 to in or about September 2018.  D. 1 ¶¶ 90, 93, 95.

The information included a racketeering forfeiture allegation under 18 U.S.C. § 1963, D. 1 ¶¶ 98–99, and a money laundering forfeiture allegation under 18 U.S.C. § 982(a)(1).  D. 1 ¶¶ 100–01.  Both allegations sought, in relevant part, forfeiture of "[a]ll funds on deposit in Bank of America checking account in the name of the Key Worldwide Foundation ending in x0486," i.e., the BOA x0486 account.  <u>Id.</u> ¶¶ 98, 100.  On March 12, 2019, Singer pled guilty.  D. 19.  Under the terms of his plea agreement, Singer agreed to the forfeiture of all funds on deposit in the BOA x0486 account and admitted that same "[were] subject to forfeiture on the grounds that these assets were involved in such offenses or traceable to such offenses."  D. 2 at 7.

Meanwhile, on March 12, 2019, the same day Singer's information and plea agreement were unsealed, D. 14, agents arrested Wilson after, in a separate criminal case, charging him (and others) in a criminal complaint for conspiring with Singer to engage in the alleged college admissions scheme.  DW. 43; <u>see</u> DW. 3.  The complaint alleged that "on or about September 29, 2018, WILSON inquired about potential 'side door' opportunities for his daughters," that "[o]n or about October 17, 2018, WILSON's company wired $500,000 to an account in the name of KWF

in the District of Massachusetts," and that "on or about December 11, 2018, WILSON's company

wired another $500,000 to the Massachusetts account in the name of KWF."  DW. 3-4 ¶¶ 304,

307, 310.

On April 9, 2019, a grand jury returned a second superseding indictment against Wilson

and others.  DW. 314.  Consistent with the complaint, the second superseding indictment alleged

that Wilson made two $500,000 transfers to a Massachusetts bank account in the name of KWF.

Id. ¶¶ 250, 253.  It charged Wilson with one count of conspiracy to commit mail and wire fraud

and honest services fraud in violation of 18 U.S.C. § 1349.  DW. 314 ¶¶ 322–23.  In connection

with this count, the second superseding indictment included a forfeiture allegation under 18 U.S.C.

§ 981(a)(1)(C) and 28 U.S.C. § 2461(c), seeking the forfeiture of "any property, real or personal,

which constitutes or is derived from proceeds traceable to the offense."[3]  DW. 314 ¶¶ 326–27.

### C.    The Government Initiates Forfeiture Proceedings in Singer's Case While Asserting Forfeiture Allegations in Wilson's Case

On the government's motion and with Singer's assent, on September 12, 2019, the Court

(Zobel, J.) entered a Preliminary Order of Forfeiture in Singer's criminal case, ordering the

forfeiture of "[a]ll funds on deposit" in the BOA x0486 account.  D. 43 at 1–2; see D. 42.  The

Court determined, on the basis of Fed. R. Crim. P. 32.2(b)(1) and Singer's guilty plea, that the

government had established the requisite nexus between the BOA x0486 account and the offenses

of which Singer had been found guilty.  D. 43 at 4.  The Court approved and authorized the

government's proposed order, requiring the government to publish notice of the Preliminary Order

---

[3] The superseding indictment also included a money laundering conspiracy charge under 18 U.S.C. § 1956(h) and a money laundering forfeiture allegation under 18 U.S.C. § 982(a)(1). DW. 314 ¶¶ 324–25, 328–29.  The third and operative fourth superseding indictments also charged Wilson with money laundering conspiracy in violation of 18 U.S.C. § 1956(h).  DW. 610 ¶¶ 317–18; DW. 732 ¶¶ 373–74.  The government dropped the money laundering charge before trial. DW. 2042; DW. 2057.

of Forfeiture on www.forfeiture.gov for thirty consecutive days and to give "to the extent practicable" direct written notice to any person known to have alleged an interest in properties including funds in the BOA x0486 account. Id. at 4–5. The government was also ordered that any third party asserting a legal interest in such properties "shall, within sixty (60) days after the first day of publication on the government forfeiture website or within thirty (30) days after receipt of actual notice, whichever is earlier, file a petition" with the Court "requesting a hearing to adjudicate the validity of his or her interest in the Properties." Id. at 5.

Thereafter, the government published a notice of the Preliminary Order of Forfeiture on www.forfeiture.gov for thirty consecutive days from October 1, 2019 to October 30, 2019. D. 47. In the notice, the government stated, in relevant part, "that on September 12, 2019, in the case of U.S. v. William Singer, Court Case Number CR 19-10078-RWZ, the United States District Court for the District of Massachusetts entered an Order condemning and forfeiting . . . Check in the amount of $5,148,328.16 from The Key Worldwide Foundation account number ending in x5388 (19-FBI-002691) which was seized from Bank of America checking account numbers ending in x0486 and x2391, held in the name of the Key Worldwide Foundation." D. 47-1 at 2.

Meanwhile, back in Wilson's criminal case, a grand jury returned the third superseding indictment on October 22, 2019, charging Wilson with one count of conspiracy to commit mail and wire fraud and honest services mail and wire fraud in violation of 18 U.S.C. § 1349. DW. 610 ¶¶ 313–14. Wilson was also charged, for the first time, with one count of conspiracy to commit federal programs bribery in violation of 18 U.S.C. § 371, three substantive counts of wire fraud and honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346 and 2 and with two substantive counts of federal programs bribery and aiding and abetting in violation of 18 U.S.C. §§ 666(a)(2) and 2. DW. 610 ¶¶ 315–16, 319–22.

The third superseding indictment included specific allegations concerning Wilson's 2018 transfer of the Funds to the BOA x0486 account.  With respect to the wire fraud charges, the third superseding indictment alleged the following wires:  (1) a "$500,000 wire transfer to KWF" on October 17, 2018; (2) a "[t]elephone call with Singer" on October 27, 2018; and (3) a "$500,000 wire transfer to KWF" on December 11, 2018.  Id. ¶ 320.  The third superseding indictment also alleged, in connection with the federal programs bribery charges, that Wilson made a "$500,000 wire transfer to KWF" on October 17, 2018 to influence the "[s]ailing coach of Stanford" and a "$500,000 wire transfer to KWF" on December 11, 2018 to influence a "[s]enior women's administrator of Harvard."  Id. ¶ 322.  It also included a forfeiture allegation under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), indicating that the government would seek forfeiture of "any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses" upon Wilson's conviction of the wire fraud and federal programs bribery charges and the related conspiracy charges.  DW. 610 ¶ 323.  The operative, fourth superseding indictment, returned on January 14, 2020, charged Wilson and others and retained the same charges against Wilson as the third superseding indictment and the same allegations detailing Wilson's transfer of the Funds in support of the wire fraud and federal programs bribery charges (Counts VI, VIII, IX, XI and XII) and the same forfeiture allegation in connection with same and the related conspiracy charges (Counts I and II).[4]  DW. 732 ¶¶ 375–78, 381–82.

Not long after the entry of the fourth superseding indictment against Wilson, in Singer's criminal case, on February 3, 2020, the government moved for a Final Order of Forfeiture as to

---

[4] As previously noted, Wilson was again charged with one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h) (Count III), the charge abandoned before trial. DW. 732 ¶¶ 373–74.  The fourth superseding indictment also charged one count of filing a false tax return in violation of 26 U.S.C. § 7206(1) (Count XIII), which is not the subject of the forfeiture allegations.  Id. ¶¶ 379–80.

the BOA x0486 account and other properties, asserting that "[n]o claims of interest in the Properties have been filed with the Court or served on the United States Attorney's Office, and the time within which to do so has expired." D. 48 ¶ 3. Its supporting certification provided a list of individuals and entities the government had sent direct notice of the forfeiture, which did not include Wilson. D. 46 ¶ 2. On February 5, 2020, the Court granted the motion and entered the Final Order of Forfeiture ordering the forfeiture of, *inter alia*, "[a]ll funds on deposit" in the BOA x0486 account. D. 49 at 1.

**D.      Wilson's Case Proceeds to Trial and Sentencing**

During discovery, the government produced documents to Wilson, including wire confirmations, text messages and emails concerning Wilson's transfer of the Funds to the BOA x0486 account. See D. 114 at 2 & n.1; D. 114-1; D. 114-2; D. 114-3; D. 125-1; D. 125-2. The wire confirmations indicate that on October 17, 2018 and December 11, 2018, respectively, $500,000 was transferred from a First Republic Bank account in the name of "Hyannis Port Capital Inc[.]" to a Bank of America account in the name of "The Key Worldwide Foundation" with an account number ending in "0486." D. 125-1 at 1–2; D. 125-2 at 1–2. According to text messages on October 17, 2018 between Singer and Wilson, Wilson asked Singer to send "wire instructions for your foundation." D. 114-1 at 1. Singer agreed and then texted Wilson information including "Bank of America," an account number ending in "0486" and "The Key Worldwide Foundation." Id. Emails dated October 17, 2018 and December 11, 2018 show that Wilson signed off on the transfers. See D. 114-2; D. 114-3.

Wilson's trial began on September 8, 2021. DW. 2169. During the trial, the wire confirmations, text messages and emails produced in discovery were entered into evidence. See D. 114-1; D. 114-2; D. 114-3; D. 125-1; D. 125-2. In addition, the government presented

summary charts documenting deposits and withdrawals from the BOA x0486 account.  D. 114-4; D. 114-5; D. 114-6.  One of these charts showed the flow of two $500,000 wire payments on October 17, 2018 and December 11, 2018, respectively, from "Hyannis Port Capital Inc." to "KWF *BoA *0486*."  D. 114-6.

On the fourteenth day of trial, September 29, 2021, the government elicited testimony from a summary witness concerning Wilson's transfer of the Funds to the BOA x0486 account. DW. 2325; DW. 2401 at 32–37, 51.  Following the defense's cross examination of the witness, counsel argued at sidebar about the scope of the government's redirect examination.  DW. 2401 at 118.  The government stated that because Wilson's attorney had "asked a series of questions about how many millions were left over in The Key Worldwide Foundation's accounts, and several million of that was paid in forfeiture to the U.S. Marshals," she had planned to ask the witness one question "about whether she saw checks from the accounts to the U.S. Marshal service."  Id.  The defense objected to the planned line of questioning as to the forfeiture of the BOA x0486 account, responding that "Singer has not testified" and that "[f]orfeiture is criminal forfeiture, and that tells the jury it's a conviction."  Id. at 118–19.  The government responded that Wilson's attorney had opened the door to this issue by asking the witness about money that had remained with Singer and requested that the Judge instruct the jury to disregard where the remaining money went.  Id. at 119.  The Court then instructed the government to prepare a proposed, curative instruction that he would give to the jury.  Id.

Later that day, defense counsel emailed the government asking about its proposed curative instruction.  D. 114-8.  In relevant part, defense counsel (for one of Wilson's co-defendants and copying counsel for the other defendants) made reference to Singer's plea agreement, noting that "Singer was supposed to forfeit all funds on deposit in BOA account ending in 0486 as of the date

of the plea agreement (2/6/19) but it does not indicate how much that was." Id. at 1.  The government responded to counsel (including Wilson's counsel), "as you are aware, Singer forfeited all the remaining funds in the Bank of America and Wells Fargo accounts in 2019.  See U.S. v. Singer, D[.] 49 (final order of forfeiture); D[.] 55 (Marshals Disposal Form).  These funds totaled approximately $5.1 million."  Id.  The jury returned a verdict on October 8, 2021, convicting Wilson on all remaining counts, Counts I, II, VI, VIII, IX, XI, XII and XIII.  DW. 2375; DW. 2376.

Wilson's sentencing hearing was held on February 16, 2022.  DW. 2535.  In his sentencing memorandum, Wilson's counsel argued that "[n]o more than [a] modest fine is warranted because Wilson has already paid $1,000,000 to the government" and "[n]o other parent forfeited an amount even close to this magnitude as a result of the government sting."  DW. 2525 at 26.  In the course of the sentencing, Wilson's counsel reiterated that "in terms of what is the appropriate fine, the government is getting a million dollar forfeiture from him.  I believe that's four times the amount anybody else has paid in a fine.  I'd ask that you factor that into your analysis as well."  DW. 2554 at 36.  Despite the forfeiture allegations in the operative indictment against Wilson, the government neither moved for forfeiture of the Funds at or in connection with his sentencing nor at any time thereafter.  See DW. 2536 at 9.

### E. The First Circuit Vacates Wilson's Convictions

On May 10, 2023, the First Circuit vacated Wilson's convictions related to his 2018 transfer of the Funds to the BOA x0486 account, affirming only Wilson's conviction as to Count XIII, the filing of a false tax return charge.  DW. 2679; see United States v. Abdelaziz, 68 F.4th 1, 74 (1st Cir. 2023).  As to Wilson's mail and wire fraud convictions, the First Circuit held that the government's "honest services theory [was] invalid as a matter of law" under Supreme Court

precedent and that, "on the arguments offered by the government, the district court erred in instructing the jury that admissions slots constitute property." Abdelaziz, 68 F.4th at 12–13.  As to the conspiracy convictions and the substantive counts of federal programs bribery under 18 U.S.C. § 666, the First Circuit further held that "the government failed to prove that [ ] Wilson agreed to join the overarching conspiracy among Singer and his clients charged in the indictment, and that this variance prejudiced [Wilson] by allowing the government to introduce a significant amount of powerful evidence related to other parents' wrongdoing in which [Wilson] played no part, creating an unacceptable risk that the jury convicted [ ] Wilson based on others' conduct rather than [his] own." Id. at 13.  Shortly thereafter, the government dismissed the counts that had been vacated.  DW. 2683.

On July 17, 2023, Wilson's counsel emailed the government asking for its assent to a motion for an order requiring the U.S. Marshals Service to return the one million dollars seized from Wilson.  DW. 2701-1 at 4.  The government declined to do so, see id. at 2–3, and has opposed Wilson's motions to do so.

## III.    Relevant Procedural History

On July 25, 2023, Wilson moved for an order requiring the government to return the Funds, DW. 2701, which the government opposed.  DW. 2708.  On September 29, 2023, at Wilson's re-sentencing hearing on his remaining tax return conviction, the Court denied Wilson's motion without prejudice to be filed in Singer's criminal case as an ancillary matter.  DW. 2740.  To that end, on October 10, 2023, Wilson filed the instant motion in this case to adjudicate a third-party petition for the return of the Funds.  D. 110.  The government opposed the motion.  D. 114.  Wilson also has moved, alternatively, for the return of the Funds pursuant to Fed. R. Crim. P. 41(g), D. 116, and the government opposed same.  D. 125.  The Court heard oral argument on the motions

and took the matter under advisement, D. 130, and later solicited supplemental briefing, D. 131, as discussed below, which the parties have filed.  D. 134; D. 136.

## IV.    Discussion

The Court turns first to Wilson's third-party petition for return of funds.  D. 110.  Under 18 U.S.C. §§ 1963(l), 982(b)(1), a third party may assert a legal interest in property which has been ordered forfeited to the United States.  See 21 U.S.C. § 853(n)(6).[5]  Once a petition is filed, the Court conducts an "ancillary proceeding" to determine whether to amend the forfeiture order to account for any third-party rights.  Fed. R. Crim. P. 32.2(c)(1)–(2).  "'[A]lthough occurring in the context of criminal forfeiture,' an ancillary proceeding 'closely resembles a civil action.'" United States v. Peña-Fernández, 401 F. Supp. 3d 223, 229 n.10 (D.P.R. 2019) (quoting Pacheco v. Serendensky, 393 F.3d 348, 352 (2d Cir. 2004)); see United States v. Davenport, 668 F.3d 1316, 1320 (11th Cir. 2012).

"[I]f no [third-party] petitions are filed . . . , the United States shall have clear title to property that is the subject of the order of forfeiture and may warrant good title to any subsequent purchaser or transferee."  18 U.S.C. § 1963(l)(7); 21 U.S.C. § 853(n)(7); see Fed. R. Crim. P. 32.2(c)(2).  Federal courts have recognized, however, that a third party who submits an untimely petition to initiate ancillary proceedings may seek relief under Fed. R. Civ. P. 60(b).  See, e.g., DSI Assocs. LLC v. United States, 496 F.3d 175, 187 n.18 (2d Cir. 2007) (acknowledging that a claimant who had filed an untimely petition could "file a Rule 60(b) motion to reopen the ancillary forfeiture proceeding in the district court and litigate its claim as to its property interest within the

---

[5] Although funds in the BOA x0486 account were forfeited under 18 U.S.C. § 982, § 982(b)(1) provides that "forfeiture of property under this section . . . shall be governed by [21 U.S.C. § 853]."  The rules set forth in 21 U.S.C. § 853(n) governing ancillary forfeiture proceedings are nearly identical to the provisions governing same in 18 U.S.C. § 1963(l).

statutory scheme created by Congress"); United States v. Puig, 419 F.3d 700, 702 (8th Cir. 2005) (reviewing a "Rule 60(b) motion to reopen the Final Order of Forfeiture" and noting that the government did not dispute "the use of Rule 60(b) to collaterally attack the criminal forfeiture order"); United States v. Estevez, 845 F.2d 1409, 1411–12 (7th Cir. 1988) (reversing a district court's denial of an untimely third-party petition under 21 U.S.C. § 853(n) on the ground that the petitioner had shown "excusable neglect" under Rule 60(b)); see also Fed. R. Crim. P. 32.2 Advisory Comm. Notes (2000) (noting that "[i]n the rare event that a third party claims that he or she was not afforded adequate notice of a criminal forfeiture action, the person may file a motion under Rule 60(b) of the Federal Rules of Civil Procedure to reopen the ancillary proceeding").

On the government's motion, this Court entered the Preliminary Order of Forfeiture in Singer's case on September 12, 2019, ordering the forfeiture of "[a]ll funds on deposit" in the BOA x0486 account.  D. 43 at 1–2; see D. 42.  That Order noted that any third party asserting a legal interest in properties including the BOA x0486 account "shall, within sixty (60) days after the first day of publication on the government forfeiture website or within thirty (30) days after receipt of actual notice, whichever is earlier, file a petition" with the Court "requesting a hearing to adjudicate the validity of his or her interest in the Properties."  D. 43 at 5.  On February 3, 2020, the government moved for a Final Order of Forfeiture as to the BOA x0486 account and other properties, asserting that "[n]o claims of interest in the Properties have been filed with the Court or served on the United States Attorney's Office, and the time within which to do so has expired."  D. 48 ¶ 3.  Based upon the submissions from the government, the Court entered a Final Order of Forfeiture granting the government clear title to "[a]ll funds on deposit" in the BOA x0486 account.  D. 49.

Although the government argues that Wilson's challenge to the government's forfeiture of the Funds is untimely, D. 114 at 7–12, the parties agree that Rule 60(b) is the right mechanism to consider his present claim. See id. at 15 (government arguing that "[t]he correct mechanism for a third party attempting to re-open an ancillary forfeiture proceeding for lack of notice to file an untimely petition is through a motion under Fed. R. Civ. P. 60(b)"); D. 119 at 7 (Wilson agreeing that the Court should construe the motion as a Rule 60(b) motion). Accordingly, the Court construes Wilson's motion to adjudicate the third-party petition, D. 110, as a Rule 60(b) motion to reopen ancillary forfeiture proceedings, amend the forfeiture order to exclude from forfeiture his interest in the Funds and to order the government to return the Funds to Wilson.

The parties dispute the proper outcome of Wilson's Rule 60(b) challenge.[6] First, the government argues that it is untimely, even for a Rule 60(b) motion. D. 114 at 16–17; D. 125 at 10–11. Second, the government objects to Wilson's argument that the Final Order of Forfeiture was secured in violation of due process and therefore was void as to Wilson under Rule 60(b)(4). D. 114 at 9–15; D. 125 at 2–10. Third, assuming Rule 60(b)(4) does not pertain to the circumstances of this case, the parties dispute whether relief is warranted under Rule 60(b)(6).[7] D. 134; D. 136.

---

[6] The New England Law Foundation filed a motion for leave to file an amicus curiae brief in support of Wilson's third-party petition for the return of the Funds. D. 135. Having reviewed the New England Law Foundation's amicus curiae brief, D. 135-1, as attached to its motion, the Court allows the motion, D. 135, *nunc pro tunc*, and has considered it in the resolution of Wilson's pending motions for return of the Funds.

[7] Because it was not clear whether Wilson sought to invoke Fed. R. Civ. P. 60(b)(6) as an alternative basis for relief, on February 21, 2024, the Court allowed the parties to submit supplemental briefing to develop their arguments as to whether relief would be warranted under Fed. R. Civ. P. 60(b)(6). D. 131; see Fisher v. Kadant, Inc., 589 F.3d 505, 513 (1st Cir. 2009) (explaining that "post-judgment relief will not normally be denied for the movant's failure to designate the proper subsection of Rule 60(b)"). The parties have filed supplemental briefs, D. 134; D. 136, which the Court has considered. Wilson also sought leave to file a reply to the government's supplemental memorandum on the applicability of Fed. R. Civ. P. 60(b)(6). D. 137.

### A.     <u>Wilson's Rule 60(b) Challenge Is Timely</u>

Under Fed. R. Civ. P. 60(b), "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:  (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief."

With respect to Rules 60(b)(1), (2) or (3), "a movant must file the motion within one year of the entry of final judgment."  <u>United States v. Boch Oldsmobile, Inc.</u>, 909 F.2d 657, 660 (1st Cir. 1990); Fed. R. Civ. P. 60(c)(1).  "Otherwise, no specific time period for filing is given, except that under Rule 60(b)(4), (5) or (6) the motion must be made within a 'reasonable time.'"  <u>Boch Oldsmobile, Inc.</u>, 909 F.2d at 660.  "What constitutes reasonable time, however, depends on the facts of each case."  <u>Id.</u> at 660–61 (citing <u>United States v. Berenguer</u>, 821 F.2d 19, 21 (1st Cir. 1987) and <u>United States v. Holtzman</u>, 762 F.2d 720, 725 (9th Cir. 1985)).  "The relevant considerations include, whether the parties have been prejudiced by the delay and whether a good reason has been presented for failing to take action sooner."  <u>Id.</u> at 661 (citing <u>In re Pac. Far E. Lines Inc.</u>, 889 F.2d 242, 249 (9th Cir. 1989)).

---

Having reviewed Wilson's proposed reply, D. 137-1, the Court allows the motion for leave *nunc pro tunc*, and has considered it in the resolution of Wilson's pending motions for return of the Funds.

Wilson asks the Court to reopen ancillary forfeiture proceedings under Rule 60(b)(4), D. 119 at 7–8, and, alternatively, under Rule 60(b)(6).  D. 134; see D. 109 at 2 n.1.  Because the one-year time bar "for reasons (1), (2), and (3)" does not apply, see Fed. R. Civ. P. 60(c)(1), the Court must assess whether Wilson has "good reason . . . for failing to take action sooner" and whether the delay has prejudiced the government.  See Boch Oldsmobile, Inc., 909 F.2d at 661. There was good reason for Wilson not moving sooner to assert his interest in the Funds, arising from the totality of the following circumstances:  the government's decision to prosecute Singer and Wilson in separate criminal cases; the timing of forfeiture in Singer's case; and the forfeiture allegations in the third and fourth superseding indictments which reasonably led Wilson to conclude that any forfeiture of the Funds would proceed in his own criminal case.  Both the substance and the timing of the government's forfeiture allegations support the reasonableness of Wilson and his counsel's belief regarding same.  The third superseding indictment alleged that Wilson's transfer of the Funds was the basis of the substantive wire fraud and federal programs bribery charges, DW. 610 ¶¶ 320, 322, and that, upon Wilson's convictions of same, the government would seek forfeiture of "any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses."  Id. ¶ 323.  Notably, these allegations were first made on October 22, 2019, during the limited window in which any third parties could file petitions to open ancillary proceedings in Singer's criminal case.  D. 47-1.  The same allegations were in the subsequent, fourth superseding indictment.  DW. 732 ¶¶ 375–78, 381–82.

Given these circumstances, Wilson reasonably could have believed that the government would seek forfeiture of the Funds in Wilson's criminal case once he was convicted of the related charges and that the government was retaining the Funds on this basis.  For the same reasons, it is unsurprising that counsel did not move on Wilson's behalf to reopen ancillary forfeiture

proceedings under Rule 60(b) during the pendency of Wilson's appeal of his convictions.  On June 29, 2023, once the First Circuit issued its mandate vacating all of Wilson's convictions related to his transfer of the Funds to the BOA x0486 account and the government dismissed the charges pertaining to same, DW. 2683; DW. 2685, Wilson's counsel diligently sought the return of the Funds to Wilson.   On July 17, 2023, Wilson's counsel emailed the government seeking its assent to a motion for return of the Funds.  DW. 2701-1 at 4.  Once it appeared that the government would not assent to such motion, see id. at 2–3, on July 25, 2023, Wilson moved for an order requiring the government to return the Funds that Wilson transferred to the BOA x0486 account in 2018. DW. 2701.  After September 29, 2023, when at his re-sentencing hearing on the remaining tax return conviction (unrelated to the transfer of the Funds) the presiding judge there denied his motion without prejudice to be filed in Singer's criminal case, DW. 2740, Wilson promptly filed the instant motion, D. 110, on October 10, 2023, which, as already noted, is properly construed as a Rule 60(b) motion.   In light of the foregoing circumstances, Wilson has presented "good reason . . . for failing to take action sooner."  See Boch Oldsmobile, Inc., 909 F.2d at 661; see also United States v. Baus, 834 F.2d 1114, 1122–23 (1st Cir. 1987) (finding a five-year lapse timely because the movant had no reason to file a Rule 60(b)(6) motion earlier in light of the government's representations).

Moreover, consideration of Wilson's Rule 60(b) motion does not substantially prejudice the government.  Although the government asserts that allowing Wilson's motion "could create uncertainty regarding forfeitures and encourage after-the-fact forfeiture litigation in scores of cases," D. 125 at 2, the peculiar confluence of the circumstances described above—including the separate prosecutions of Singer and Wilson's criminal cases, Wilson's transfer of the Funds during Singer's cooperation with the government, the particular timing and substance of the forfeiture

allegations in Wilson's case, and the successful appeal of his convictions—appear to be unique to Wilson.  Because prejudice to the government is minimal and Wilson's delay in bringing the instant Rule 60(b) motion is reasonable, the Court will not deny it as untimely.

**B.**   **Despite Wilson's Equitable Interest in the Funds and the Lack of Actual Notice,  Rule 60(b)(4) Does Not Govern the Circumstances of This Case**

Wilson argues that the Court's Final Order of Forfeiture is void as to him under Rule 60(b)(4) because it was obtained in violation of due process.  D. 119 at 7–16.  However, "[i]n the interest of finality, the concept of void judgments is narrowly construed."  Lubben v. Selective Serv. Sys. Loc. Bd. No. 27, 453 F.2d 645, 649 (1st Cir. 1972).  Thus, a judgment is only void when it is "premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard."  United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 271 (2010); see Hoult v. Hoult, 57 F.3d 1, 6 (1st Cir. 1995) (explaining that a judgment is void "in circumstances in which the court's action amounts to a plain usurpation of power constituting a violation of due process") (quoting Boch Oldsmobile, Inc., 909 F.2d at 661); see also United States v. Giraldo, 45 F.3d 509, 512 (1st Cir. 1995) (noting in the administrative forfeiture context that "[i]f the notice turns out to have been inadequate, the forfeiture is void").  Wilson does not assert any jurisdictional error; thus, the Court turns to his due process claim.

*1.   Entitlement to Due Process*

"A threshold requirement for a successful procedural due process claim is to demonstrate the implication of a constitutionally protected interest in life, liberty, or property."  Aponte v. Calderón, 284 F.3d 184, 191 (1st Cir. 2002).  "In evaluating whether a purported contract or property right is entitled to constitutional protection under the . . . Due Process Clause, this Court

generally looks to state law as interpreted by the state's highest court." Picard v. Members of the Emp. Ret. Bd. of Providence, 275 F.3d 139, 144 (1st Cir. 2001).

Here, Wilson asserts that he had a property interest in the Funds after their transfer by constructive trust. D. 119 at 16–18. Under Massachusetts law (which the parties agree applies here, D. 114 at 13–15; D. 119 at 16–18), "[a] constructive trust is a flexible tool of equity designed to prevent unjust enrichment resulting from fraud, a violation of a fiduciary duty or confidential relationship, mistake, or 'other circumstances' in which a recipient's acquisition of legal title to property amounts to unjust enrichment." Maffei v. Roman Cath. Archbishop of Bos., 449 Mass. 235, 246 (2007); see Kelly v. Kelly, 358 Mass. 154, 156 (1970).

Wilson argues that a constructive trust is warranted on the theory that Singer's false statements inducing Wilson's transfer of the Funds to the BOA x0486 account were tantamount to fraud. D. 119 at 17. To discern whether fraud has occurred for purposes of imposing a constructive trust, the Court considers whether the false statements "were made with the clear knowledge that they were untrue or with the false implication that the speaker was speaking from personal knowledge." See Maffei, 449 Mass. at 251.

Although there is some disagreement between the parties as to when Singer and Wilson first discussed "side door" opportunities for Wilson's daughters, the government does not deny that Singer began cooperating with agents in September 2018, prior to Wilson's transfer of the Funds in October and December of 2018. D. 119 at 2 (Wilson asserting that Singer was cooperating with agents as of September 24, 2018); D. 125 at 7 (government highlighting Wilson's "conce[ssion]" that the conspiracies did not end as to other participants upon "Singer's 'decision to become a cooperating witness in September 2018'") (quoting D. 119 at 11).

Agents first approached Singer on September 21, 2018 and secured his cooperation, at the latest, on September 24, 2018, when agents accompanied Singer to open the BOA x0486 account. DW. 2391 at 150–53.  After that date, and as part of his cooperation with the government, Singer made a series of false statements to Wilson about possible opportunities for Wilson's children in the form of admissions spots at Harvard and Stanford.  See D. 110-1 ¶ 2 (Wilson declaring that "Mr. Singer represented to me that he would merely hold the Wilson Funds in the Account temporarily, and would subsequently donate them in their entirety to particular universities chosen by me, specifically Harvard University and Stan[ford] University"); id. ¶¶ 1, 3 (Wilson declaring that he transferred the Funds to the BOA x0486 account "at Defendant William Singer's direction" and that "[b]ut for Mr. Singer's false representations and agreement to donate the Wilson Funds to the universities I selected, I would never have transferred them to the Account"); DW. 2391 at 170–78 (agent testifying that, on September 29, 2018, Singer and Wilson spoke over the phone about "side door" opportunities); see also DW. 732 ¶ 239 (alleging that "[o]n or about October 15, 2018, Singer called WILSON to discuss various 'side door' options for WILSON's daughters"); id. ¶ 242 (alleging that, "[o]n or about October 27, 2018," Singer "told WILSON that he had secured a 'side door' deal for one of WILSON's daughters with the Stanford sailing coach"); id. ¶ 243 (alleging that, "[o]n or about November 29, 2018," Singer "told WILSON that he had secured an admissions spot at Harvard" and that "in exchange for an initial $500,000 payment to her . . . the administrator would designate one of WILSON's daughters as an athletic recruit").

To be clear, unjust enrichment does not result from the mere fact that the government seizes or forfeits property through an undercover agent or a cooperating witness.  Whatever "fraud" that may occur under such circumstances is necessary for the government to successfully investigate and punish the commission of crimes.  See United States v. Gifford, 17 F.3d 462, 470–71 (1st Cir.

1994) (noting that "undercover operations by their nature involve elements of furtiveness, duplicity, and manipulation" and that "the fairness of employing a particular form of undercover operation is in part a function of the crime under investigation").  The unjust enrichment flows from the particular posture of this case, where Wilson's convictions pertaining to the 2018 transfer of the Funds to the BOA x0486 account have now been vacated and the charges regarding same have been dismissed.  See DW. 2679; DW. 2683; DW. 2685.  As the government acknowledged at oral argument, D. 132 at 30, had the Funds been forfeited in Wilson's criminal case, the government would have returned them to Wilson upon the vacatur of his convictions.  That did not happen, here, because the government forfeited the Funds in Singer's criminal case, even as it signaled the possible forfeiture of same to Wilson in his criminal case.  Accordingly, to prevent unjust enrichment, the Court recognizes Wilson as the beneficiary of a constructive trust with respect to the Funds.  See Zimmermann v. Epstein Becker & Green, P.C., 657 F.3d 80, 83 (1st Cir. 2011); Torres v. $36,256.80 U.S. Currency, 25 F.3d 1154, 1159 (2d Cir. 1994).

Some federal courts have suggested that a constructive trust is not warranted where the effect of recognizing one would inequitably elevate the beneficiary's claims over those of multiple "similarly situated" claimants.  See, e.g., United States v. Ramunno, 599 F.3d 1269, 1275–76 (11th Cir. 2010) (affirming a district court's decision not to impose a constructive trust because doing so would give one similar victim priority over another).  Other courts have emphasized, however, that these inequities do not preclude imposition of a constructive trust where the "beneficiaries of properly traced constructive trusts could claim third-party interests under the forfeiture statute." See, e.g., Willis Mgmt. (Vt.), Ltd. v. United States, 652 F.3d 236, 243 (2d Cir. 2011).  This principle of "tracing" has been recognized by the First Circuit and Massachusetts courts.  See, e.g., In re Chew, 496 F.3d 11, 15 n.5 (1st Cir. 2007) (explaining that "the constructive trust encumbers

the property only to the extent of the funds traceable from the alleged fraud"); Mickelson v. Barnet, 390 Mass. 786, 790 (1984) (noting that the individual who converted the funds "became a constructive trustee of the money and its traceable proceeds").  There is no indication on this record that there are other claimants who can be properly described as "similarly situated" to Wilson, such that the recognition of a constructive trust would unfairly elevate his interest over the interest of others.  Although the government suggested at oral argument that the imposition of a constructive trust as to Wilson would open the door to third-party petitions by individuals who transferred money to the BOA x0486 account, but who ultimately were not charged, D. 132 at 44, the government has proffered no evidence to substantiate this assertion.  Even assuming *arguendo* that such individuals exist in substantial numbers, Wilson's equitable interest stands on special footing given the peculiar circumstances of his case.

Accordingly, the Court recognizes that Wilson's 2018 transfer of the Funds to Singer created a constructive trust and that Wilson has a cognizable interest in the Funds sufficient at least to challenge its forfeiture on due process grounds.  See Torres, 25 F.3d at 1161 (noting that the beneficiary of a constructive trust may assert a due process violation).[8]

### 2.     Due Process

Although the Court has concluded that Wilson has a basis to assert a due process claim, it still must decide if there was a due process violation such that the forfeiture judgment was void under Rule 60(b)(4).  Wilson argues that the forfeiture of the Funds in Singer's criminal case violated due process as to him because the government did not provide him with adequate notice of the forfeiture proceedings.  D. 119 at 8–16.  The government does not deny that it did not send

---

[8] Given this conclusion regarding a constructive trust, the Court need not reach Wilson's alternative basis, a resulting trust, D. 119 at 18–19, for asserting a due process challenge.

Wilson direct written notice of the forfeiture proceedings in Singer's criminal case but asserts instead that Wilson had actual knowledge of it.  D. 114 at 9–12.

It is well-settled that "due process" generally requires that "individuals must receive notice and an opportunity to be heard before the Government deprives them of property."  United States v. James Daniel Good Real Prop., 510 U.S. 43, 48 (1993); see Gonzalez-Gonzalez v. United States, 257 F.3d 31, 35–36 (2001).  "The notice must be of such nature as reasonably to convey the required information, . . . and it must afford a reasonable time for those interested to make their appearance."  Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950) (citations omitted).

"Because due process is an infinitely flexible concept, there is no infallible test for determining the adequacy of notice in any particular situation."  Gonzalez-Gonzalez, 257 F.3d at 36.  Although they serve as useful guideposts, the forfeiture rules set forth in 18 U.S.C. §§ 1963, 982(a)(1) and Fed. R. Crim. P. 32.2 "neither trump nor displace the constitutional requirement that the government afford an individual notice sufficient to satisfy the demands of due process before confiscating that individual's property through the instrumentality of a judicial forfeiture."  See United States v. One Star Class Sloop Sailboat, 458 F.3d 16, 22 (1st Cir. 2006).  "The question of whether the government provided an interested party constitutionally sufficient notice before effecting a forfeiture entails a case-specific inquiry that hinges, in the first instance, on the information available to the putative claimant."  Id.  "A putative claimant's actual knowledge of a forfeiture proceeding can defeat a subsequent due process challenge, even if the government botches its obligation to furnish him with notice."  Id.  Actual knowledge entails "notice-in-fact of forfeiture proceedings, as opposed to notice-in-fact of seizure," Gonzalez-Gonzalez, 257 F.3d at

38, and is sufficient even if actual knowledge belongs to the claimant's attorney.  See United States

v. Lyons, No. 10-10159-PBS, 2013 WL 1694865, at *1, 3 (D. Mass. Apr. 12, 2013).

"In cases involving the absence of actual notice, the result of the ensuing inquiry does not

depend on whether the government actually attempted individually to contact each and every party

in interest but, rather, on whether the government's attempt to provide notice is, under all the

circumstances, reasonably designed to apprise the parties in interest of the currency of the

forfeiture action." One Star Class Sloop Sailboat, 458 F.3d at 23.  "The government is not required

to engage in a sprawling, open-ended investigation to identify and track down unidentified, but

potentially interested, parties."  Id. at 24.  Where a potential claimant cannot easily be identified

or located, publication notice may be sufficient.  See id. (explaining that "[i]f a person using the

lead could easily identify and locate the potential claimant, eschewing further inquiry and relying

on secondary measures (such as notice by publication) may be unreasonable, or out of step with

due process, or both").  Ultimately, "[t]he reasonableness and hence the constitutional validity of

any chosen method may be defended on the ground that it is in itself reasonably certain to inform

those affected, . . . or, where conditions do not reasonably permit such notice, that the form chosen

is not substantially less likely to bring home notice than other of the feasible and customary

substitutes."  Mullane, 339 U.S. at 315 (citations omitted).

As to actual knowledge, the government asserts that Wilson knew of the forfeiture

proceedings in Singer's case as of the government's motion for the Preliminary Order of Forfeiture

and the Court's entry of same in September 2019.  D. 114 at 9–10.  To support this assertion, the

government cites the declaration of Yavok Malkiel, one of Wilson's former attorneys who, at the

time, was a member of Wilson's defense team.  See D. 114-7.  Malkiel attests in the declaration

that, during his representation of Wilson, he "made sure to read each filing in the various dockets

related to the 'Varsity Blues' prosecutions, including <u>United States v. Singer</u>, Cr. [N]o. 19-10078-RWZ" and "arranged to receive CM/ECF alerts in those dockets." D. 114-7 ¶ 3. Thus, the government maintains that Malkiel would have seen that the Preliminary Order of Forfeiture ordered the forfeiture of all funds in the BOA x0486 account. <u>See</u> D. 114 at 9.

Although Malkiel attests to reviewing filings in Singer's case, he also states that "[d]uring the time [he] represented Mr. Wilson, [he] was the only person with this responsibility on the Wilson defense team" and that he "did not commit to memory the serial number of the bank account into which Mr. Wilson made his payments of $1 million." D. 114-7 ¶¶ 3, 9. Malkiel further declares that "[n]one of the submissions [he] read in Mr. Singer's case or in the other Varsity Blues dockets suggested to [him] that the government was attempting" to forfeit the Funds. <u>Id.</u> ¶ 8. The Court credits this statement given that the Preliminary Order of Forfeiture, consistent with the government's motion, does not specifically describe the Funds at issue here but instead subjects to forfeiture "[a]ll funds on deposit in Bank of America checking account in the name of the Key Worldwide Foundation ending in x0486." D. 42; D. 43.

The government insists that Malkiel must have known this language referred to the Funds because of the discovery it produced to Wilson's attorneys prior to the September 12, 2019 entry of the Preliminary Order of Forfeiture. D. 114 at 9–10. Specifically, the government avers that it produced bank statements and wire confirmations for the BOA x0486 account detailing the relevant transfers in the months leading up to September 2019. <u>Id.</u> at 2 & n.1, 9–10. The wire confirmations indicate that on October 17, 2018 and December 11, 2018, respectively, $500,000 was transferred from a First Republic Bank account in the name of "Hyannis Port Capital Inc[.]" to a Bank of America account in the name of "The Key Worldwide Foundation" with an account number ending in "0486." D. 125-1 at 1–2; D. 125-2 at 1–2.

The government's production of these materials through discovery, however, does not establish that Malkiel or Wilson and his other attorneys knew the Funds were subject to forfeiture by the Preliminary Order of Forfeiture when Malkiel reviewed same in September 2019.  See D. 114-7 ¶ 3.  Even assuming *arguendo* that Malkiel had reviewed the Preliminary Order of Forfeiture, it is unreasonable to presume that he would have remembered the last four digits of the BOA x0486 account's serial number and pieced together that the Funds were being subjected to forfeiture.  Also undermining the government's theory of actual knowledge is that, when the government moved for the Preliminary Order of Forfeiture in September 2019, the Funds were no longer in the BOA x0486 account because, as of March 2019, Singer had withdrawn virtually all funds from the account through a cashier's check payable to the U.S. Marshals Service, leaving just $4,938.96 in the account at month's end.  See D. 119-1 at 44, 46, 124.  In light of this fact, and the implausibility that Malkiel would have necessarily known that the BOA x0486 account was the same account to which Wilson had transferred the Funds, the government has not shown that Wilson had actual knowledge of the forfeiture proceedings in September 2019.[9]

The government next argues that Wilson had actual knowledge that the Funds had been forfeited in or around September 2021, when the wire confirmations, text messages and emails produced in discovery, as well as other exhibits, were introduced at Wilson's trial.  See D. 114-1; D. 114-4; D. 114-6; D. 125-1; D. 125-2; D. 125-4.  The evidence introduced by the government at trial also included summary charts, including one showing the flow of two $500,000 wire

---

[9] The government also relies upon the Malkiel declaration to assert that, "through the electronic docket," Wilson's attorneys knew of the forfeiture of the Funds on February 3, 2020, when the government moved for the Final Order of Forfeiture, D. 48, and on February 5, 2020, when the Court entered same.  D. 49; D. 114 at 10.  This argument fails for the same reasons discussed above concerning the government's theory that Wilson had actual notice as per the Preliminary Order of Forfeiture.

payments on October 17, 2018 and December 11, 2018, respectively, to "KWF *BoA \*0486*." D. 114-6.

The introduction of the wire confirmations, text messages and emails as trial exhibits, and the summary charts, do not establish that Wilson's counsel knew that the Funds at issue, that is, Wilson's monies, had been forfeited pursuant to forfeiture proceedings in Singer's criminal case. Although these documents indicate that the last four digits of the account to which Wilson had transferred the Funds was "0486," none of them expressly reference the forfeiture proceedings and that the Funds had been forfeited in same. See Gonzalez-Gonzalez, 257 F.3d at 38 (explaining that actual knowledge concerns "notice-in-fact of forfeiture proceedings, as opposed to notice-in-fact of seizure").

Perhaps more persuasive is the government's email following the September 29, 2021 sidebar conference concerning the government's proposed curative instruction, in which the government cited the Final Order of Forfeiture, D. 49.  D. 114-8 (noting that "as you are aware, Singer forfeited all the remaining funds in the Bank of America and Wells Fargo accounts in 2019. See U.S. v. Singer, D[.] 49 (final order of forfeiture); D[.] 55 (Marshals Disposal Form)").  But this email must be read in the context in which it was sent.  That counsel for Wilson in the midst of trial is expected to piece together that "all remaining funds" refers to Wilson's one million dollars transferred to the BOA x0486 account when the government's statement does not address this expressly seems to put more burden on Wilson and his counsel when the "burden of due process [is] placed upon the government."  See United States v. One Parcel of Land Together with Its Bldgs., Improvements, Fixtures, Attachments, Easements Located at 13 Maplewood Drive, N. Grafton, Mass., No. 94-cv-40137-NMG, 1997 WL 567945, at *3 (D. Mass. Sept. 4, 1997).

The government also relies upon Wilson's February 11, 2022 sentencing memorandum, in which counsel argued that no more than a modest financial penalty was warranted because "Wilson has already paid $1,000,000 to the government."   D. 114 at 6–7 (citing DW. 2525 at 26). Consistent with this argument, at Wilson's sentencing hearing on February 16, 2022, his counsel reiterated that the government was "getting a million dollar forfeiture from him" even though the government had not moved for forfeiture in advance of (or at) the hearing.   DW. 2554 at 36.   These passing references to forfeiture, however, do not prove that Wilson or his counsel understood the extent of the forfeiture proceedings that had occurred in Singer's criminal case or that the Funds had been forfeited pursuant to the Final Order of Forfeiture in that case, cf. Lyons, 2013 WL 1694865, at *3 (holding that claimant had actual knowledge of its helicopter where its attorney "admitted" that he "accessed the government's notice on www.forfeiture.gov"), but a recognition that the government still held the Funds and had asserted a basis to forfeit them in Wilson's case and, at the time, had grounds to do so.

Even assuming *arguendo* that Wilson was on actual notice of the forfeiture of his Funds in February 2022, or even in the course of his September 2021 trial, actual notice would have been long after the November 2019 deadline for filing a petition and, thus, would have come too late. The government cites several cases to argue that Wilson's actual notice was sufficient.   See D. 114 at 11–12.   But in these cases, the court emphasized that actual notice may defeat a due process claim or other 60(b) challenge to forfeiture where the actual notice was obtained *before* the effectuation of the forfeiture.   See One Star Class Sloop Sailboat, 458 F.3d at 22, 26 (framing the issue as whether the government provided an interested party with constitutionally sufficient notice "before effecting a forfeiture" and remanding for further proceeding); United States v. One-Sixth Share of James J. Bulger in All Present and Future Proceeds of Mass Millions Lottery Ticket No.

M246233, 326 F.3d 36, 42 (1st Cir. 2003) (concluding that where it was "beyond serious dispute that one claimant was aware of the parallel forfeiture action," his "failure to file anything at that time, whether because he chose not to do so or because he recognized his lack of standing, leaves him with no good excuse for his tardiness"); Whiting v. United States, 231 F.3d 70, 74 (1st Cir. 2000) (affirming the district court's rejection of a 60(b) challenge to forfeiture where the claimant had actual notice of forfeiture proceedings as of April 24, 1991 and, thus, "had ample time . . . to contest the forfeiture before the entry of the default judgment on July 8, 1991"); Lyons, 2013 WL 1694865, at *3 (concluding that the "claimant had sufficient time to file the petition" because "the claimant admits it had actual knowledge of the forfeiture proceeding when it accessed the government's notice on www.forfeiture.gov on August 10, 2012, 46 days before the petition was due").

Moreover, what undermines that actual notice was given, here, is that on October 22, 2019—during the pendency of the government's publication notice period, D. 47—the government included forfeiture allegations in the third superseding indictment against Wilson (which were also included in the subsequently filed operative indictment) that reasonably could have led him and his counsel to believe that the Funds would be forfeited in his own criminal case.  See DW. 610 ¶¶ 323–24.  Indeed, the third superseding indictment was the first indictment to specifically allege, as the basis for the wire fraud and federal programs bribery charges, that Wilson had made a "$500,000 wire transfer to KWF" on October 17, 2018 and a "$500,000 wire transfer to KWF" on December 11, 2018.  Id. ¶¶ 320, 322.  As to these charges, the third superseding indictment included a forfeiture allegation under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), informing Wilson that the government would seek forfeiture of "any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses."  DW. 610 ¶ 323.  Given that the

government's forfeiture allegations expressly referenced the wire fraud and federal programs bribery charges and that these charges were predicated on detailed allegations about the transfer of the Funds, it would have been reasonable for Wilson and his counsel to assume that any forfeiture proceedings relative to the Funds would have ensued in his own criminal case.

Notwithstanding the lack of actual notice to Wilson, however, the nature of Wilson's equitable interest in the Funds highlights the problem with analyzing this case under the framework of due process and Rule 60(b)(4).  Whether the government violated due process turns on the reasonableness of its attempt to provide notice in light of all of the circumstances.  See Mullane, 339 U.S. at 314–15.  Although Wilson possesses an equitable interest in the Funds through a constructive trust, this interest has only today been recognized by the Court given the vacatur of Wilson's convictions and the particular posture of his case.  Even assuming Wilson's equitable interest arose at the time of the transfer, see Curtis Mfg. Co. v. Plasti-Clip Corp., 933 F. Supp. 94, 106 (D.N.H. 1995) (explaining that "the weight of authority indicates that [a] constructive trust arises at the time of the occurrence of the events giving rise to the duty to reconvey the property") (alteration in original) (internal quotation marks and citation omitted) (collecting cases), the government cannot reasonably be expected to have known in 2019 that the Court would, in 2024, recognize a constructive trust on the basis, in part, of the First Circuit's 2023 vacatur of Wilson's convictions.  Thus, although the parties have focused their arguments primarily on whether the government violated Wilson's due process rights, Fed. R. Civ. P. 60(b)(4) is ill-suited for the circumstances of this case.

**C.**     **Relief from the Forfeiture Order Is Warranted Under Rule 60(b)(6)**

Wilson argues, in the alternative, that the Court may consider his request for the return of the Funds under Fed. R. Civ. P. 60(b)(6).  D. 134; see D. 109 at 2 n.1.  The government responds

that Rule 60(b)(6) cannot be used to circumvent Rule 60(b)(1), which the government maintains is the proper basis for Wilson's petition and which he is now time-barred from invoking.  D. 136 at 1–4.

Rule 60(b)(6) allows relief from a final judgment, order or proceeding for "any other reason that justifies relief."  The rule "grants federal courts 'broad authority' to vacate final judgments provided that the motion is made within a reasonable time."  Bouret-Echevarría v. Caribbean Aviation Maint. Corp., 784 F.3d 37, 42 (1st Cir. 2015) (citing Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 (1988)); see Klapprott v. United States, 335 U.S. 601, 614–615 (1949) (recognizing that Rule 60(b)(6) provides courts with authority to vacate judgments "whenever such action is appropriate to accomplish justice"); but see Ackermann v. United States, 340 U.S. 193, 199 (1950) (cautioning that Rule 60(b)(6) should only be applied in "extraordinary circumstances").  "[C]lause (6) is designed as a catchall, and a motion thereunder is only appropriate when none of the first five subsections pertain."  Cotto v. United States, 993 F.2d 274, 278 (1st Cir. 1993).

The Supreme Court has construed Rule 60(b)(6) to require a showing of "'extraordinary circumstances' suggesting that the party is faultless in the delay."  Dávila–Álvarez v. Escuela de Medicina Universidad Cent. del Caribe, 257 F.3d 58, 67 (1st Cir. 2001) (quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 393 (1993)).  "The high threshold required by Rule 60(b)(6) reflects the need to balance finality of judgments with the need to examine possible flaws in the judgments."  Bouret-Echevarría, 784 F.3d at 42.

To balance the finality of judgments with resolving litigation on the merits, the Court looks to four factors under Rule 60(b)(6) including (1) the motion's timeliness, (2) whether exceptional circumstances justify extraordinary relief, (3) whether the movant can show a potentially

meritorious claim, and (4) the likelihood of unfair prejudice to the opposing party.  Id. at 43; Teamsters, Chauffeurs, Warehousemen & Helpers Union, Loc. No. 59 v. Superline Transp. Co., 953 F.2d 17, 19–20 (1st Cir. 1992).  "This compendium is neither exclusive nor rigidly applied.  Rather, the listed factors are incorporated into a holistic appraisal of the circumstances."  Ungar v. Palestine Liberation Org., 599 F.3d 79, 83–84 (1st Cir. 2010).  "[T]here is no ironclad rule requiring an in-depth, multi-factored analysis in every case.  Sometimes one factor predominates to such an extent that it inexorably dictates the result."  Id. at 86.

Before assessing Wilson's petition under Rule 60(b)(6), the Court considers the government's suggestion that doing so would circumvent Rule 60(b)(1).  See D. 136 at 1–4; see also Cotto, 993 F.2d at 278 (noting that Rule 60(b)(6) "may not be used as a vehicle for circumventing clauses (1) through (5)").  Rule 60(b)(1) allows the court to relieve a party from a final judgment, order or proceedings for "mistake, inadvertence, surprise, or excusable neglect" and a motion brought on this ground must be made within a year.  See Fed. R. Civ. P. 60(c)(1).  Thus, "[i]f a party is 'partly to blame,' Rule 60(b)(6) relief is not available to that party; instead, 'relief must be sought within one year under subsection (1) and the party's neglect must be excusable.'"  Claremont Flock Corp. v. Alm, 281 F.3d 297, 299 (1st Cir. 2002) (quoting Pioneer Inv. Servs. Co., 507 U.S. at 393).  Given all of circumstances recounted above, that Wilson did not submit a third-party petition prior to the vacatur of his convictions cannot be characterized as a "mistake" or otherwise attributed to neglect.  Thus, Rule 60(b)(1) is not the proper subsection, and because none of the other subsections of Rule 60(b) appear to pertain, the Court may properly consider Wilson's motion, and the unique circumstances of his case, under Rule 60(b)(6).

Proceeding to the four factors pertinent to the Rule 60(b)(6) analysis, see Bouret-Echevarría, 784 F.3d at 43, the Court already addressed the first factor of the motion's timeliness

prior to its analysis of Wilson's motion under Rule 60(b)(4).  Nonetheless, the Court notes again that Wilson's counsel acted with diligence following the First Circuit's vacatur of Wilson's convictions based upon the 2018 transfer of the Funds to the BOA x0486 account—when Wilson was definitively "put on notice of a potential claim."  See id. at 44.

Second, as highlighted by the Court's analysis of the parties' due process arguments, this case presents exceptional circumstances justifying extraordinary relief.  These circumstances, including how the government separately prosecuted Wilson and Singer's criminal cases in parallel, the confusion stoked by the forfeiture allegations in the third superseding indictment in Wilson's criminal case, the timing of same during the pendency of the government's publication notice for forfeiture in Singer's criminal case, the absence of actual notice to Wilson and the ultimate vacatur of his convictions, have converged to make this case an exceptional one, where Wilson is "faultless in the delay."  See Dávila–Álvarez, 257 F.3d at 67.

Third, having already recognized Wilson's equitable interest in the Funds by operation of a constructive trust, and case law indicating that an equitable interest may be asserted in the criminal forfeiture context (discussed further below,) Wilson's petition to reopen ancillary forfeiture proceedings is, at least, "potentially meritorious."  See Bouret-Echevarría, 784 F.3d at 42.

Finally, any prejudice to the government on this record is minimal.  This case does not present circumstances in which "witnesses have died," "memories have dimmed beyond refreshment," "some discovery scheme has been thwarted" or "evidence has been lost."  See Coon v. Grenier, 867 F.2d 73, 77 (1st Cir. 1989).  The government's only proffered prejudice is that allowing Wilson's Rule 60(b) motion would open potential floodgates to other petitioners "in an untold number of cases."  D. 136 at 10; see D. 125 at 2.  As the Court has already noted, however,

the government's asserted prejudice is belied by the unique posture and circumstances of Wilson's case.

Thus, in light of the extraordinary circumstances of this case, the Court allows Wilson's third-party petition to reopen ancillary forfeiture proceedings under Rule 60(b)(6).

### D.      Wilson Is Entitled to the Return of the Funds Under 18 U.S.C. §§ 1963, 982

Wilson argues that he is entitled to the return of the Funds because his legal interest in the Funds is superior to Singer's interest in same. D. 119 at 16–19. The government contends that a constructive trust is not a cognizable interest under 18 U.S.C. § 1963 and 18 U.S.C. § 982(a)(1) and insists that the proper, and only, avenue for Wilson to obtain relief is to submit a petition for remission of forfeiture to the Attorney General.[10] D. 114 at 19–20; D. 125 at 14.

Here, the Funds were forfeited under 18 U.S.C. § 1963 and § 982, which incorporates by reference the forfeiture requirements set forth in 21 U.S.C. § 853. See D. 43; D. 49; 18 U.S.C. § 982(b)(1).

Under 18 U.S.C. § 1963(l)(2) and 21 U.S.C. § 853(n)(2), "[a]ny person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United

---

[10] Wilson argues at some length that the Preliminary Order of Forfeiture and Final Order of Forfeiture, D. 43; D. 49, "*could not* have lawfully included the Wilson Funds because there was no nexus between Mr. Singer's offenses and the Wilson Funds." D. 119 at 11–13. The thrust of this argument appears to be that because the Funds were not transferred to the BOA x0486 account until October 17, 2018 and December 11, 2018 and because Singer had, by that time, withdrawn from the alleged conspiracies forming the basis of the forfeiture in Singer's criminal case, the Court's prior determinations of forfeitability were predicated on an erroneous link between the BOA x0486 account and Singer's crimes. See id. To the extent Wilson seeks to challenge the Court's prior determinations of forfeitability, the government correctly notes that a third party has no standing to challenge the determination of forfeitability made as to a criminal defendant. D. 114 at 18–19; see Davenport, 668 F.3d at 1321 (acknowledging circuit consensus that third parties "cannot challenge or relitigate a preliminary order's finding of forfeitability"). Accordingly, the Court focuses on Wilson's assertion of a third party interest under 18 U.S.C. § 1963 and 21 U.S.C. § 853 to discern whether the forfeiture order should be amended to exclude his interest in the Funds.

States pursuant to this section may . . . petition the court for a hearing to adjudicate the validity of his alleged interest in the property."  "At the hearing, the third party must establish that he has standing within the meaning of section 853 by 'asserting a legal interest' in the property."  United States v. Catala, 870 F.3d 6, 9 (1st Cir. 2017); see 18 U.S.C. § 1963(l)(2) (using the same language, in relevant part, as 21 U.S.C. § 853(n)(2)).  The criminal forfeiture statutes further provide that:

> If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section . . . the court shall amend the order of forfeiture in accordance with its determination.

18 U.S.C. § 1963(l)(6)(A); 21 U.S.C. § 853(n)(6)(A).  "This provision cannot be read in a vacuum but, rather, must be read in tandem with section 853(c)," which "specifies that the right to all property used in committing, and any proceeds derived from, a criminal offense 'vests in the United States upon the commission of the act giving rise to [the] forfeiture.'"  Catala, 870 F.3d at 10 (quoting 21 U.S.C. § 853(c)); see 18 U.S.C. § 1963(c).  Accordingly, the First Circuit has noted that "a third party asserting an interest in forfeited property must establish that his interest in that specific property existed *before* the commission of the crime that led to the forfeiture."  Catala, 870 F.3d at 10 (emphasis in original).

As with the analysis of a person's entitlement to due process, in the forfeiture context, "[p]roperty interests are defined by state law."  Peña-Fernández, 401 F. Supp. 3d at 226; see United States v. White, 675 F.3d 1073, 1078 (8th Cir. 2012).  Wilson has a "legal interest" in the Funds under Massachusetts law by virtue of a constructive trust, for reasons already discussed above in the Court's analysis of Wilson's entitlement to due process.  See Maffei, 449 Mass. at 246.  The government maintains, however, that equitable remedies are not legal interests within the meaning

of 18 U.S.C. § 1963(l)(6)(A) and 21 U.S.C. § 853(n)(6)(A).  D. 125 at 14.  To support this broad

proposition, the government cites the First Circuit's decision in <u>One-Sixth Share</u>, 326 F.3d at 44.

Contrary to the government's characterization of <u>One-Sixth Share</u>, the First Circuit did not,

in its decision, "reject[ ] the constructive trust theory as sufficient to confer standing to challenge

forfeiture."  D. 125 at 14.  Two of the claimants there had brought wrongful death actions against

Bulger and, in state court, secured an equitable lien, "subject to some limitations," to "one-sixth

share of James J. Bulger in all present and future proceeds of Mass Millions Lottery Ticket No.

M246233."  <u>One-Sixth Share</u>, 326 F.3d at 38–40.  The claimants asserted this equitable lien as a

third-party interest to challenge the government's forfeiture of the one-sixth share.  <u>Id.</u> at 43.  The

First Circuit noted that the state court that had issued the equitable lien carved out an exception

"to exclude any interest that the federal government already had in the property by virtue of the

civil forfeiture" and, thus, the exception "swallow[ed] up whatever hold the lien would otherwise

provide over the res."  <u>Id.</u>  The First Circuit proceeded with its analysis, assuming *arguendo* that

they had obtained a judgment against Bulger and thus had sought relief as "judgment creditors."

<u>Id.</u> at 44.  The First Circuit concluded that such a claim would not prevail, reasoning that "the

federal courts have consistently held that unsecured creditors do not have standing to challenge

the civil forfeiture of their debtors' property."  <u>Id.</u> (quoting <u>United States v. $20,193.39</u>, 16 F.3d

344, 346 (9th Cir. 1994)).  The First Circuit then included a quote that "[a] mere equitable interest

in the property was historically not deemed sufficient to confer standing [to contest forfeiture]."

<u>Id.</u> (quoting 1 D.B. Smith, Prosecution and Defense of Forfeiture Cases ¶ 9.04, at 70.6–70.7

(2002).  Concluding its discussion about general creditors, the First Circuit observed that, "[i]n

the related context of criminal forfeiture," some federal circuit courts, including the D.C. Circuit

in <u>United States v. BCC Holdings (Lux.), S.A.</u>, 46 F.3d 1185, 1191–92 (D.C. Cir. 1995), have held

that a general creditor can never have an interest in specific forfeited property; the First Circuit, however, expressly reserved on the issue, noting that "[w]hether this rule about general creditors may ever be relaxed in unusual circumstances is an issue we need not decide." One-Sixth Share, 326 F.3d at 44.

At root, One-Sixth Share is inapposite because Wilson, unlike the claimants there, is the beneficiary of a constructive trust. The portion of the opinion cited by the government considers only whether general creditors may challenge a forfeiture and recognizes the typical rule that they may not. See Catala, 870 F.3d at 11 (rejecting a general creditor's attempt to assert an interest in the form of a state court judgment in funds subject to a criminal forfeiture). Nothing in the First Circuit's decision sets forth a sweeping principle that equitable interests cannot be asserted under 18 U.S.C. § 1963(l)(6)(A) or 21 U.S.C. § 853(n)(A), let alone a specific rule foreclosing the beneficiary of a constructive trust from asserting an interest in forfeited property.

The government correctly notes that, in One-Sixth Share, the First Circuit cited BCCI Holdings (Luxembourg), S.A., 46 F.3d at 1191–92, a case in which the D.C. Circuit held that a constructive trust "is a *remedy* that a court devises after litigation" which cannot "be interposed as superior to the government's forfeiture claim" because forfeiture vests title in the government at the time of the defendant's wrongdoing. Id. at 1190–91 (emphasis in original). But as noted, the First Circuit did not cite BCC Holdings (Lux.), S.A. for its holding on constructive trusts as to particular property; rather, it cited its holding on general creditors and, even then, declined to go as far as the D.C. Circuit.

It appears that the federal circuit courts to have considered the issue have held that the beneficiary of a constructive trust has standing to assert a legal interest in property in criminal forfeiture proceedings. See United States v. Schwimmer, 968 F.2d 1570, 1582 (2d Cir. 1992)

(holding that "a constructive trust may be a superior interest under § 1963(l)(6)(A)"); United States v. Campos, 859 F.2d 1233, 1238–39 (6th Cir. 1988) (recognizing that a superior interest under § 853(n)(6)(A) "would clearly be one in the nature of a . . . constructive trust"); United States v. Marx, 844 F.2d 1303, 1308 (7th Cir. 1988) (vacating and remanding a district court's denial of a § 853(n) claimant's assertion of a constructive trust and emphasizing that, on remand, "a constructive trust should be imposed"); United States v. Wilson, 659 F.3d 947, 953–55 (9th Cir. 2011) (acknowledging that a constructive trust is a cognizable interest under § 853(n) that arises "[a]t the time of transfer"); United States v. Shefton, 548 F.3d 1360, 1366 (11th Cir. 2008) (agreeing with "the majority of circuits that have held that a constructive trust can serve as a superior legal interest under § 853(n)(6)(A) and thus can serve as grounds for invalidating a criminal forfeiture order").

This general consensus reflects the view that, although a constructive trust is a remedial device, once declared, the beneficiary's interest in the property is deemed retroactively to have existed at the moment the property was transferred, such that the beneficiary may assert a legal interest "at the time of the commission of the acts which gave rise to the forfeiture of the property." 18 U.S.C. § 1963(l)(6)(A); 21 U.S.C. § 853(n)(6)(A); see In re Seneca Oil Co., 906 F.2d 1445, 1453 (10th Cir. 1990) (noting that although courts dispute whether a constructive trust conceptually arises at the time of the wrongful act or only once declared by the court and applied retroactively, "under either theory, the *effective* date of the constructive trust is the date the wrongful act occurred") (emphasis in original).[11]

---

[11] That Wilson's interest should be deemed retroactive is different than the Court's Rule 60(b)(4) analysis, which required the Court to assess whether the government reasonably could have known that a constructive trust would years later be imposed for the purposes of providing notice of forfeiture.  See Mullane, 339 U.S. at 315.

The only circuit to have held otherwise appears to be the D.C. Circuit in <u>BCCI Holdings (Luxembourg), S.A.</u>, 46 F.3d at 1190–91.  Since that decision, another panel of that court has observed that "[e]very circuit to consider the constructive trust question in the context of criminal forfeiture has rejected the analysis in <u>BCCI Holdings</u>.  However, since we cannot overrule a prior panel's decision, except via an *Irons* footnote or en banc review, we leave this issue for another day."  <u>United States v. Emor</u>, 785 F.3d 671, 682 (D.C. Cir. 2015) (citations omitted).

Applying these principles, the Court holds that Wilson's ownership interest in the Funds, which existed before the conspiracies that served as the basis of the forfeiture in Singer's criminal case, <u>see</u> D. 2 at 7 (Singer admitting that the funds in the BOA x0486 account, which had included the Funds, were among the assets involved in his commission of conspiracy offenses); D. 43 at 4 (ordering the forfeiture of same on the basis of Singer's admission), survived after the Funds were transferred to the BOA x0486 account on the basis of Singer's fraud by operation of a constructive trust and, thus, constitutes a "legal interest" sufficient to confer standing within the meaning of 18 U.S.C. § 1963(l)(6)(A) and 21 U.S.C. § 853(n)(6)(A).

Proceeding to the merits of the petition (as this Court would have done if Wilson had sought the return of the Funds after his predicate convictions had been overturned and if the Funds had been forfeited in his own criminal case), Wilson is entitled to an amendment of the forfeiture order if his interest in the Funds is "superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property."  18 U.S.C. § 1963(l)(6)(A); 21 U.S.C. § 853(n)(6)(A).  Here, the "defendant" was Singer.  <u>See Shefton</u>, 548 F.3d at 1366 (emphasizing that "the issue is not . . . whether a petitioner's constructive trust 'can be interposed as superior to the government's forfeiture claim'" but "whether the petitioner's interest is superior to the *defendant*'s interest in the forfeited property") (emphasis in original).

Since it was Singer who induced Wilson into transferring the Funds into the BOA x0486 account on the basis of false statements, Singer's interest in the Funds either never obtained or reverted back to Wilson at the moment of the transfers by operation of a constructive trust; thus, Wilson has shown by a preponderance of the evidence that his interest is superior to Singer's interest in same.[12]  See Wilson, 659 F.3d at 954 (explaining that "once the original owner meets the burden of proof set out at § 853(n), the Government's interest is eliminated").

Finally, the Court disagrees with the government's suggestion that Wilson's only available avenue for relief is to file a petition for remission of forfeiture under 18 U.S.C. § 1963(g)(1) and 21 U.S.C. § 853(i)(1).  D. 114 at 19–20.  As the Second Circuit has explained, remission "does not provide a legal remedy for the petitioners in this case, never mind an adequate one."  One-Sixth Share, 326 F.3d at 37.  "It only authorizes the Attorney General to, among other things, 'grant petitions for mitigation or remission of forfeiture, restore forfeited property to victims . . . , or take any . . . action to protect the rights of innocent persons which is in the interest of justice and which is not inconsistent with the provisions of [§ 853].'"  Id. (quoting 21 U.S.C. § 853(i)(1)).  Because this is a "non-judicial remedy" that is left to the Attorney General's discretion, "[i]t . . . is not an adequate legal remedy that would deprive a district court of its equitable powers to recognize a constructive trust."  Id. at 243–44 (citations omitted); see Shefton, 548 F.3d at 1365 (explaining that "[g]iven that § 853(i)(1) leaves to the government, which holds the forfeited property, full and unreviewable discretion as to whether it will release some or all of it, § 853(i)(1) remission is certainly not as complete or effectual as the equitable relief of a constructive trust").

---

[12] To the extent Wilson must demonstrate that his interest in the Funds is traceable to the forfeited funds on deposit in the BOA x0486 account, there is ample evidence in the record confirming same.  See, e.g., D. 114-6; D. 125-1; D. 125-2.

**V.      Conclusion**

For the reasons stated, Wilson's Rule 60(b) motion to reopen ancillary proceedings and amend the Preliminary Order of Forfeiture to exclude his interest in the Funds, D. 110, is ALLOWED.  Accordingly, the Court will AMEND the Final Order of Forfeiture, D. 49, under Fed. R. Crim. P. 32.2(c)(2) to exclude from "[a]ll funds on deposit in Bank of America checking account in the name of the Key Worldwide Foundation ending in x0486" the Funds that Wilson transferred to the BOA x0486 account in October and December of 2018 (totaling $1,000,000). Further, upon the amendment of the Final Order of Forfeiture, the Court ORDERS the government to return to Wilson the $1,000,000.00 it previously forfeited in Singer's criminal case as part of its seizure of all funds on deposit in the BOA x0486 account.  In light of this ruling, Wilson's Rule 41(g) motion, D. 116, which seeks the same relief as his Rule 60(b) motion, is DENIED AS MOOT.

      **So Ordered.**

                                                            /s Denise J. Casper
                                                            United States District Judge