UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal No. 19-10078-DJC |
| WILLIAM "RICK" SINGER, | ) ) ) | |
| Defendant | ) ) | |

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MEMORANDUM REGARDING CONDITIONS OF RELEASE

The government respectfully submits this response to defendant William "Rick" Singer's memorandum regarding his conditions of supervised release (Dkt. 165) and in advance of the status conference requested by the Probation Office.[1] The government submits this response to convey

---

[1] As acknowledged in the defendant's memorandum, *see* Dkt. 165 at 1 n.1, current defense counsel previously represented a parent who pled guilty to conspiring with the defendant and others to commit mail and wire fraud and honest services mail and wire fraud by participating in both the test cheating and athletic recruitment aspects of the defendant's scheme. *See United States v. Elizabeth Henriquez*, 19-cr-10080-NMG. The government respectfully submits that counsel's successive representation of first a parent and now the defendant poses a potential conflict of interest. While counsel assures the Court that there is no discernible conflict and the Massachusetts Rules of Professional Conduct permit consent to successive representation, there may be instances where it would not be reasonable for an attorney in such circumstances to believe that they could provide competent and diligent representation to the current client, or where any consent to such conflicted representation would not be fully informed. *See* ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 97-409 (Aug. 2, 1997) (suggesting that, even though Rule 1.7(b) permits a current client to consent to a conflict of interest created by a lawyer's obligations to a former client, there may be circumstances in which it would not be reasonable for defense counsel to believe that he could competently and diligently represent a current client where his duty of confidentiality to a former client would prohibit him from disclosing or using information that otherwise would benefit the current client); ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 90-358 (Sept. 13, 1990) (suggesting that it may be unlikely that defense counsel can obtain the current client's informed consent to the representation and a material limitation conflict, because his duty of confidentiality to his former client likely would prohibit him from fully disclosing the nature and extent of the conflict to the current client). Even if counsel's belief in his ability to provide competent and diligent representation in these circumstances is reasonable, the

its concerns with the defendant's proposal to work as the "master coach & lead advisor" of ID Future Stars, a newly formed college admissions counseling business purportedly owned by his sister.[2]

The defendant was the architect of the most significant college admissions scheme in history. For approximately a decade, through his college admissions business and a sham charity he created, the defendant led a racketeering enterprise that employed bribery, fraud, cheating, and countless lies to secure the admission of high school students to elite colleges and universities across the country. For example, he paid off test proctors and administrators to cheat on college entrance exams for his clients. He bribed athletic coaches and administrators to designate his clients as athletic recruits. He falsified and outright made up academic, athletic, and extracurricular credentials for his clients, sometimes without their knowledge. He paid individuals to take classes for his clients. He transferred, spent, or otherwise used more than $15 million of his clients' money for his own benefit, which, in part, resulted in his owing millions of dollars in restitution and forfeiture. And then, after he was caught, the defendant obstructed the government's investigation, marring his cooperation.

The defendant claims that any "concern" that he "might be tempted to reoffend" as part of his proposed employment is "unfounded" and "theoretical." Dkt. 165 at 2. Against the backdrop

---

government believes that the rules require each affected client to give informed consent in writing, and that is the safest route whether there is an actual conflict, a potential conflict, or even the appearance of a potential conflict. The most prudent course of action to protect the defendant's right to conflict-free counsel and the integrity of these proceedings is for the Court to formally advise the defendant of the risks associated with counsel's prior representation and, in the event the Court deems any actual or apparent conflict waivable, ensure that any waiver is fully informed and in writing.

[2] To the government's knowledge, the defendant's sister was not involved in his prior college admissions counseling business and does not otherwise have experience in this area.

of this case, the defendant's offense conduct, and his history and characteristics, the government does not agree. And the government's concern is only heightened by statements and representations that the defendant has made on his new business's website and in interviews. For example, on his business's website,[3] the defendant claims on one hand that he is "not afraid to tell people who I am," but then characterizes his past conduct as a "mistake," states that he has learned to "stay away from the gray areas in college admissions and institutional advancement," and suggests—through a quote he attributes to his now-deceased former lawyer—that he was simply "stupid" because if he had "contact[ed] an attorney" and "set up a lobbying company for [his] donations," his conduct "would have been perfectly legal."[4]

The defendant's website also touts "senior-level relationships with colleges and universities nationwide" and markets very specific (but, to the government's knowledge, unverified) admission rates for his clients, including at multiple colleges and universities that were victims of his scheme. For example, it is unclear on what data the purported 89% admission rate for his clients at Georgetown University is based, and it is also unclear whether that figure includes the nearly 20 Singer clients who were admitted as fake tennis recruits in exchange for millions of dollars in cash bribes that the defendant and his clients paid to Gordon Ernst, the former Georgetown tennis coach.

---

[3] *See* https://www.idfuturestars.com/. Relevant portions of the website are attached hereto as Exhibit 1.

[4] Here the term "donations" is ostensibly a reference to payments the defendant made to university athletic funds controlled by insiders who, in exchange for the payments, agreed to designate the defendant's clients as athletic recruits. The website makes no mention of the personal bribes the defendant paid to university athletic coaches and administrators or the test-cheating aspect of his scheme.

On top of the problematic representations on his website, the defendant has made several public statements, apparently to rehabilitate his public image, that are rife with minimization, mischaracterizations, and false statements. *See, e.g.*, https://www.chronicle.com/podcast/college-matters-from-the-chronicle/mr-varsity-blues-claps-back ("But my students. No, no, no. You keep throwing on that my kids weren't qualified. They are qualified to get into these schools. They're all qualified because here's the bottom line. They all graduate. How about the kids who get in and got in for years [through] affirmative action who weren't qualified, but they got in because there's a reason why they got in."); *see also id.* ("Oh, I think there's lots of people out there that are doing worse than I am."); *see also id.* ("Q. If you use purported charitable donations from parents, at least in part to bribe two SAT and ACT test administrators, do you not consider that bribery? A. That was a payment. That's not bribery. I'm not bribing somebody to do it. We are doing business with each other. I'm not bribing them.").

To be sure, the defendant's conditions of supervised release do not include an absolute prohibition on college admissions counseling, and the government is not trying to interfere with his ability to earn a living (and pay millions of dollars in restitution he owes, of which he has paid none despite working). But his employment must be and remain lawful, and it must be approved by the Probation Office. The defendant's proposed employment places Probation in the difficult position of having to supervise him and his business in the same sphere in which he committed numerous serious crimes for years, the parties in the difficult position of having to address any issues and potential violations, and the Court in the difficult position of having to resolve those issues. The government respectfully submits that there are countless job opportunities outside the realm of college admissions and consulting available to the defendant that are more appropriate

4

under the circumstances, and the government cannot stand idly by and allow the fox in the hen house without voicing its concerns to the Court and Probation.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:  /s/ Leslie A. Wright
     LESLIE A. WRIGHT
     KRISTEN A. KEARNEY
     Assistant United States Attorneys

Certificate of Service

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

By:  /s/ Leslie A. Wright
     LESLIE A. WRIGHT
     Assistant United States Attorney